**EXHIBIT O**



California Office of
Administrative Law

Home  Most Recent Updates  Search  Help
©

# Welcome to the online source for
# California Code of Regulations

22 CA ADC § 70217

◀ Term ▶

22 CCR s 70217

Cal. Admin. Code tit. 22, s 70217

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
TITLE 22. SOCIAL SECURITY
DIVISION 5. LICENSING AND CERTIFICATION OF HEALTH FACILITIES, HOME HEALTH
AGENCIES, CLINICS, AND REFERRAL AGENCIES
CHAPTER 1. GENERAL ACUTE CARE HOSPITALS
ARTICLE 3. BASIC SERVICES
This database is current through 7/13/07, Register 2007, No. 28

s 70217. Nursing Service Staff.

(a) Hospitals shall provide staffing by licensed nurses, within the scope of their licensure in accordance with the following nurse-to-patient ratios. Licensed nurse means a registered nurse, licensed vocational nurse and, in psychiatric units only, a licensed psychiatric technician. Staffing for care not requiring a licensed nurse is not included within these ratios and shall be determined pursuant to the patient classification system.

No hospital shall assign a licensed nurse to a nursing unit or clinical area unless that hospital determines that the licensed nurse has demonstrated current competence in providing care in that area, and has also received orientation to that hospital's clinical area sufficient to provide competent care to patients in that area. The policies and procedures of the hospital shall contain the hospital's criteria for making this determination.

Licensed nurse-to-patient ratios represent the maximum number of patients that shall be assigned to one licensed nurse at any one time. "Assigned" means the licensed nurse has responsibility for the provision of care to a particular patient within his/her scope of practice. There shall be no averaging of the number of patients and the total number of licensed nurses on the unit during any one shift nor over any period of time. Only licensed nurses providing direct patient care shall be included in the ratios.

Nurse Administrators, Nurse Supervisors, Nurse Managers, and Charge Nurses, and other licensed nurses shall be included in the calculation of the licensed nurse-to-patient ratio only when those licensed nurses are engaged in providing direct patient care. When a Nurse Administrator, Nurse Supervisor, Nurse Manager, Charge Nurse or other licensed nurse is engaged in activities other than direct patient care, that nurse shall not be included in the ratio. Nurse Administrators, Nurse Supervisors, Nurse Managers, and Charge Nurses who have demonstrated current competence to the hospital in providing care on a particular unit may relieve licensed nurses during breaks, meals, and other routine, expected absences from the unit.

Licensed vocational nurses may constitute up to 50 percent of the licensed nurses assigned to patient care on any unit, except where registered nurses are required pursuant to the patient classification system or this section. Only registered nurses shall be assigned to Intensive Care Newborn Nursery Service Units, which specifically require one registered nurse to two or fewer infants. In the Emergency Department, only registered nurses shall be assigned to triage patients and only registered nurses shall be assigned to critical trauma patients.

Nothing in this section shall prohibit a licensed nurse from assisting with specific tasks within the scope of his or her practice for a patient assigned to another nurse. "Assist" means that licensed nurses may provide patient

care beyond their patient assignments if the tasks performed are specific and time-limited.

(1) The licensed nurse-to-patient ratio in a critical care unit shall be 1:2 or fewer at all times. "Critical care unit" means a nursing unit of a general acute care hospital which provides one of the following services: an intensive care service, a burn center, a coronary care service, an acute respiratory service, or an intensive care newborn nursery service. In the intensive care newborn nursery service, the ratio shall be 1 registered nurse: 2 or fewer patients at all times.

(2) The surgical service operating room shall have at least one registered nurse assigned to the duties of the circulating nurse and a minimum of one additional person serving as scrub assistant for each patient-occupied operating room. The scrub assistant may be a licensed nurse, an operating room technician, or other person who has demonstrated current competence to the hospital as a scrub assistant, but shall not be a physician or other licensed health professional who is assisting in the performance of surgery.

(3) The licensed nurse-to-patient ratio in a labor and delivery suite of the perinatal service shall be 1:2 or fewer active labor patients at all times. When a licensed nurse is caring for antepartum patients who are not in active labor, the licensed nurse-to-patient ratio shall be 1:4 or fewer at all times.

(4) The licensed nurse-to-patient ratio in a postpartum area of the perinatal service shall be 1:4 mother-baby couplets or fewer at all times. In the event of multiple births, the total number of mothers plus infants assigned to a single licensed nurse shall never exceed eight. For postpartum areas in which the licensed nurse's assignment consists of mothers only, the licensed nurse-to-patient ratio shall be 1:6 or fewer at all times.

(5) The licensed nurse-to-patient ratio in a combined Labor/Delivery/Postpartum area of the perinatal service shall be 1:3 or fewer at all times the licensed nurse is caring for a patient combination of one woman in active labor and a postpartum mother and infant The licensed nurse-to-patient ratio for nurses caring for women in active labor only, antepartum patients who are not in active labor only, postpartum women only, or mother-baby couplets only, shall be the same ratios as stated in subsections (3) and (4) above for those categories of patients.

(6) The licensed nurse-to-patient ratio in a pediatric service unit shall be 1:4 or fewer at all times.

(7) The licensed nurse-to-patient ratio in a postanesthesia recovery unit of the anesthesia service shall be 1:2 or fewer at all times, regardless of the type of anesthesia the patient received.

(8) In a hospital providing basic emergency medical services or comprehensive emergency medical services, the licensed nurse-to-patient ratio in an emergency department shall be 1:4 or fewer at all times that patients are receiving treatment. There shall be no fewer than two licensed nurses physically present in the emergency department when a patient is present.

At least one of the licensed nurses shall be a registered nurse assigned to triage patients. The registered nurse assigned to triage patients shall be immediately available at all times to triage patients when they arrive in the emergency department. When there are no patients needing triage, the registered nurse may assist by performing other nursing tasks. The registered nurse assigned to triage patients shall not be counted in the licensed nurse-to-patient ratio.

Hospitals designated by the Local Emergency Medical Services (LEMS) Agency as a "base hospital", as defined in section 1797.58 of the Health and Safety Code, shall have either a licensed physician or

a registered nurse on duty to respond to the base radio 24 hours each day. When the duty of base radio responder is assigned to a registered nurse, that registered nurse may assist by performing other nursing tasks when not responding to radio calls, but shall be immediately available to respond to requests for medical direction on the base radio. The registered nurse assigned as base radio responder shall not be counted in the licensed nurse-to-patient ratios.

When licensed nursing staff are attending critical care patients in the emergency department, the licensed nurse-to-patient ratio shall be 1:2 or fewer critical care patients at all times. A patient in the emergency department shall be considered a critical care patient when the patient meets the criteria for admission to a critical care service area within the hospital.

Only registered nurses shall be assigned to critical trauma patients in the emergency department, and a minimum registered nurse-to-critical trauma patient ratio of 1:1 shall be maintained at all times. A critical trauma patient is a patient who has injuries to an anatomic area that : (1) require life saving interventions, or (2) in conjunction with unstable vital signs, pose an immediate threat to life or limb.

(9) The licensed nurse-to-patient ratio in a step-down unit shall be 1:4 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a step-down unit shall be 1:3 or fewer at all times. A "step down unit" is defined as a unit which is organized, operated, and maintained to provide for the monitoring and care of patients with moderate or potentially severe physiologic instability requiring technical support but not necessarily artificial life support. Step-down patients are those patients who require less care than intensive care, but more than that which is available from medical/surgical care. "Artificial life support" is defined as a system that uses medical technology to aid, support, or replace a vital function of the body that has been seriously damaged. "Technical support" is defined as specialized equipment and/or personnel providing for invasive monitoring, telemetry, or mechanical ventilation, for the immediate amelioration or remediation of severe pathology.

(10) The licensed nurse-to-patient ratio in a telemetry unit shall be 1:5 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a telemetry unit shall be 1:4 or fewer at all times. "Telemetry unit" is defined as a unit organized, operated, and maintained to provide care for and continuous cardiac monitoring of patients in a stable condition, having or suspected of having a cardiac condition or a disease requiring the electronic monitoring, recording, retrieval, and display of cardiac electrical signals. "Telemetry unit" as defined in these regulations does not include fetal monitoring nor fetal surveillance.

(11) The licensed nurse-to-patient ratio in medical/surgical care units shall be 1:6 or fewer at all times. Commencing January 1, 2005, the licensed nurse-to-patient ratio in medical/surgical care units shall be 1:5 or fewer at all times. A medical/surgical unit is a unit with beds classified as medical/surgical in which patients, who require less care than that which is available in intensive care units, step-down units, or specialty care units receive 24 hour inpatient general medical services, post-surgical services, or both general medical and post-surgical services. These units may include mixed patient populations of diverse diagnoses and diverse age groups who require care appropriate to a medical/surgical unit.

(12) The licensed nurse-to-patient ratio in a specialty care unit shall be 1:5 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a specialty care unit shall be 1:4 or fewer at all times. A specialty care unit is defined as a unit which is organized, operated, and maintained to provide care for a specific medical condition or a specific patient population. Services provided in these units are more specialized to meet the needs of patients with the specific condition or disease process than that which is required on medical/surgical units, and is not otherwise covered by subdivision (a).

(13) The licensed nurse-to-patient ratio in a psychiatric unit shall be 1:6 or fewer at all times. For purposes of psychiatric units only, "licensed nurses" also includes licensed psychiatric technicians in addition to licensed vocational nurses and registered nurses. Licensed vocational nurses, licensed psychiatric technicians, or a combination of both, shall not exceed 50 percent of the licensed nurses on the unit.

(14) Identifying a unit by a name or term other than those used in this subsection does not affect the requirement to staff at the ratios identified for the level or type of care described in this subsection.

(b) In addition to the requirements of subsection (a), the hospital shall implement a patient classification system as defined in Section 70053.2 above for determining nursing care needs of individual patients that reflects the assessment, made by a registered nurse as specified at subsection 70215(a)(1), of patient requirements and provides for shift-by-shift staffing based on those requirements. The ratios specified in subsection (a) shall constitute the minimum number of registered nurses, licensed vocational nurses, and in the case of psychiatric units, licensed psychiatric technicians, who shall be assigned to direct patient care. Additional staff in excess of these prescribed ratios, including non-licensed staff, shall be assigned in accordance with the hospital's documented patient classification system for determining nursing care requirements, considering factors that include the severity of the illness, the need for specialized equipment and technology, the complexity of clinical judgment needed to design, implement, and evaluate the patient care plan, the ability for self-care, and the licensure of the personnel required for care. The system developed by the hospital shall include, but not be limited to, the following elements:

(1) Individual patient care requirements.

(2) The patient care delivery system.

(3) Generally accepted standards of nursing practice, as well as elements reflective of the unique nature of the hospital's patient population.

(c) A written staffing plan shall be developed by the administrator of nursing service or a designee, based on patient care needs determined by the patient classification system. The staffing plan shall be developed and implemented for each patient care unit and shall specify patient care requirements and the staffing levels for registered nurses and other licensed and unlicensed personnel. In no case shall the staffing level for licensed nurses fall below the requirements of subsection (a). The plan shall include the following:

(1) Staffing requirements as determined by the patient classification system for each unit, documented on a day-to-day, shift-by-shift basis.

(2) The actual staff and staff mix provided, documented on a day-to-day, shift-by-shift basis.

(3) The variance between required and actual staffing patterns, documented on a day-to-day, shift-by-shift basis.

(d) In addition to the documentation required in subsections (c)(1) through (3) above, the hospital shall keep a record of the actual registered nurse, licensed vocational nurse and licensed psychiatric technician assignments to individual patients by licensure category, documented on a day-to-day, shift-by-shift basis. The hospital shall retain:

(1) The staffing plan required in subsections (c)(1) through (3) for the time period between licensing surveys, which includes the Consolidated Accreditation and Licensing Survey process, and

(2) The record of the actual registered nurse, licensed vocational nurse and licensed psychiatric technician assignments by licensure category for a minimum of one year.

(e) The reliability of the patient classification system for validating staffing requirements shall be reviewed at least annually by a committee appointed by the nursing administrator to determine whether or not the system accurately measures patient care needs.

(f) At least half of the members of the review committee shall be registered nurses who provide direct patient care.

(g) If the review reveals that adjustments are necessary in the patient classification system in order to assure accuracy in measuring patient care needs, such adjustments must be implemented within thirty (30) days of that determination.

(h) Hospitals shall develop and document a process by which all interested staff may provide input about the patient classification system, the system's required revisions, and the overall staffing plan.

(i) The administrator of nursing services shall not be designated to serve as a charge nurse or to have direct patient care responsibility, except as described in subsection (a) above.

(j) Registered nursing personnel shall:

(1) Assist the administrator of nursing service so that supervision of nursing care occurs on a 24-hour basis.

(2) Provide direct patient care.

(3) Provide clinical supervision and coordination of the care given by licensed vocational nurses and unlicensed nursing personnel.

(k) Each patient care unit shall have a registered nurse assigned, present and responsible for the patient care in the unit on each shift.

(l) A rural General Acute Care Hospital as defined in Health and Safety Code Section 1250(a), may apply for and be granted program flexibility for the requirements of subsection 70217(i) and for the personnel requirements of subsection (j)(1) above.

(m) Unlicensed personnel may be utilized as needed to assist with simple nursing procedures, subject to the requirements of competency validation. Hospital policies and procedures shall describe the responsibility of unlicensed personnel and limit their duties to tasks that do not require licensure as a registered or vocational nurse.

(n) Nursing personnel from temporary nursing agencies shall not be responsible for a patient care unit without having demonstrated clinical and supervisory competence as defined by the hospital's standards of staff performance pursuant to the requirements of subsection 70213(c) above.

(o) Hospitals which utilize temporary nursing agencies shall have and adhere to a written procedure to orient and evaluate personnel from these sources. Such procedures shall require that personnel from temporary nursing agencies be evaluated as often, or more often, than staff employed directly by the hospital.

(p) All registered and licensed vocational nurses utilized in the hospital shall have current licenses. A method to document current licensure shall be established.

(q) The hospital shall plan for routine fluctuations in patient census. If a healthcare emergency causes a change in the number of patients on a unit, the hospital must demonstrate that prompt efforts were made to maintain required staffing levels. A healthcare emergency is defined for this purpose as an unpredictable or unavoidable occurrence at unscheduled or unpredictable intervals relating to healthcare delivery requiring immediate

California Code of Regulations

medical interventions and care.

<General Materials (GM) - References, Annotations, or Tables>

Note: Authority cited: Sections 1275, 1276.4 and 100275(a), Health and Safety Code. Reference: Sections 1250(a), 1276, 1276.4, 1797.58 and 1790.160, Health and Safety Code.

HISTORY

1. Restoration of text as it existed prior to 11-12-2004 and addition of explanatoryNote (Register 2005, No. 33).

2. Editorial correction implementing restoration of text as it existed prior to 11-12-2004 (Register 2005, No. 36).

22 CCR s 70217, ←22 CA ADC s 70217→
1CAC

←22 CA ADC s 70217→

END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

📖 Term

📖 Doc 2 of 2

Cite List    Docs In Sequence    Table of Contents

This site Is provided by West.
© 2007 West | Privacy | Accessibility

**THOMSON**
**WEST**

**EXHIBIT  P**

# PERFORMANCE CORRECTION NOTICE

**Disciplinary Level:**
- ☐ Verbal Warning
- ☐ Written Warning
- ☒ Investigatory Leave
- x Final Written Warning

**Employee Name:** Lisa Maria Boccignone

**Department Name:** Emergency Dept.

**Manager Name:** Foster/Hutchings

**Subject:**
- x Policy procedure violation
- x Performance transgression
- x Behavior/conduct Infraction
- ☐ Workflow Impact problem
- ☐ Other

**Prior Notifications:**

| Type | Date | Subject |
|------|------|---------|
| ☐ Verbal | | |
| ☐ Written | | |
| ☐ Final Written | | |

## Incident Description:
*Be sure to include time, place, date of occurrence, person present as well as organization impact*

8/05 - Removing pacemaker (Zoll) from a critical patient without consent of patient's nurse

8/05 -Transferring a patient to TCU without IV access

8/05 - Administering a drug without a physician order.

8/05 – Inappropriate behavior around a PES patient

8/05 - Use of a 14 gauge IV in a 16 year old patient.

All the incidences listed above occurred in the ED at Peninsula and involved patients in the ED at the time.

## Performance Improvement Plan:
*1. Measurable/Tangible improvement goals. (i.e. I expect you to....)*

We expect that you will practice within your scope, ensure that physician orders are a part of the process and that what you do for your patient is covered by a physician order.

We expect that you will handle PES patients in a manner appropriate to their diagnosis and respect their dignity at all times.

We expect that you will work with your peers to ensure that ED policy and procedures are followed with all patients.

We expect that in the future if you are unsure of common procedures for the care of an ED patient that you consult with your peers or other resources before moving forward with care.

*2. Training or special direction to be provided:*

We expect that you will use the written resources that have been provided to you for review.

We expect you to come to one of us (Manager/Director), or to the Charge Nurse if you have questions or do not understand a response to your questions.

We expect that you will use your peers as a resource when deciding what action to take with an ED patient.

*3. Interim performance evaluation necessary?*

We anticipate meeting with you every 2 weeks, time to be determined based on scheduling.

*4. Our Employee Assistance Program (EAP) Provider, The Assist U, can be confidentially reached to assist you at 800-750-5595. This is strictly voluntary. A booklet regarding the Assist U is provided for you.*

*5. In addition, I recognize that you may have certain ideas to improve your performance. Therefore, I encourage you to provide your own Personal Implement Plan Input and Suggestions.*
*(Attach additional sheets or Employee Original if needed)*

**Outcomes and Consequences:**

Positive: If you meet your performance goals and demonstrate your critical thinking skills, no further disciplinary action will be taken regarding this issue. In addition, you will no longer need to meet with Director/Manager on an every 2-week basis.

Negative: If at any time patient care is brought to our attention, investigate, and we find similar patient care issues; it will lead to immediate termination of employment.

Scheduled review date: **9/9/05**

Employee Comments and/or Rebuttal:
{Fill In Employee Comments/Rebuttal Here]
{Attach additional sheets or Employee Original if needed}

_Lisa MacGregor_ 8/24/05     _Bobbi Foster_ RN Dir. 8/24/05
Employee Signature    Date      Manager Signature     Date

Linda Campagna RN 8/24/05
CNA Nurse Rep

rebuttail letter to be
attached.

Performance Correction Notice Lisa Maria
10/8/02

**EXHIBIT Q**

# Mills-Peninsula Health Services (MPHS)
# Loan Forgiveness Program
# For Registered Nurses

**Purpose**

This program is intended to assist registered nurses in reducing debt from loans incurred to pay for their nursing degree.

**Eligibility**

Eligibility Requirements:
- Must be a MPHS employee at the time of application and grant disbursement(s)
- Must possess a valid California RN license
- Must have at least six months of experience as a permanently licensed Registered Nurse at MPHS
- Must have an outstanding loan balance which was applied to an accredited RN program
- Must maintain a satisfactory performance with annual evaluations that meet MPHS standards with no written disciplinary actions
- Must maintain benefited status during participation in the loan forgiveness program
- Must be willing to abide by the **Loan Forgiveness Program Agreement**

**Application procedure and deadlines**

Applications must be approved by the employee's Department Manager and are to be submitted to **Employee Services** no later than **April 15th** and/or **November 15th**.

**Funding**

Funding for the program is limited and not all applicants may be funded. The size of the grant awarded is based on the following: (1) the hours worked at Mills-Peninsula Health Services (MPHS) during the six-month period prior to the employee's application for a loan forgiveness grant, (2) the amount of the balance of the employee's educational loan(s) and (3) the number of applicants to the program and MPHS' ability to fund the program. Reimbursements are paid semi-annually with an *annual* limit of *$5,000.00 per applicant*. The amount disbursed to a registered nurse for the purpose of the loan forgiveness is based on the hours paid during the previous six-month period. Reimbursements are reviewed annually.

**Awardees will be notified in writing of their application status.**

APR 0 6 2006

## MILLS-PENINSULA HEALTH SERVICES

### RN Loan Forgiveness Program/Educational Grant Application

**Applicant Information**

Name: _LISA MARIA BOCCIG NONE_ Employee Number: _3601 3681_

Department: _Emergency Room_ Manager: _Penny Hutchings/Bobbi Foss_

Hire Date: _01/2005_ Scheduled Hours: _19 - 0730_ RN license number: _652432_

Home Address: _853 Commodore Dr #274_
_San Bruno, CA 94066_

Home Phone: _650 to 872-0639_ Work Phone: _650 - 696 -5446_

**School Information**

School name and Address:
_Golden West College_
_17842 Golden West st_
_Huntington Beach CA 92647_

Graduation Date: _DEC 20, 2004_ Degree: _AA, ADN_

**Loan Information (one lender only please)**

Lender's Name: _ACS_
Lender's Address: _PO Box 7051_
_Utica, New York 13504-7051_
Lender's Phone #: _1-800-835-4611_

*Attach copy of most recent loan statement(s). Copies of web page loan transactions/summaries acceptable only if lender contact information is complete above and on attached documents.*

Employee Signature: _Ana M. Baccigno RN_ Date: _04/06/06_

Department Manager: _____ Date: _____

*Important Note:*
*Although Mills Peninsula intends to continue to offer this program, it reserves the right to change, amend, and/or discontinue this program at any time. Discontinuation of this program will not affect any disbursements and agreements incurred while the program was in force.*



*Mills-Peninsula*
*Health Services*

A Sutter Health Affiliate

1783 El Camino Real
Burlingame. CA 94010
650.696 5400

May 12, 2006

Lisa Boccignone
853 Commodore Drive #274
San Bruno, CA 94066

Dear Lisa,

After reviewing your application for the Loan Forgiveness Program, we find that you do not meet the eligibility requirements for an award at this time. Written disciplinary action within the last year of employment is cause for disqualification. Please refer to the guidelines enclosed.

If you have any further questions or concerns please contact Cynthia Cherin in Human Resources at (650) 696-5467 or email cherinc@sutterhealth.org .

Sincerely,

MPHS Loan Forgiveness Program Committee

email to Shawn
Persons name
At HR Student loans
Retention bonus

A 100 Top U.S. Hospitals Award Winner

www.mills-peninsula.org

*Just extract*
*personal*
*of feelings*

**Mills-Peninsula**
**Health Services**

A Sutter Health Affiliate

1783 El Camino Real
Burlingame, CA 94010
650.696.5400

January 4, 2006

Lisa Boccignone
853 Commodore Drive #274
San Bruno, CA 94066

Dear Lisa,

After reviewing your application for the Loan Forgiveness Program, we find that you do not meet the eligibility requirements for an award at this time. Written disciplinary actions within the last year of employment are cause for disqualification. Please refer to the guidelines enclosed.

If you have any further questions or concerns please contact Cynthia Cherin in Employee Services at (650) 696-5467 or email cherinc@sutterhealth.org.

Sincerely,

MPHS Loan Forgiveness Program Committee

STATE OF CALIFORNIA - STATE AND CONSUMER SERVIC   NCY                                    EDMUND G. SCHWARZENEGGER, Governor

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

1515 Clay Street, Suite 701, Oakland, CA 94612
(510) 622-2973 TTY (800) 700-2320 Fax (510) 622-2952
www.dfeh.ca.gov

July 13, 2007

Robert Harlan Gold
Attorney At Law
Gold & Associates
235 Montgomery Street
San Francisco, CA 94104

RE:  E200708A0014-00-psc
Boccignone/Mills-Peninsula Sutter Health

Dear Robert Harlan Gold:

## NOTICE TO COMPLAINANT'S ATTORNEY

Enclosed is a copy of your client's complaint of discrimination filed with the
Department of Fair Employment and Housing on 7/13/2007 pursuant to the
California Fair Employment and Housing Act, Government Code section 12900 et
seq.  Also enclosed is a copy of your client's Notice of Case Closure, which
constitutes your client's right-to-sue notice.

Please note that under Government Code section 12962, you are responsible for
**service of the complaint** on respondent(s). You should also enclose a copy of the
Notice of Case Closure along with the complaint.  These documents must be
served within **60 days** of the filing date of the complaint.  Government Code
section 12962(b) further provides that complaints must be served either personally
or by certified mail with return receipt requested.

For additional information, please read the enclosed Notice of Case Closure that
explains the conditions for filing a private lawsuit in the State of California.

Sincerely,

Herbert Yarbrough
District Administrator

Enclosure:   Complaint of Discrimination
             Notice of Case Closure

DFEH-200-06 (01/05)



ARNOLD SCHWARZENEGGER, Governor

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

1515 Clay Street, Suite 701, Oakland, CA 94612
(510) 622-2973 TTY (800) 700-2320 Fax (510) 622-2952
www.dfeh.ca.gov



July 13, 2007


Robert Harlan Gold
Attorney At Law
Gold & Associates
235 Montgomery Street
San Francisco, CA 94104

RE:   E200708A0014-00-psc
      Boccignone/Mills-Peninsula Sutter Health

Dear Robert Harlan Gold:

## NOTICE OF CASE CLOSURE

This letter informs that the above-referenced complaint that was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective July 13, 2007 because an immediate right-to-sue notice was requested. DFEH will take no further action on the complaint.

This letter is also the Right-To-Sue Notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

If a federal notice of Right-To-Sue is wanted, the U.S. Equal Employment Opportunity Commission (EEOC) must be visited to file a complaint within 30 days of receipt of this DFEH *Notice of Case Closure* or within 300 days of the alleged discriminatory act, whichever is earlier.

Notice of Case Closure
Page Two


DFEH does not retain case files beyond three years after a complaint is filed, unless
the case is still open at the end of the three-year period.

Sincerely,

Herbert Yarbrough
District Administrator


. cc:    Case File


Bibbi  Foster
Director of Emergency Department
Mills-Peninsula Sutter Health
1725 El Camino Real
Burlingame, CA  94010

DFEH-200-43 (06/06)

# EXHIBIT 

ROBERT H. GOLD (STATE BAR NO. 146136)
GOLD & ASSOCIATES
235 Montgomery Street, Suite 747
San Francisco, CA 94104
Telephone: (415) 354-5400
Facsimile: (415) 354-5405

Attorney for Plaintiff L. M. Boccignone

**ENDORSED FILED**
SAN MATEO COUNTY

NOV 1 4 2007

Clerk of the Superior Court
By_____J. Obaob_____
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

SAN MATEO COUNTY,

UNLIMITED JURISDICTION

L. M. BOCCIGNONE,

*Plaintiff,*

v.

SUTTER HEALTHCARE (MILLS
PENINSULA HEALTH SERVICES),
BARBARA "BOBBI" FOSTER, CLAUDIA
CHRISTENSEN and DOES 1-97,

*Defendants.*

Case No. 460718

SECOND AMENDED COMPLAINT FOR:
1. INTENTIONAL AND/OR NEGLIGENT
MISREPRESENTATION [OF EMPLOYMENT
BENEFIT OF REPAYMENT OF STUDENT
LOANS]
2. BREACH OF CONTRACT,
3. SEX DISCRIMINATION
4. SEXUAL HARASSMENT
5. SEXUAL HARASSMENT IN VIOLATION
OF THE CALIFORNIA CONSTITUTION
6. FALSE LIGHT [Defamation]
7. VIOLATION OF THE CONFIDENTIALITY
OF MEDICAL INFORMATION ACT
8. WRONGFUL TERMINATION IN
VIOLATION OF CALIFORNIA
CONSTITUTION ARTICLE 1, SECTION 8
9. COMMON LAW WRONGFUL DISCHARGE
10. CANCER DISCRIMINATION
11. PREGNANCY DISCRIMINATION
12. RETALIATION

JURY TRIAL DEMANDED [AT THIS TIME]

Plaintiff L. M. BOCCIGNONE, in conjunction with the following causes of action against

defendants, each and all of them, alleges as follows:

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

SECOND AMENDED COMPLAINT—Boccignone v. Foster, et al.
- 1 -

## PARTIES

1. Plaintiff was first recruited by SUTTER HEALTH'S subsidiary: MILLS-PENINSULA

   HEALTH SERVICES and then hired in late January, 2005 to be an E. R. Registered Nurse.

   Upon the filing of the Original Complaint, the Plaintiff, being ignorant of the true names of

   all the Defendants and having designated the Defendants in the Complaint by the fictitious

   names of Does Number One (1), Two (2) and Three (3) and having since discovered some of

   the true names of Defendants to be SUTTER HEALTH (MILLS-PENINSULA HEALTH

   SERVICES is a wholly owned subsidiary of SUTTER HEALTH, hereafter referred to

   MILLS-PENINSULA), filed an Amended Complaint on July 31, 2007, substituting fictitious

   names wherever it appeared in the Complaint for said names to be substituted. Named

   Defendants here are both corporate and personal entities with conflicting interests. The

   latter were named individually, as a jury may find their individual personal actions to be so

   egregious, wanton and reckless, as to be outside the scope of their foreseeable employment

   description and/or their employer's scope of liability (Is an Employer responsible if an

   Employee violates the Penal Code for instance?) that one or both named defendant's

   individual actions and/or intent to harm Plaintiff may be found to be individually egregious

   enough by a jury, or after a finding of intent, that said intent carried such wanton and

   reckless *personal behavior*, as to assign a separate percentage liability upon these named

   Personal Defendants, separate from the any liability assigned to the Employer Defendant

   Sutter Health. As Plaintiff is already contemplating administrative adjudication for

   corporate in-house counsel's possible abetting fraudulent acts herein and violation of his

   professional oath; it is clearly foreseeable that the named Personal Defendants FOSTER and

   CHRISTIANSEN may be found to be individually, by a trier of fact, in contradiction to the

   legality of their actions as employees of Sutter Health, to have separate liability from their

   employer. It should be noted that any Administrative action against Sutter Health in-house

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

counsel would be brought by another counsel and/or law firm than present Plaintiff's

counsel; as present counsel would be a percipient witness to any alleged claims.

Additionally, Plaintiff's parents believe that an attorney who specializes in said actions

would best handle said matter. Plaintiff's parents, for all purposes regarding this litigation

are clients of Plaintiff's counsel and should not be directly contacted by defendant's counsel,

and may consider this notice of said representation and request not to notice the family of the

young girl defendants have "hazed", took away health insurance as her baby was born two

months premature, and continue to retaliate against when job prospects contact to confirm

employment and R.N. training requirements.

2. Mills Peninsula Health Services (hereinafter Mills-Peninsula) is a subsidiary of Sutter Health

a *non-profit* entity. Mills-Peninsula's principal place of business is Peninsula Hospital,

leased from the County of San Mateo on a 50-year-lease to Sutter Health Corporation (a

*non-profit* entity with enormous *for-profit* commercial real estate holdings, nearly two

dozen *for-profit* pharmacies and other *for- profit* subsidiaries, separate from the alleged

*non-profit* healthcare business it operates only in California. Peninsula Hospital's 50-year-

lease (which is a public record) makes inference, as well as specific reference, to Sutter

Health's required delivery of community patient care, public services, and obeying all

applicable rules, regulations as well as the doctrine of good faith and fair dealing when

entering into private contracts, presumably written or oral. It is alleged Sutter Health

remains a solely California medical corporation due to California's draconian Medical

Malpractice tort recovery liability limit, for over ten years limited at $250,000.00 other than

medical expenses, (which has never have been readjusted for *real time* inflation since its

enactment) as Defendant Sutter Heath, seeks to ape Duane Reade Drug Stores in New York

and Los Remedios, (already active in California's above referenced restricted medical

malpractice tort recovery environment), and create Registered Nurse and/or Nurse

---

**SECOND AMENDED COMPLAINT—Boccignone v. Foster, et al.**

- 3 -

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

Practitioner Clinics whereupon these Nurse Supervised "drop-in" clinics will be manned by non union (non California Nurse's Association) staff as supervisory personal may not belong to C.N.A. by definition and while it is believed a doctor's supervisory presence will be required under California law—it is likely that Human Resources and the "bean counters", not the healing staff of Sutter Health, will have supervisory control over these "*for-profit*" units under Sutter Health's *non-profit* status. This is applicable to the instant matter as Plaintiff, a Union Nurse, who reported in writing regulation mistakes within her department, and requested union representation when brought to task by her administrative superiors, was first insulted by an illegal investigation into her private life; then suffered the ignored if not encouraged "hazing" of her other night-shift co-workers, [interestingly, rarely complaints from doctors—at least any who will sign their name to anything] to the point where her Employer had to abruptly fire her. This solution, firing a single registered nurse (R.N.) rather than fire over five or six R.N.'s who contributed to such infractions, encouraged by the named Defendants, as the public viewing of the interior of Plaintiff's vagina and the public viewing of her fetus (less than a year after she had already miscarried a prior baby) as if Plaintiff were an animal or a "*less than racial group*" in 1930's Germany. These events occurred while C.N.A. was operating without a union contract and Sutter Health was taking a "*hard line*" with union nurse's, ignoring C.N.A.'s claim, **that the Nurse's public statement regarding Sutter Health was that there complaints were not about money, but about how abused they were by the employer, and that that abuse can unintentionally ricochet on to patient care.** It is likely that many of the R.N. "scabs" who filled slots at other Sutter "R. N. lock out facilities", such as Alta Bates Hospital, will be hired as the non-union "supervisor" nurses at Sutter's planned "drop-in" clinics discussed all over the world wide web, including such sites as "Sutter Watch".

SECOND AMENDED COMPLAINT—Boccignone v. Foster, et al.
- 4 -

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

3.  Upon the filing of the Complaint, the Plaintiff, being ignorant of the true name of the Defendant and having designated the Defendant in the Complaint by the fictitious name of Doe Number One (1), and having discovered the true name of Defendant to be MILLS-PENINSULA HEALTH SERVICES (hereafter MILLS-PENINSULA), amends the Complaint by substituting the fictitious name wherever it appears in the Complaint.

4.  Upon the filing of the Complaint, the Plaintiff, being ignorant of the true name of the Defendant and having designated the Defendant in the Complaint by the fictitious name of Doe Number Two (2), and having discovered the true name of Defendant to be SUTTER HEALTH, amends the Complaint by substituting the true name for the fictitious name wherever it appears in the Complaint.

5.  Upon the filing of the Complaint, the Plaintiff, being ignorant of the true name of the Defendant and having designated the Defendant in the Complaint by the fictitious name of Doe Number Three (3), and having discovered the true name of Defendant to be CLAUDIA CHRISTENSEN, amends the Complaint by substituting the true name for the fictitious name wherever it appears in the Complaint.

6.  Plaintiff is informed and believes and therefore alleges that Defendant SUTTER HEALTH is a private non-profit corporation domiciled in the State of California. Plaintiff believes that MORE THAN 99.5% of this entity's assets are located in California. Plaintiff is informed by public record and/or documents, and believes and therefore alleges that Defendant SUTTER HEALTH owns, rents, operates, and/or manages Defendant MILLS-PENINSULA and many other hospitals; employs nurses and other staff at MILLS-PENINSULA; and negotiates numerous Collective Bargaining Agreements, under which some nurses, security guards, medical support technicians, custodial help and other staff are employed at MILLS-PENINSULA as well as other SUTTER HEALTH facilities.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

7. Plaintiff is informed and believes and therefore alleges that Defendant MILLS-PENINSULA is a private, *non-profit* California subsidiary of SUTTER HEALTH, domiciled in San Mateo County. MILLS-PENINSULA consists of Mills Health Center located at 100 South San Mateo Drive in San Mateo, California, and Peninsula Medical Center located at 1501 Trousdale Drive in Burlingame, California. The latter is the former Peninsula Hospital referred to above, on the 50-year-lease to Sutter Health corporation by the County of San Mateo, in exchange for financial and public service pledges.

8. In the remainder of this pleading, Defendants MILLS-PENINSULA and SUTTER HEALTH are referred to collectively as MILLS-PENINSULA.

9. Plaintiff is informed by public document, therefore believes and alleges that Defendant BOBBI FOSTER is the Emergency Department Director of MILLS-PENINSULA, and that Defendant FOSTER is domiciled in San Mateo County, California.

10. Plaintiff is informed and therefore believes and alleges that Defendant CLAUDIA CHRISTENSEN is the Director of Human Resources of MILLS-PENINSULA.

11. The true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants named herein as DOES 4 through 100, inclusive, are presently unknown to Plaintiff, who therefore names said Defendants by fictitious names. Plaintiff will amend this Complaint to show the true identities and capacities of Doe Defendants when the same have been ascertained. Plaintiff alleges on information and belief that each of the fictitiously named Defendants is in some way responsible for the events, transactions, and occurrences referred to herein, whether individually or in their employment capacity.

12. At all times herein mentioned, each and every defendant was the agent and/or employee of each and every other defendant, and in so doing the things alleged each defendant was acting within the course and scope of such agency and employment, and in so doing the acts herein alleged each defendant was acting with the consent, permission, and/or

authorization of each of the remaining defendants. All defendant actions herein alleged

were approved or ratified by the officers/supervisors of each defendant or their superiors.

## JURISDICTION AND VENUE

13. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 11 of

this Complaint as though fully set forth herein.

14. Jurisdiction and venue are proper in San Mateo County Superior Court because: all parties

are wholly or partially domiciled within the territorial limits of this Court's jurisdiction,

Defendant SUTTER HEALTH regularly does business through MILLS-PENINSULA

within the territorial limits of this Court's jurisdiction, the events giving rise to the instant

action all occurred within the territorial limits of this Court's jurisdiction, and many, if not

all, of the witnesses are located within the territorial limits of San Mateo County Superior

Court's jurisdiction as well as a primary cause of action as a violation of the California

Constitution, Article I, Section 8. Furthermore, Plaintiff suffered damages in an amount

sufficient to sustain this Court's unlimited jurisdiction.

## STATEMENT OF FACTS

15. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 13 of

this Complaint as though fully set forth herein. Plaintiff files this Amended Complaint

pursuant to an Order of the Court.

16. Plaintiff was hired as an Emergency Department Registered Nurse (R.N.) by MILLS-

PENINSULA HEALTH SERVICES on approximately January 23rd or January 24th of 2005.

Plaintiff now resides in San Mateo County, California. When Defendant MILLS-

PENINSULA HEALTH SERVICES recruited Plaintiff for employment at a job fair, in

Southern California. Plaintiff was at the time a resident of Huntington Beach, California.

Presently, there is no claim of wrongdoing made by Defendants outside of San Mateo

County, California.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

17. Plaintiff's position at MILLS-PENINSULA was her first employment as a Registered Nurse after finishing Nursing School. She was recruited with inducements including, but not necessarily limited to, employer's promise to pay her student loans, and moving allowances for her 350 mile relocation from Southern California to Northern California. These inducements are separate contract issues from the at-present not-raised breach of collective bargaining agreement/C.N.A. union contract.

18. From the start of Plaintiff's employment at MILLS-PENINSULA on January 23rd or January 24th of 2005 through May 30, 2005, Plaintiff received positive, if not glowing, written evaluations of her work, technical competence, critical thinking, interpersonal relations, and customer service. (See Performance Recognition attached as Exhibit A. See Exhibit B— *Rose Grams* from other MILLS-PENINSULA staff and patients, with patient names redacted to protect their medical privacy. All Exhibits attached to this Amended Complaint are incorporated herein by reference.)

19. Defendants have a pattern and practice of irregularities in employment-related documents; one example is the Performance Recognition attached as Exhibit A—which states it is an appraisal of work from January 24, 2005 through May 30, 2005, but the signatures of Defendant Foster and Plaintiff Boccignone are dated May 7, 2005. Plaintiff is informed and believes and therefore alleges that employment documents generated by Mills-Peninsula pertaining to Plaintiff were the responsibility of Defendants FOSTER and CHRISTENSEN throughout this matter, until or unless further evidence indicating other individuals, such as in-house counsel, arises. It is Plaintiff's belief under California law, Defendant Sutter Health has a duty to inform in-house counsel related to this matter that they may have personal liability for actions undertaken in the past eighteen [18] months regarding Plaintiff contrary and/or different to that of the employer, Defendant Sutter Health.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5600
FACSIMILE: (415) 354-5405

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

20. On July 8, 2005, Plaintiff made a written objection to being assigned as the virtual *charge nurse* (in lay person's language, the "Supervisor") on shift in the Emergency Department. (See *Assignment despite objection/inpatient* attached as Exhibit C. Exhibit C documents that although Plaintiff was a new and inexperienced R. N., and therefore on a less expensive union pay scale, she was the only R.N. on shift qualified to do P.O.C. [Point of Care] testing, resulting, and care.) Plaintiff did not feel qualified at that point in time for such responsibilities.

21. On July 10, 2005, Plaintiff made a written objection to being assigned as the *virtual charge nurse on shift in the Emergency Department.* (See attached, as Exhibit D, Assignment Despite Objection/Inpatient, documenting that that although Plaintiff was a new and inexperienced R. N., she was the only R.N. Sutter provided on that shift qualified to perform all P. O. C. [Point of Care] labs, testing, resulting, and other patient care duties.)

22. On August 24, 2005, Defendants accused Plaintiff of poor performance of her nursing duties on the August 6th to August 7, 2005 night shift, and disciplined Plaintiff by giving her a "final written warning" and placing her on unpaid leave (suspension)—despite Plaintiff's objection that the cause of her difficulties was that the Emergency Department was understaffed (only three licensed nurses on duty with *over* fifteen patients[1]) in violation of California law (Title 22, California Code of Regulations, § 70217).

23. On or about January 2, 2006, Plaintiff Boccignone received a bonus in connection with her employment. On January 4, 2006, Plaintiff Boccignone received a congratulatory letter for a year's service at MILLS-PENINSULA. (See Exhibit E.) On January 6, 2006, she was denied repayment of her student loans. (See Exhibit F.)

---

[1] Title 22, California Code of Regulations, § 70217 states in pertinent part at subsection(a) (8), "In a hospital providing basic emergency medical services or comprehensive emergency medical services, the licensed nurse-to-patient ratio in an emergency department shall be 1:4 or fewer at all times that patients are receiving treatment." (Emphasis added.)

24. On or about July 3, 2006, union representative Shawn Bartlett filed a grievance against Defendant Foster on behalf of Plaintiff Boccignone for forcing Plaintiff to sign a mostly blank job evaluation form and threatening Plaintiff with possible employment termination in 90 days.

25. The grievance hearing, scheduled for August 29, 2006, never occurred. On August 28th Plaintiff Boccignone's doctor (obstetrician) placed her on bed rest through August 30th. Plaintiff was not expected to appear again at work until the first week of September, which was cancelled. Plaintiff was ordered to come to Mills-Peninsula on September 8, 2006, a Friday, for what she thought would be a meeting regarding her employment. At said meeting, she was terminated with a letter dated September 7, 2006. Furthermore, named Defendant Claudia Christensen explained to Plaintiff how to fill out her paper work for E.D.D. [unemployment], but when Plaintiff applied for unemployment it was denied by Defendants; cumulating not only in financial discomfort but the necessitating of her not being able to afford COBRA health insurance coverage and her needing to have her premature baby on Medi-Cal, at the expense of the State of California taxpayer instead of Sutter Health as originally promised and intended.

    Plaintiff is not bringing claims at this time in the Second Amended Complaint for failure by Defendants to pay Plaintiff the two (2) weeks termination pay (under the C. N. A. Collective Bargaining Agreement.) Plaintiff is claiming lost pay due to an unpaid February through March 2006 suspension for allegations pertaining to an investigation and continuing sexual harassment which began with said investigation, into her private life, as well as Defendant's failure to correctly itemize Plaintiff's pay stubs, underpaid wages, pay for meal breaks (pursuant to *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal. 4th 1094, 155 P.3d 284), and for waiting time penalties and any other penalties that the Superior Court finds to

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

be relevant to the instant matter as well as penalties under the California Confidentiality of
Medical Information Act.

## FIRST CAUSE OF ACTION

### (INTENTIONAL OR NEGLIGENT MISREPRESENTATION)

26. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 25 of
this Complaint as though fully set forth herein.

27. While in the process of recruiting Plaintiff to come work for defendants, defendants
represented to Plaintiff that MILLS-PENINSULA provided repayment of Registered Nurse
employees' student loans as a paid benefit of employment benefit, specifically with
Defendant. MILLS-PENINSULA, once that promise came due then represented to Plaintiff
that her then present disciplinary action against *an applicant for loan repayment could lead
to disqualification* (see Loan Forgiveness documents attached as Exhibit F). Defendant
never warned Plaintiff Boccignone that they would bring disciplinary action to disqualify her
by accusing her of inadequate job performance on a shift where the Emergency Department
was understaffed (more than fifteen patients and only three Registered Nurses) in violation
of California Code of Regulations, Title 22, § 70217. (See Exhibits G, H, and I.) As such,
the inducement of student loan payment was illusory, was breached, remains breached, and
constitutes breach of a contract which is separate from the Collective Bargaining Agreement
negotiated by the California Nurses Association (hereafter, the "union" or C.N.A.).

## SECOND CAUSE OF ACTION

### (BREACH OF CONTRACT)

28. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 27 of
this Complaint as though fully set forth herein.

29. While in the process of recruiting Plaintiff to come work for defendants, defendants
represented to Plaintiff that MILLS-PENINSULA provided repayment of Registered Nurse

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

employees' student loans as a company inducement for employment. MILLS-PENINSULA only when that promise came due, then represented to Plaintiff that past disciplinary actions *against an applicant for loan repayment could lead to disqualification* (see Loan Forgiveness documents attached as Exhibit F). Defendant never warned Plaintiff Boccignone that they would bring disciplinary action to disqualify her by accusing her of inadequate job performance on a shift where the Emergency Department was understaffed (more than fifteen patients and only three Registered Nurses) in violation of California Code of Regulations, Title 22, § 70217. (See Exhibits G, H, and I.) As such, the inducement of student loan payment was illusory, was breached, remains breached, and constitutes breach of a contract which is separate from the Collective Bargaining Agreement negotiated by the union, CAN; as well as a breach of the doctrine of good faith and fair dealing when negotiating a contract to repay student loans in exchange for employment relocation and not seeking other employment with other employers.

## THIRD CAUSE OF ACTION

### (SEX DISCRIMINATION)

30. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 29 of this Complaint as though fully set forth herein.

31. During January of 2006, Plaintiff Boccignone became pregnant, and on February 2, 2006 Plaintiff suffered a miscarriage (a medical condition related to pregnancy, which involves significant blood loss, consequent fatigue and normal depression due to the loss of her "wanted" baby—as well as the coincidental in time loss of her grandmother.)

32. Thirteen (13) days later on February 15, 2006, Plaintiff, still fatigued, requested and received permission from her charge nurse, Brian Johnson, to nap on her break. The long experienced charge nurse readily granted this permission to sleep, as a reasonable accommodation for her medical conditions related to pregnancy, miscarriage and loss of a

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

loved one. Plaintiff slept during her break. During this break, there were no patients in the Emergency Department and it was quiet. Named personal Defendant FOSTER, later, retroactively withdrew this permission and weeks later she wrote up Plaintiff a "final written warning" for sleeping on the job, to build a file, in order to have good cause to fire Plaintiff. (See Exhibit J.)

33. Defendants FOSTER admitted under oath that she knew Plaintiff had suffered a miscarriage, but when questioned "isn't fatigue a normal symptom of women who have a miscarriage…" replied "no." Def. FOSTER went on to blame Plaintiff: "if Lisa had, was still having [fatigue from the miscarriage] then she should not have returned to work to her night shift and her regular duty." (See EDD Appeal hearing transcript attached hereto as Exhibit K.)

34. On or about June 1, 2006, Plaintiff was informed that she was seven to twelve weeks pregnant. On August 4, 2006, Plaintiff gave Defendant Foster Plaintiff's Obstetrician's signed written request for accommodation of Plaintiff's temporary disability due to pregnancy, specifying no lifting over 30 pounds, and limiting exposure of Plaintiff's unborn baby to x-rays and infections exposure from August 4th through Plaintiff's then-anticipated January 1, 2007 commencement of maternity leave. (See Exhibit L.) Defendant Foster and Senior Nurse, antagonist, Penny Hutchings discussed giving Plaintiff light duty, but stated they were uncertain how to comply with Plaintiff's OBGYN's pregnancy accommodation letter. Defendants never again discussed accommodating Plaintiff's pregnancy disability, and never provided light duty or any other accommodations, as apparently they did not know how to comply with said letter and acted as if they had never received said pregnancy accommodation letter from Plaintiff's O.B. G. Y.N.

35. Contrary to the signed doctor's statement delineating the needed pregnancy accommodation, Plaintiff and her unborn baby were repeatedly exposed to x-rays and numerous infections, including but not limited to Rocky Mountain Spotted Fever and Dengue Fever, as if Plaintiff

had never requested pregnancy disability accommodation at all via written request by her

OBGYN. Nothing was changed in Plaintiff's duties, if anything they were made more

difficult and dangerous, as apparently Hutchinson and Foster did not know how to comply

with said pregnancy accommodation letter and acted as if they had never received said

pregnancy accommodation letter from Plaintiff's O.B. G. Y.N.

36. Furthermore, Defendants owed a higher duty to Plaintiff to provide pregnancy

accommodation, as Defendants knew or should have known Plaintiff's need for

accommodation because Defendants were in the unique position of being Plaintiff's

**Employer/Health Insurer/Healthcare Provider**. (See Exhibit M.)  Defendants knew of

both Plaintiff's miscarriage and her subsequent pregnancy disability.  Defendant employers

had a duty under the Fair Employment and Housing Act (hereafter FEHA) regarding both

instances of pregnancy-related disability to initiate a dialogue with Plaintiff offering

disability accommodations, even if Plaintiff never requested accommodations.  DFEH Right

to Sue Letters pertaining to these issues (and other issues) was noticed on July 13, 2007,

pursuant to the terms stated therein.  Subsequently, Plaintiff received Right to Sue Letters

(see Exhibit N)—which include sexual harassment based on, among other things, publication

of Plaintiff Boccignone's private medical records, and invasion into her private sex life.

37. Defendant employers knew Plaintiff had had a miscarriage, as evidenced by the fact that

some MILLS-PENINSULA employee accessed Plaintiff's vaginal ultrasound, and displayed

said vaginal ultrasound on the Emergency Department overhead monitor for all to see.  It is

believed if Mills-Peninsula hospital policy was followed, Plaintiff's name was labeled on the

ultrasound image.  Plaintiff's HIPPA rights and rights under the California Confidentiality of

Medical Records Act were violated.

38. As Defendants are the **Employer/Health Insurer/Healthcare Provider**, they use Benefit

and Risk Management Services as a Third Party Administrator (hereafter, "TPA"); said TPA

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

is also a healthcare risk manager (Exhibit O).  In so much as Defendants' TPA reviewed information, paid the bills for Plaintiff's injuries, and investigated work related claims (herein limited to but a cut hand, and possible infection due to being stuck by a malfunctioning safety syringe.)  Defendants were in a position to know that Plaintiff's work in the Emergency Department made her pregnancy *higher risk* due to repeated exposure to X-rays, numerous infections, and other risks from many sources.  Defendants were also in a position to access the results of genetic testing they performed (as Healthcare Provider) on Plaintiff's unborn baby.  After creating the risk that Plaintiff could give birth to a gravely ill baby needing expensive healthcare, Defendants (the self insured **Employer/ Insurer/Healthcare Provider**) terminated Plaintiff's employment, potentially saving themselves a substantial amount of money in medical care not provided to Plaintiff and her baby (subsequently born two months premature, with a heart murmur, on Medi-Cal at the expense of the California taxpayer instead of Sutter Health as intended and expected.)

39. Plaintiff received a July 13, 2007 Right to Sue Letter from the Department of Fair Employment and Housing (hereafter "DFEH").  See Exhibit N.

40. Pregnancy discrimination is discrimination against a female employee on the basis of her sex.  Pregnancy discrimination affects all women of all races, from ages 13 -53.  It also is a the beginning of discriminating against mothers, especially single mothers, of babies and young children, especially by older women who have had the personal experience or have seen over the years the work environment effects on other women, of raising babies and tots, even if they are in child care, compared to work performance and Employer Audit expectations and scheduling.

## FOURTH CAUSE OF ACTION

### (SEXUAL HARASSMENT)

41. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 40 of this Complaint as though fully set forth herein.

42. Defendants ratified, permitted, and/or did not stop their employees from accessing Plaintiff's medical records without her consent, and displaying Plaintiff's ultrasound picture of her vagina and amniocentesis on computer monitors to be viewed by staff, patients, and potentially the general public. Said vaginal ultrasound pictures and amniocentesis likely displayed Plaintiff's name.

## FIFTH CAUSE OF ACTION

### (SEX DISCRIMINATION VIOLATION OF THE CALIFORNIA CONSTITUTION)

43. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 42 of this Complaint as though fully set forth herein.

44. Defendants ratified, permitted, and/or did not stop their employees from accessing Plaintiff's medical records without her consent, and displaying Plaintiff's ultrasound picture of her vagina and amniocentesis on computer monitors to be viewed by staff, patients, and potentially the general public. Said vaginal ultrasound pictures and amniocentesis likely displayed Plaintiff's name.

45. During January of 2006, Plaintiff Boccignone became pregnant. On or about, February 2, 2006, Plaintiff suffered a miscarriage (a medical condition related to pregnancy, which involves significant blood loss and consequently fatigue.)

46. Thirteen (13) days later, on or about, February 15, 2006, Plaintiff was still fatigued, and requested permission from her charge nurse Brian Johnson to nap during her "night shift" break. This long experienced R. N. granted Plaintiff permission to sleep, a reasonable accommodation for her then medical conditions related to pregnancy, miscarriage and recent

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

loss of a loved one (grandmother). Plaintiff slept during her break. During this break, there were no patients in the Emergency Department. Defendant FOSTER, later, retroactively withdrew this permission and weeks later wrote Plaintiff up a "final written warning" for sleeping on the job so she could have a written record to fire her for cause. (See Exhibit J.)

47. Defendants FOSTER admitted under oath that she knew Plaintiff had suffered a miscarriage, but when questioned "isn't fatigue a normal symptom of women who have a miscarriage..." replied "no." Def. FOSTER went on to blame Plaintiff: "if Lisa had, was still having [fatigue from the miscarriage] then she should not have returned to work to her night shift and her regular duty." (See EDD Appeal hearing transcript attached hereto as Exhibit K.)

48. On or about June 1, 2006, Plaintiff was informed that she was seven to twelve weeks pregnant. On August 4, 2006, Plaintiff gave Defendant Foster Plaintiff's Obstetrician's signed written request for accommodation of Plaintiff's temporary disability due to pregnancy, specifying no lifting over 30 pounds, and limiting exposure of Plaintiff's unborn baby to x-rays and infections exposure from August 4th through Plaintiff's then-anticipated January 1, 2007 commencement of maternity leave. (See Exhibit L.) Defendant Foster and Senior Nurse, (antagonist and possible future named personal Defendant) Penny Hutchings discussed giving Plaintiff light duty, but stated they were uncertain how to comply with Plaintiff's O.B.G.Y.N.'s pregnancy accommodation letter. Defendants never again discussed accommodating Plaintiff's pregnancy disability, and never provided light duty or any other accommodations as apparently Hutchings and Foster did not know how to comply with said pregnancy accommodation letter and acted as if they had never received said letter from Plaintiff's O.B. G. Y.N.

49. Contrary to the signed doctor's request for accommodation of pregnancy, Plaintiff and her unborn baby were repeatedly exposed to x-rays and numerous infections, including but not

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

limited to Rocky Mountain Spotted Fever and Dengue Fever, as if Plaintiff had never

requested pregnancy disability accommodation at all via written request by her OBGYN.

50. Furthermore, Defendants owed a higher duty to Plaintiff to provide pregnancy

accommodation, as Defendants were in the unique position of being Plaintiff's

**Employer/Health Insurer/Healthcare Provider**, and therefore knew or should have known

Plaintiff's need for accommodation. (See Exhibit M.) Defendants knew of both Plaintiff's

miscarriage and her subsequent pregnancy disability. Defendant employers had a duty under

FEHA regarding both instances of pregnancy-related disability to initiate a dialog with

Plaintiff offering disability accommodations, even if Plaintiff never requested

accommodations.

51. Defendant employers knew Plaintiff had had a miscarriage, further evidenced by the fact that

some MILLS-PENINSULA employee accessed Plaintiff's vaginal ultrasound, and displayed

said vaginal ultrasound on the Emergency Department overhead monitor for all to see.

Plaintiff's name was clearly labeled on the ultrasound image within the defendant's record

keeping and she was the only patient with that last name at that hospital at that time.

Plaintiff's HIPPA rights and rights under the California Confidentiality of Medical Records

Act were violated.

52. As Defendants are the **Employer/Health Insurer/Healthcare Provider**, they use Benefit

and Risk Management Services as a Third Party Administrator (hereafter, "TPA"); said TPA

is also a healthcare risk manager (Exhibit O). In so much as Defendants' TPA reviewed

information, paid the bills for Plaintiff's injuries, and investigated work related claims (not

any worker's compensation disability claims, but a cut hand, and possible infection due to

being stuck by a malfunctioning safety syringe), Defendants were in a position to know that

Plaintiff's work in the Emergency Department made her pregnancy higher risk due to

repeated exposure to X-rays, numerous infections, and other risks from many sources.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

Defendants were also in a position to access the results of genetic testing they performed (as Healthcare Provider) on Plaintiff's unborn baby. After creating the risk that Plaintiff could give birth to a gravely ill baby needing expensive healthcare, Defendants (the self insured **Employer/ Insurer/Healthcare Provider**) terminated Plaintiff's employment, potentially saving themselves a substantial amount of money in medical care not provided to Plaintiff and her baby (subsequently born two months premature, with a heart murmur, on Medi-Cal instead of Sutter Health as intended and expected as an·employee health benefit, not to be paid by the taxpayers of the state of California.)

53. Plaintiff received Right to Sue Letters from the DFEH, both dated July 13, 2007.

54. Pregnancy discrimination is discrimination against a female employee on the basis of her sex.

55. Sex discrimination is prohibited by Section 8. Section 8 is the embodiment of the California public policy that (despite the general rule that a contracted employee or an employee at-will can be terminated for no reason or for arbitrary and/or irrational reasons) an employee cannot be discharged for reasons prohibited by law. (See Exhibit Q—*Phillips v. St. Mary Reg'l Medical Ctr.*, 96 Cal. App. 4th 218, 116 Cal. Rptr. 2d 770.)

## SIXTH CAUSE OF ACTION

## (FALSE LIGHT)

56. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 55 of this Complaint as though fully set forth herein.

57. On or about, February 11, 2006, while on break during the night shift, Plaintiff was visited at work by her boyfriend. Plaintiff and her boyfriend were sitting in his truck in the hospital parking lot, socializing and eating dinner. Plaintiff is informed and believes and therefore alleges that she and her boyfriend were seen in the truck by a security guard, presently

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

1    believed also to be Defendants' employee. This was approximately two weeks after Plaintiff

2    miscarried their baby.

3    58. On or about, February 24, 2006, Defendant FOSTER telephoned to inform Plaintiff that she

4    was being placed on unpaid administrative leave. A nurse union representative Linda

5    Campagna telephoned Plaintiff later that same day, and informed Plaintiff that the

6    administrative leave was due to a statement made by the aforementioned security guard to

7    Defendant FOSTER that Plaintiff had been somehow lewd on that February night in the

8    parking lot on her own, not company time. (Plaintiff will not further dignify the filthy

9    allegation cast upon her by named personal Defendant FOSTER, as the truth of the parking

10   lot incident is moot regarding named personal Defendant FOSTER's subsequent actions.)

11   Sometime during the administrative leave initiated by named personal Defendant FOSTER

12   and allegedly approved by named personal Defendant CHRISTENSEN (February 24, 2006

13   through March 16, 2006, wherein Defendant FOSTER investigated what Plaintiff was doing

14   inside her boyfriend's truck), Defendant FOSTER informed Plaintiff that the security guard

15   had written an incident report documenting said alleged lewd behavior by Plaintiff. This

16   said *incident report* has never been produced to Plaintiff despite repeated requests by both

17   Plaintiff herself and her union representatives. This report is supposedly held by the

18   MILLS-PENINSULA security division in a sealed location. By March 16th Defendant

19   FOSTER had dropped the investigation into allegations of lewd behavior. This was only

20   after Plaintiff was publicly humiliating named Personal Defendant FOSTER's actions—

21   questioning numerous doctors and other staff if the allegations were true, and, by doing so,

22   creating an atmosphere of hazing in the work place, better suited to the film "Animal House"

23   than the Emergency Department of Mills-Peninsula, in which plaintiff assisted in the saving

24   of lives, never injuring or causing loss of life (a fact not contested during the sworn

25   testimony of named Personal Defendant FOSTER). This hazing environment allowed by

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

supervisors named Personal Defendant FOSTER, and then-Assistant-Director/now-Director of Human Resources CHRISTENSEN led to the violation of Plaintiff's medical privacy with the publication of her vaginal ultrasound picture and ultrasound picture of her fetus for all to see. (See Exhibit S.)

59. After Plaintiff's employment by Defendants was terminated, Plaintiff had been offered nursing employment at Kaiser Permanente in South San Francisco, but the employment offer was rescinded on September 15, 2006 after Kaiser telephoned Defendants and received a negative employment reference from Mills-Peninsula. As stated above, Defendant FOSTER'S March 16, 2006 and September 7, 2006 allegations that Plaintiff is an incompetent and dangerous nurse seem pretextual in light of the fact that Defendant FOSTER permitted Plaintiff to be assigned to work as a preceptor and/or charge nurse during the pay periods April 9-April 22, 2006, May 7-May 20, 2006, May 21-June 3, 2006, June 4-June 17, 2006, June 18-July 1, 2006, July 2-July 15, 2006, July 16-July 29, 2006, August 13-August 26, 2006, and August 27-September 9, 2006. (See documents of Plaintiff's pay attached as Exhibit R.)

60. After Plaintiff's employment by Defendants was terminated, Plaintiff was offered R.N. positions at St. Mary's in San Francisco, and at other hospitals or medical facilities, but the employment offers were rescinded after the prospective employers telephoned Defendants and received negative employment references.

61. As a direct and proximate result of the suspension due to false light on or about February 24, 2006 through March 16, 2006, Plaintiff has suffered wage loss in an amount to be proved at trial.

62. As a direct and proximate result of the false negative employment references, Plaintiff continues to suffer wage loss in an amount to be proved at trial. It should be noted that while Administrative decisions are not Res Judicata in Superior Court, the E.D.D. matter

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

was heard by a sole J.D. Administrative Law Judge (conscious of the weight of evidence).

Defendants lost their case of allegedly firing Plaintiff for good cause—based solely on

named Personal Defendant FOSTER'S sworn testimony, which was overheard by her

accompanying supervisor (also sworn under oath) Defendant CLAUDIA CHRISTENSEN,

and unsigned "Xeroxes" of some e-mails admittedly solicited by named Personal Defendant

FOSTER, compared with a Doctor's Declaration and several doctors willing ness to be on

telephone standby. The E.D.D. hearing will be a factor at the trial of the instant matter,

regardless of some counsel's public writings and speaking about time-consuming and

expense motions in limine and bifurcation.

## SEVENTH CAUSE OF ACTION

### (VIOLATION OF THE CONFIDENTIALITY OF MEDICAL INFORMATION ACT)

63. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 62 of
    this Complaint as though fully set forth herein.

64. Defendants ratified, permitted, and/or did not stop their employees from accessing Plaintiff's
    medical records without her consent, and displaying Plaintiff's ultrasound picture of her
    vagina and amniocentesis on computer monitors to be viewed by staff, patients, and
    potentially the general public. Said vaginal ultrasound pictures and amniocentesis likely
    displayer Plaintiff's name.

65. Defendants also ratified, permitted, and/or did not stop their employees from accessing
    Plaintiff's medical records (without Plaintiff's consent) to find out what room she was in on
    the maternity ward when she was hospitalized in MILLS-PENINSULA.

66. Defendants and their employees, through the above stated acts, violated the Confidentiality
    of Medical Information Act. (See California Civil Code §§ 56-56.16.)

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-8400
FACSIMILE: (415) 354-5405

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

## EIGHTH CAUSE OF ACTION

## (WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

## CALIFORNIA CONSTITUTION ARTICLE 1, SECTION 8)

67. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 66 of this Complaint as though fully set forth herein.

68. Plaintiff claims that Defendants terminated her employment in violation of public policy as set forth in the California Constitution, Article 1, Section 8, which provides:

> A person may not be disqualified from ... pursuing a business, profession, vocation, or employment because of sex....

69. Pregnancy discrimination, a cause of action set forth above, is a species of sex discrimination, and is therefore prohibited by Section 8. Section 8 is the embodiment of the California public policy that (despite the general rule that a contracted employee or an employee at-will can be terminated for no reason, or for arbitrary and/or irrational reasons) an employee cannot be discharged for reasons prohibited by law. (See Exhibit R—*Phillips v. St. Mary Reg'l Medical Ctr.*, 96 Cal. App. 4th 218, 116 Cal. Rptr. 2d 770.)

70. It is a violation of public policy, and a violation of § 8, to terminate the employment of a pregnant woman on the grounds that her pregnancy temporary disability makes her an inconvenient employee.

71. On August 24, 2005, Defendant FOSTER gave Plaintiff a "final written warning" for poor employment performance of nursing duties. However, this warning was pretext, especially in light of the fact that Plaintiff was paid an employment-related bonus on or about January 2, 2006. Employer never let employee know whether she was coming or going.

72. On March 16, 2006, Defendant FOSTER gave Plaintiff a "final written warning" for poor employment performance of nursing duties, and allegedly being a danger to patients. However, this warning also appears to be pretext—given the fact that Plaintiff was paid as

*Preceptor* (experienced nurse who trains new, inexperienced nurses) and/or charge (the nurse who is the shift supervisor, in lay person's terms) during the pay periods of April 9-April 22, 2006, May 7-May 20, 2006, May 21-June 3, 2006, June 4-June 17, 2006, June 18-July 1, 2006, July 2-July 15, 2006, July 16-July 29, 2006, August 13-August 26, 2006, and August 27-September 9, 2006. (See documents of Plaintiff's pay attached as Exhibit R.)

73.  Defendant FOSTER alleges she terminated Plaintiff's employment on September 7, 2006 because Plaintiff was allegedly a danger to patients. However, these allegation also appear to be pretext—in light of the fact that Plaintiff was paid as preceptor (experienced nurse who trains new, inexperienced nurses) and/or charge (the nurse who is the shift supervisor, in lay person's terms) during the pay periods of April 9-April 22, 2006, May 7-May 20, 2006, May 21-June 3, 2006, June 4-June 17, 2006, June 18-July 1, 2006, July 2-July 15, 2006, July 16-July 29, 2006, August 13-August 26, 2006, and August 27-September 9, 2006. (See documents of Plaintiff's pay attached as Exhibit R.) Said pretextual allegations were disproved before an EDD Appeals Administrative Law Judge where the predominant evidence was Plaintiff's sworn testimony, FOSTER's sworn testimony, and the declaration of a Doctor supporting Plaintiff's actions in the E.R. and contrary to named Personal Defendant FOSTER'S testimony.

74.  Defendants—despite the rules and regulations set forth in the Collective Bargaining Agreement with the California Nurses Association (not being raised at this time, but possibly at a later date depending on discovery regarding the present causes of action)—ignored said union Agreement and terminated Plaintiff so she or her unborn baby would not cost Defendant any more money. Plaintiff was terminated while waiting for her agreed upon grievance hearing and still recovering from the investigation into her private life which had nothing to do with her work or her ability to work.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

## NINTH CAUSE OF ACTION

### (COMMON LAW WRONGFUL TERMINATION)

75. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 74 of this Complaint as though fully set forth herein.

76. Defendants fired Plaintiff from their employment without just cause (without complying with their own employment policies and procedures, and in violation of the agreed upon terms for a union grievance hearing), and asserted a pretextual reason (allegations of incompetence) for firing Plaintiff.

77. As a direct and proximate result of wrongful termination, Plaintiff sustained damages in an amount to be proved at trial.

## TENTH CAUSE OF ACTION

### (PERCEIVED CANCER DISCRIMINATION)

78. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

79. As Plaintiff's **Employer/Healthcare Provider/Health Insurer**, Defendants had actual or constructive knowledge that Plaintiff's thyroid condition was being treated by a medical doctor by use of radioactive iodine, and knew or should have known that this condition was considered borderline cancer. Consequently, Defendants regarded Plaintiff as being disabled by thyroid cancer, and did not want to bear the costs for this illness as the **Employer/ Healthcare Provider/Health Insurer**.

80. Defendants owed a higher duty to Plaintiff to provide disability accommodation of her chronic medical condition as Defendants were in the unique position of being Plaintiff's **Employer/Health Insurer/Healthcare Provider**, and therefore knew or should have known her need for accommodation. (See Exhibit M.) Because Defendants were in a position to know of Plaintiff's chronic (thyroid gland) medical condition, Defendant employers had a

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

duty under FEHA to initiate a dialog with Plaintiff offering disability accommodations, even if Plaintiff never requested accommodations. Defendants never initiated any dialog with Plaintiff about any disability accommodations, and no accommodations were provided. (See Exhibit N.)

81. Furthermore, employer had actual notice of plaintiff's thyroid condition because she requested medical leave for radiation treatment, but Defendants denied Plaintiff's requested medical leave. (Exhibit P.)

82. Fatigue is a common symptom of cancer and/or a diagnosis of borderline cancer. On February 15, 2006, Plaintiff was normally tired and requested permission from her charge nurse to take a break and sleep. The charge nurse, Brian Johnson, granted permission to nap, a reasonable accommodation for cancer or a diagnosis of borderline cancer, and Plaintiff slept during her break. During this break, there were no patients in the Emergency Department. Defendant FOSTER later retroactively withdrew permission, and on March 16, 2006, wrote Plaintiff a "final written warning" for sleeping on the job. (See Exhibit J.)

83. Plaintiff's perceived-by-defendant chronic illness (thyroid cancer or borderline diagnosis of cancer), and requests for medical leave of absence for treatments with radioactive iodine, were an inconvenience to Defendants.

## ELEVENTH CAUSE OF ACTION
### (PREGNANCY DISCRIMINATION)

84. Plaintiff incorporates by reference the allegations contained in paragraphs 83 of this Complaint as though fully set forth herein.

85. During January of 2006, Plaintiff Boccignone became pregnant, and on February 2, 2006 Plaintiff suffered a miscarriage (a medical condition related to pregnancy, which involves significant blood loss and consequently fatigue).

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

86. Thirteen (13) days later on February 15, 2006, Plaintiff was still fatigued and requested permission from her charge nurse to take a break and sleep. The charge nurse Brian Johnson granted permission to sleep, a reasonable accommodation for this medical condition related to pregnancy and the subsequent miscarriage. Plaintiff slept during her break. During this break, there were no patients in the Emergency Department. Defendant FOSTER, later, retroactively withdrew this permission and on March 16, 2006, wrote Plaintiff a "final written warning" for sleeping. (See Exhibit J.)

87. Defendants FOSTER admitted under oath that she knew Plaintiff had suffered a miscarriage, but when questioned "isn't fatigue a normal symptom of women who have a miscarriage..." replied "No." Def. FOSTER went on to blame Plaintiff, "if Lisa had, was still having [fatigue from the miscarriage] then she should not have returned to work to her night shift and her regular duty." (See EDD Appeal hearing transcript attached hereto as Exhibit K.)

88. On or about June 1, 2006, Plaintiff was informed that she was seven to twelve weeks pregnant. On August 4, 2006, Plaintiff gave Defendant Foster Plaintiff's Obstetrician's signed written request for accommodation of Plaintiff's temporary disability due to pregnancy, specifying no lifting over 30 pounds, and limiting exposure of Plaintiff's unborn baby to x-rays and infections exposure from August 4th through Plaintiff's then-anticipated January 1, 2007 commencement of maternity leave. (See Exhibit L.) Defendant Foster and Senior Nurse, antagonist, Penny Hutchings discussed giving Plaintiff light duty, but stated they were uncertain how to comply with Plaintiff's OBGYN's pregnancy accommodation letter. Defendants never again discussed accommodating Plaintiff's pregnancy disability, and never provided light duty or any other accommodations, as if no pregnancy accommodation letter was ever provided to Hutchings and named Personal Defendant FOSTER at all.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

89. Contrary to the signed doctor's request for accommodation of pregnancy, Plaintiff and her unborn baby were repeatedly exposed to x-rays and numerous infections, including but not limited to Rocky Mountain Spotted Fever and Dengue Fever, as if Plaintiff had never requested pregnancy disability accommodation at all via written request by her O.B.G.Y.N.

90. Furthermore, Defendants owed a higher duty to Plaintiff to provide pregnancy accommodation as Defendants were in the unique position of being Plaintiff's **Employer/Health Insurer/Healthcare Provider**, such that they had to know of Plaintiff's need for accommodation. (See Exhibit M.) Defendants knew of both Plaintiff's miscarriage and her subsequent pregnancy disability. Defendant employers had a duty under FEHA regarding both instances of pregnancy-related disability to initiate a dialog with Plaintiff offering disability accommodations, even if Plaintiff never requested accommodations. (See Exhibit N.)

91. Defendant employers knew Plaintiff had had a miscarriage, further evidenced by the fact that some MILLS-PENINSULA employee accessed Plaintiff's vaginal ultrasound, and displayed said vaginal ultrasound on the Emergency Department overhead monitor for all to see. Per Defendants' usual custom and practice, Plaintiff's name was probably labeled on the ultrasound image within the defendant's record keeping, and she was the only patient with that last name at that hospital at that time. Plaintiff's HIPPA rights and rights under the California Confidentiality of Medical Records Act were violated.

92. As Defendants are the **Employer/Health Insurer/Healthcare Provider**, they use Benefit and Risk Management Services as a Third Party Administrator (hereafter, "TPA"); said TPA is also a healthcare risk manager (Exhibit O). In so much as Defendants' TPA reviewed information, paid the bills for Plaintiff's injuries, and investigated work related claims (herein limited to possible infection due to being stuck by a malfunctioning safety syringe), Defendants were in a position to know that Plaintiff's work in the Emergency Department

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

made her pregnancy higher risk due to repeated exposure to X-rays, numerous infections, and other risks from many sources. Defendants were also in a position to access the results of genetic testing they performed (as Healthcare Provider) on Plaintiff's unborn baby. After creating the risk that Plaintiff could give birth to a gravely ill baby needing expensive healthcare, Defendants (the self insured **Employer/ Insurer/Healthcare Provider**) terminated Plaintiff's employment, potentially saving themselves a substantial amount of money in medical care not provided to Plaintiff and her baby (subsequently born two months premature, with a heart murmur, on MediCal).

93. Plaintiff received Right to Sue Letters from the DFEH, both dated July 13, 2007.

## TWELFTH CAUSE OF ACTION

### (RETALIATION)

94. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 93 of this Complaint as though fully set forth herein.

95. On July 8, 2005 and on July 10, 2005, Plaintiff made written objections (Exhibits C and D) to being assigned as the virtual charge nurse (in lay person's language, the supervisor) because she was a relatively new and inexperienced nurse.

96. Plaintiff defended herself in writing for having difficulty with her employment performance on August 6, 2005 because the department was understaffed (only three Registered Nurses working to care for more than fifteen patients in violation of California Code of Regulations, Title 22, § 70217). (See Quality Assurance Occurrence Report attached as Exhibit N, and § 70217 attached as Exhibit O.)

97. On August 24, 2005, Defendants retaliated by placing Plaintiff on unpaid leave, and placing a Performance Correction Notice in Plaintiff's personnel file containing a "final written warning" that she could be fired. (See Quality Assurance Occurrence Report attached as

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5403
FACSIMILE: (415) 354-5405

Exhibit N, § 70217 attached as Exhibit O, and Performance Correction Notice attached as Exhibit P)

98. On February 2, 2006, Plaintiff suffered a miscarriage. From February 4, 2006 through February 20, 2006, Plaintiff was ill with a sinus infection, and she called in sick to work on February 8th and February 9, 2006. On February 15, 2006, Plaintiff slept during a break with the permission of charge nurse Brian Johnson. Defendants retaliated by denying Plaintiff's request for medical leave for perceived cancer treatment on February 16-February 26, 2006.

99. Plaintiff called in sick to work on February 21st, February 22nd, February 23rd, and February 24, 2006. Defendants retaliated by placing Plaintiff on unpaid administrative leave from February 24th through March 16, 2006.

100. On August 4, 2006, Plaintiff requested accommodation of her temporary pregnancy disability, and requested maternity leave from January 1, 2007-May 6, 2007. On August 6, 2006, Plaintiff requested days off from work on October 31st and November 1, 2006. On August 28, 2006, Plaintiff declined to work a double shift because she did not want to miss her doctor's appointment that day for amniocentesis. On August 29th and August 30, 2006, Plaintiff, pursuant to doctor's orders, called in sick as she had been placed on "bed rest." On September 7, 2006, Defendants FOSTER retaliated by signing a letter terminating Plaintiff's employment, before officially meeting and noticing Plaintiff of this action at a meeting on Friday September 8, 2006 at MILLS-PENINSULA, which was describe by named Personal Defendant FOSTER to *discuss the present situation* (paraphrased).

**WHEREFORE**, Plaintiff prays for judgment against Defendants, as follows:

ON THE ELEVENTH CAUSE OF ACTION (PREGNANCY DISCRIMINATION):

    a.    $280,000.00 in special damages;

    b.    $500,000.00 in general damages;

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

ON THE SIXTH (FALSE LIGHT) AND NINTH (COMMON LAW WRONGFUL

DISCHARGE) CAUSES OF ACTION:

    a.    Special and/or general damages in an amount to be proved at trial;

AS TO ALL OTHER CAUSES OF ACTION:

    a.    $1,250,000.00;

    b.    Reasonable attorneys' fees;

    c.    All costs of suit incurred herein;

    d.    Exemplary damages according to proof at trial; and

    d.    Such other and further relief as the Court may deem proper.

**JURY TRIAL DEMANDED [AT THIS TIME]**

    At this time, Plaintiff demands trial of all issues by a jury.

Respectfully submitted,

Dated: November 14, 2007

Robert H. Gold, Esq.
Attorney for Plaintiff

SECOND AMENDED COMPLAINT—Boccignone v. Foster, et al.

# Exhibit A

# Mills-Peninsula Health Services – Performance Recognition Cover Sheet

MAY 9 2005
EMPLOYEE SERVICES

| Employee Name: | Lisa Maria Boccignone | Title: | Staff Nurse | Empl ID: | 36013681 |
| Department: | Emergency Services–*Introductory* | Appraisal Period From: | 1/24/05 | To: | 5/30/2005 |

**Evaluator Summary/Comments:**

Enter rating for each section below using whole numbers:

| | | | |
|---|---|---|---|
| Minimal Requirements: | [ ] 1 | [ ] 2 | [X] 3.0 |
| Technical Competence: | [ ] 1 | [ ] 2 | [X] 3.0 [ ] 4 |
| Critical Thinking: | [ ] 1 | [ ] 2 | [X] 3.0 [ ] 4 |
| Interpersonal Relations/Customer Service: | [ ] 1 | [ ] 2 | [X] 3.0 [ ] 4 |

**Overall Appraisal:**   [ ] 1   [ ] 2   [X] 3.0 [ ] 4

An overall score of 1 or 2 requires a developmental period or extension of new employee orientation at the end of which an updated appraisal must be done.

Manager to indicate re-evaluation date here: 5/2006. Goals for improvement must be outlined on Employee Development Plan – Part A.

| |
|---|
| Initiative |
| Punctual |
| Professional attire |

_Bettie Jones, RN Midas_   5/7/05
Evaluated by [name] / [title]    Date

_Lisa Maria Boccignone_   05/07/2005
Employee's Signature    Date

**Evaluator Comments:**

License Date:
CPR/BCLS Date:
Date Reviewed Job Description:
*Attached Copies of Licenses and CPR/BCLS*

**Evaluator Comments:**
- Priority to get along with others
- Smiles
- Strives to offer excellent care
- Learning ED practice
- Can be compassionate

**Employee Comments:**

Perfo  nce Appraisal for Staff Nurse
Appraisal Period:

# Mills-Peninsula Health Services – Performance Recognition – Part A, Development Plan

| Goal: | Recommended Action / Education: | Timeframe for Accomplishment: |
|---|---|---|
| *Management Developed Goals/Objectives:* | | |
| 1. Being 100% Independent within 6/11 | daily Practice | 6 months Dec |
| 2. accepting criticism from Pro | daily Practice | 6 in 3 months CWC |
| 3. Leadership course | course work | 6/11 6 months Dec |
| 4. | | |
| 5. | | |
| *Employee-identified Goals/Objectives:* | | |
| 6. Delegation of Skills | course work inservices | 6/11 6months December |
| 7. Master IV Skills | daily Practice weekly | ASAP |
| 8. Be more Assertive | course work inservices | 6/11 6months.9 |

Assessment of Prior Performance Period's Goals:
Note: Refer to Part A of prior year's evaluation and assess achievement

---

**Career Development Interests:**

What are your long-range career ambitions? I want to get my TNCC, MICN, and BSN in ED/Trauma

Are your career interests currently met in your present position?

[ ] Career interests are currently met in your present position.

[✓] Long-range career interests, preference for future assignments, and/or desirable career development activities:

1. TNCC, MICN, BSN in ED/Trauma
2. become a preceptor
3. work more independently & more interpretations of EKG's

**Employee Initials:** LMb

(Signifies that the information contained in this Career Development Interests section was provided by the employee and accurately re-states the employee's own career development interests.)

Page 2 of 8

Period:
Appraisal Period:

# Mills-Peninsula Health Services Performance Recognition – Part B, Key Job Functions

Performance Rating Key: 1=Resists behavior; 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

Validation Codes: Record Audit (RA); Direct Observation (DO); Test (T); Skills Checklist (SCL); Simulation (S);Patient/Survey/Feedback (PS/FF); Co-Worker Feedback (CF).

| Technical Competency Assessed<br>Key job functions from job description that are major/high volume, infrequently performed but consequential, recently introduced, or troublesome; include performance criteria/standards. | Validation:<br>[See Key above] | Performance<br>Rating:<br>[See Key above] | Comments: |
|---|---|---|---|
| 1. Provides direct patient care, evaluates outcomes, consults with other health team members and adjusts nursing care plan as indicated to ensure optimal patient care. Completes initial nursing admission assessment and history and develops individual care plans for assigned patients. | DO, CF | 3.0 | Lisa Maria does consistent patient care, and is able to assess and evaluate the outcome. Documentation is accurate and thorough |
| 2. Assesses and monitors patient's medical condition and reports changes to appropriate personnel. | DO, CF | 3.0 | Monitors her patients closely while in the ED. |
| 3. Administers medications to patients within specific guidelines. (4=0 minor errors; 3=1 minor error, 2=2 minor errors; 1=1 major or 3 or more minor errors) | DO, CF | 3.0 | Careful with medication administration, cross checks and follows the principles of safe administration. |
| 4. Writes initial nursing histories, assesses patients' conditions and develops individual care plans for patients assigned to the unit. Documentation is complete and accurate. Initial nursing histories are documented in accordance with unit standards. Ongoing documentation is 100% current and accurate in accordance with unit standards. | DO, CF | 3.0 | Lisa Maria documents her care well, she completes her assessment and reviews the patients past history. Documentation reflects the patient's chief complaint as their primary reason for being in the ED. |
| 5. Assess patient's/significant other's readiness to learn, prepares for discharge and provides appropriate educational materials. Documents teaching and ensures that all disciplines participate in the teaching plan. | DO, CF | 3.0 | Does a complete job of providing discharge instructions to the patient and their family members. |

# Mills-Peninsula Health Services Performance Recognition – Part B, Key Job Functions

Validation Codes: Record Audit (RA); Direct Observation (DO); Test (T); Skills Checklist (SCL); Simulation (S);Patient/Survey/Feedback (PS/FF); Co-Worker Feedback (CF).

Performance Rating Key: 1=Resists behavior; 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

| Technical Competency Assessed Key job functions from job description that are major/high volume, infrequently performed but consequential, recently introduced, or troublesome; include performance criteria/standards. | Validation: [See Key above] | Performance Rating: [See Key above] | Comments: |
|---|---|---|---|
| 6. Assumes a professional leadership role in assisting with staff development. Orients, instructs, trains and evaluates nursing team members. Performance validated based on feedback from staff being oriented and direct observation. | DO, CF | 3.0 | Lisa Maria is still learning the ED at this point in time, consistently meeting standards of practice. Has the potential to be a future preceptor. |
| 7. Performs and functions in a leadership role which includes acting as a relief charge nurse and delegating as necessary. Willingly assumes responsibility and acts as a role model for staff. | DO, CF | 3.0 | Lisa Maria is to new to assume charge responsibilities, we hope in the future that she will be interested in assisting with Charge Nurse duties. |
| 8. Maintains a safe, comfortable and therapeutic environment for patients/families in accordance with MPHS standards. Adheres to all JCAHO and Title XXII standards and ensures equipment meets preventive maintenance standards and is fully operational. | DO, CF | 3.0 | Practices safety and follows established policies and procedures when she is working in the ED. She knows the standards from JCAHO and DHS and follows the standards. |

**Overall Section Rating:**    [ ] 1    [ ] 2    [X] 3.0    [ ] 4

Perfo　nce Appraisal for Staff Nurse

Appra␣al Period:

# Mills-Peninsula Health Services Performance Recognition – Part C, Key Generic Standards

Performance Rating Key: 1=Resists behavior; 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

Validation Codes: Record Audit (RA); Direct Observation (DO); Patient/Survey/Feedback (PS/FF); Co-Worker Feedback (CF).

| Minimal Requirements: | Does Not Meet Expectations: | Meets Expectations: | Comments: |
|---|---|---|---|
| 1. Complies with established hospital and department dress and personal grooming policies. | | 3.0 | Follows established standards |
| 2. Plans and coordinates time-off so as not to interfere with department scheduling. | | 3.0 | Flexible and cooperative with her time |
| 3. Arrives, begins and concludes work as scheduled. Minimizes incremental of overtime through swiping in and out within established time frames (no more than seven minutes early or late). | | 3.0 | Punctual, and follows standards |
| 4. Takes breaks and meal periods within established guidelines. Secures supervisory approval in advance when unable to take required rest periods and meal periods. | | 3.0 | Follows CN recommendations and directions |
| 5. Completes all time records according to policy. | | 3.0 | Follows policy |
| 6. Works in a manner which ensures his/her own safety and the safety of others. Knowledgeable about department safety/disaster plan. | | 3.0 | Practices safety, knows the safety policies, if on duty here would assist in disaster. |
| 7. Compliant with all Infection Control standards and annual TB test. | | 3.0 | Compliant with IC policies |
| 8. Provides documentation of valid license/certification as required by the job. | | 3.0 | Maintains license and certifications to continue working in the ED |
| 9. Attends/reads minutes for at least 75% of staff meetings. Keep up-to-date with necessary departmental communications and policies. | | 3.0 | Attends regular and mandatory staff meetings and reads departmental updates when posted. |
| 10. Completes required annual M3 coursework and all required unit specific competencies. | | 3.0 | Completes required training on line with a minimum or reminders. |

Appr        ( Period:

# Mills-Peninsula Health Services Performance Recognition – Part C, Key Generic Standards

Validation Codes: Record Audit (RA); Direct Observation (DO); Patient/Survey/Feedback (PS/F/F), Co-Worker Feedback (CF).

Performance Rating Key: 1=Resists behavior; 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

| Critical Thinking Skills | Validation: (See Key Above) | Performance Rating: (See Key Above) | Comments: |
|---|---|---|---|
| 1. Takes initiative to share relevant information, issues and concerns directly and assertively with appropriate persons. | DO/CF | 3.0 | Takes it upon herself to report necessary information as appropriate. |
| 2. Identifies potential problem situations and takes appropriate action to minimize any negative impact. | DO/CF | 3.0 | Can see the problems before they happen and acts to prevent any negative outcome. |
| 3. Knows when to get help from immediate supervisor or other resources as appropriate. | DO/CF | 3.0 | Reports 'up' appropriately. |
| 4. Solves problems effectively and creatively. | DO/CF | 3.0 | Consistent problem solving skills-experienced |
| 5. Effectively prioritizes work; meets deadlines. | DO/CF | 3.0 | Can prioritize without difficulty |
| 6. Uses supplies and resources conservatively. | DO/CF | 3.0 | Uses supplies appropriate and without excess waste |

**Overall Appraisal:**   [ ] 1   [ ] 2   [X] 3.0   [ ] 4

| Interpersonal Relations/Customer Service - Standards of Conduct | Validation: (See Key Above) | Performance Rating: (See Key Above) | Comments: |
|---|---|---|---|
| 1. INTEGRITY and ACCOUNTABILITY - Demonstrates uncompromising ethics (#1&2) Accountable for actions. Adheres to Sutter Health Standards for business conduct, Mills-Peninsula policies and procedures and Standards of Conduct. | DO/CF | 3.0 | Accountable for her assignment and reporting the outcomes to the Charge Nurse. She follows established policies and procedures to do this. |
| 2. EXCELLENCE – Continuously exceeds organizational, professional and customer expectations. (#7) Completes and demonstrates job duties/tasks and takes initiative to follow through until service is completed. | DO/CF | 3.0 | Lisa Maria has worked to work to earn the respect of her peers and the ED physicians. She cares about her patients and their families when they are in the ED. |

**Overall Appraisal:**
[ ] 1    Not all minimum requirements fully met
[X] 3    All minimum requirements fully met

Perf'  'ance Appraisal for Staff Nurse
App.    .1 Period:

# Mills-Peninsula Health Services Performance Recognition – Part C, Key Generic Standards

Performance Rating Key: 1=Resists behavior; 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

Validation Codes: Record Audit (RA); Direct Observation (DO); Patient/Survey/Feedback (PS/FF); Co-Worker Feedback (CF)

| | | | |
|---|---|---|---|
| 3.   HONESTY – Commitment to truthful and open conduct in all aspects of work and workplace relationships.<br><br>(#24) Performs duties in a safe, ethical and honest ;<br>manner. | DO/CF | 3.0 | Lisa Maria practices safely and ensures that her patients are not harmed while they are in the ED. She acts as an advocate for them and shares information with them pertinent to their diagnosis |
| 4.   TEAMWORK – The ability to work unselfishly with others toward a common goal or vision.<br><br>(#27) Takes ownership of any problem that customers bring to my attention by handling those things that I can, takes responsibility for contacting the appropriate person for things that I cannot solve and follow up with the customer to ensure that the issue was resolved. | DO/CF | 3.0 | Lisa Maria is experienced and shares that with others, she is not afraid to teach or assist in problem solving. |
| 5.   RESPECT – Treats everyone with patience, consideration and dignity.<br><br>(#44) Respects all individuals' beliefs, ideas and contributions in a courteous supportive manner. | DO/CF | 3.0 | Not judgmental-treats patients with kindness, compassion and dignity. |
| 6.   INITIATIVE – Anticipates the needs of others and proactively responds.<br><br>(#58) Takes the first step in providing service without being asked by anticipating, identifying and resolving concerns/challenges in day-to-day activities. | DO/CF | 3.0 | Takes the initiative to help and assist other nurses when the help is needed to keep the ED running smoothly. |
| 7.   SERVICE – Exceeds performance standards and expectations while enhancing the quality of care jo our customers and the quality of the work environment.<br><br>(#65) Listens carefully to the needs of others, be patient and tolerant in responding to those needs and demonstrates a willingness to go the extra mile when providing service. | DO/CF | 3.0 | Lisa Maria offers consistent customer service by attending to her patients and family member concerns in a timely fashion. |

Appr: Period:

# Mills-Peninsula Health Services Performance Recognition – Part C, Key Generic Standards

Validation Codes: Record Audit (RA); Direct Observation (DO); Patient/Survey/Feedback (PS/FF); Co-Worker Feedback (CF).

Performance Rating Key: 1=Resists behavior, 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

| | | | |
|---|---|---|---|
| 8.  COMMUNICATION – Efficiently and compassionately communicates with patients, visitors, customers and fellow employees.<br><br>(#87) Makes eye contact and smile at customers.<br>(#47) Treats others with courtesy and respect, avoiding rudeness and sarcasm. Accepts constructive feedback.<br>(#98) Consistently resolves concerns and follows up as needed. | DO/CF | 3.0 | Lisa Maria continues to work at coming in with a positive attitude and associated behaviors. She can be kind to her peers when she is focused on her positive attitude. |
| **Overall Appraisal:** | | [1] | [2] [X] 3.0 [4] |

# Exhibit B



**YOU DESERVE A**

# ROSE

REWARD OUTSTANDING SERVICE EXCELLENCE

---

**I AM RECOGNIZING:**

*Lisa Maria Bo° (I think)*

FIRST/LAST NAME

*Emergency*

DEPARTMENT

MILLS HEALTH CENTER?  ☑ PENINSULA MEDICAL CENTER

OTHER FACILITY

*M* ▅▅▅▅▅▅

☐ A PATIENT/GUEST   ☐ AN EMPLOYEE
☐ A VOLUNTEER   ☐ A MEMBER OF THE PROFESSIONAL STAFF

**RECOGNITION FOR:**

*for her outstanding work.
She is so wonderful patient
and caring. She knows
how to make her patients
smile when they need it.
Thank you Lisa for making
me feel so comfortable
how I was in great hands
under your care.*

**THANK YOU FOR TAKING
THE TIME TO LET US KNOW
ABOUT A JOB WELL DONE.**

*respect · initiative · communication · teamwork · service*

---

**YOU DESERVE A**

# ROSE

REWARD OUTSTANDING SERVICE EXCELLENCE

**I AM RECOGNIZING:**

*Lisa Maria Boccignone*

PRINT FIRST/LAST NAME

DEPARTMENT

☐ MILLS HEALTH CENTER   ☑ PENINSULA MEDICAL CENTER
☐ OTHER FACILITY

FROM: *Claude*

☐ A PATIENT/GUEST   ☑ AN EMPLOYEE
☐ A VOLUNTEER   ☐ A MEMBER OF THE PROFESSIONAL STAFF

**RECOGNITION FOR:**

*Lisa Maria has been an young R.N.
in E.R. who has been demonstrating
excellent sense of communications
with her co-workers and patients.
Lisa Maria is advocating her patients
by reading their physiological
and emotional needs. Thanks!
Claude*

**THANK YOU FOR TAKING
THE TIME TO LET US KNOW
ABOUT A JOB WELL DONE.**

*excellence · honesty · accountability · integrity · respect · initiative · communication · teamwork · service*



# YOU DESERVE?

# ROSE

REWARD OUTSTANDING SERVICE EXCELLENCE

FEB 01 2008

**I RECOGNIZING:** ✓

Lisa Marie

FIRST / LAST NAME

Emergency Room

DEPARTMENT

☐ MILLS HEALTH CENTER    ☐ PENINSULA MEDICAL CENTER

OTHER FACILITY

FROM: ▬▬▬▬▬▬

☐ A PATIENT/GUEST    ☐ AN EMPLOYEE
☐ A VOLUNTEER    ☐ A MEMBER OF THE
                                PROFESSIONAL STAFF

**RECOGNITION FOR:**

She was very skilled
+ her job and had a
wonderful bedside
manner. She made
our experience
here much more
pleasant.

THANK YOU FOR TAKING
THE TIME TO LET US KNOW
ABOUT A JOB WELL DONE.



# YOU SERVE A

# ROSE

REWARD OUTSTANDING SERVICE EXCELLENCE

A good
nurse can make a hospital
**I AM RECOGNIZING:** stay much less
difficult

Lisa Marie Boccignone

PRINT FIRST/LAST NAME

Emergency

DEPARTMENT

☐ MILLS HEALTH CENTER    ☐ PENINSULA MEDICAL CENTER
☐ OTHER FACILITY

FROM:

☒ A PATIENT/GUEST    ☐ AN EMPLOYEE
☐ A VOLUNTEER    ☐ A MEMBER OF THE
                                PROFESSIONAL STAFF

**RECOGNITION FOR:**

She has been a speedy
and very efficient
care giver. She has
also been very friendly
and seems genuinely
focused on making
me feel less anxious
and more comfortable!

THANK YOU FOR TAKING
THE TIME TO LET US KNOW
ABOUT A JOB WELL DONE.

FROM ▬▬▬▬▬▬

## YOU DESERVE A ROSE
### REWARD OUTSTANDING SERVICE EXCELLENCE



I RECOGNIZING:    Aug 1 2 2006

'sa Marie (Boccignone)
f FIRST/LAST NAME

Em Rm
RTMENT
☐ MILLS HEALTH CENTER    ☐ PENINSULA MEDICAL CENTER
OTHER FACILITY

M: ▓▓▓▓▓▓▓▓▓▓▓▓
A PATIENT/GUEST    ☐ AN EMPLOYEE
A VOLUNTEER    ☐ A MEMBER OF THE PROFESSIONAL STAFF

COGNITION FOR:

*thards friendly manner*
*d sense of humor.*
*n excellent person*
*n have on ER staff*

*respect    excellence    initiative    honesty    communication    accountability    team*

---

## YOU DESERVE A ROSE
### REWARD OUTSTANDING SERVICE EXCELLENCE

I AM RECOGNIZING:    JUL 2 6 2006

Lisa Maria Boccignone
PRINT FIRST/LAST NAME

ER
DEPARTMENT
☐ MILLS HEALTH CENTER    ☒ PENINSULA MEDICAL CENTER
☐ OTHER FACILITY

FROM: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
☒ A PATIENT/GUEST    ☐ AN EMPLOYEE
☐ A VOLUNTEER    ☐ A MEMBER OF THE PROFESSIONAL STAFF

RECOGNITION FOR:

Outstanding
Compassionate
Humane
Care !

*respect    initiative    communication    team*

THANK YOU FOR TAKING
THE TIME TO LET US KNOW

---

## YOU DESERVE A ROSE
### REWARD OUTSTANDING SERVICE EXCELLENCE



I AM RECOGNIZING:    APR 1 2 2006

Lisa Maria
PRINT FIRST/LAST NAME

Emergency Room
DEPARTMENT
☐ MILLS HEALTH CENTER    ☒ PENINSULA MEDICAL CENTER
☐ OTHER FACILITY

FROM: Dennis Sisk - Security
☐ A PATIENT/GUEST    ☒ AN EMPLOYEE
☐ A VOLUNTEER    ☐ A MEMBER OF THE PROFESSIONAL STAFF

RECOGNITION FOR:
CARING NATURE - ON MARCH 26
We had a patient pass away. I
observed Lisa Maria as she talked
To the family members - She was so
compassionate and caring, it
made me proud to work here.

*respect    initiative    communication    teamwork    serv..*

*egrity    accountability    honesty    excellence*

Exhibit C

CALIFORNIA NURSES ASSOCIATION

**ASSIGNMENT DESPITE OBJECTION/INPATIENT**

You must first verbally protest your assignment to your supervisor at the time you believe it is inappropriate or unsafe. This is usually at the beginning of the shift, but may occur at any time. If your supervisor does not make a satisfactory adjustment to the assignment, complete this form to the best of your knowledge and distribute the ADO copies according to the instructions on the reverse side.

**SECTION I**

I/We _Lisa Maria Boccignone RN_

Registered Nurse(s) employed at _M,115 - Pan, NSUIG - ER_    _1900-0730_
                                 Facility         Unit/Dept              Shift

hereby protest my/our assignment as: ☑primary nurse ☑charge nurse ☑relief charge ☐team leader ☐team member _none_    on _July 8, 2005_

given to me/us by _Relief Penny & Katerine_          Date/Time
                                   Name / Title

As a patient advocate, in accordance with the California Nursing Practice Act, this is to confirm that I notified you that, in my professional judgment, today's assignment is unsafe and places my patients at risk. As a result, the facility is responsible for any adverse effects on patient care. I will, under protest, attempt to carry out the assignment to the best of my ability.

**SECTION IIa.** See Title 22 Revisions on reverse side.

I am objecting to the aforementioned assignment on the grounds that: (check all that apply)
                                        _Date of Injury_
☑ I was given an assignment where I did not receive         _07/08/05_
    ☐ orientation to the unit.
    ☐ training to competently perform my assigned duties and responsibilities.
☑ I was given an assignment which poses a potential threat to the health and safety of my patients (explain in Section V).
☐ Staffing/Skill mix is/was insufficient to
    ☐ meet the individual patient care needs/requirements of my patients.
    ☐ perform effective assessments of patients assigned to me.
    ☐ meet the teaching/discharge needs identified by my patient's condition.
    ☐ provide breaks to prevent fatigue, accidents, and/or errors.
☑ The unit is/was staffed with
    ☐ unqualified/unlicensed/uncertified staff.
    ☐ excessive registry personnel whose competency was not communicated to me.
☐ Direct patient care duties did not allow time for charge nurse duties (clinical supervision and coordination of care).
☐ ICU/CCU patient(s) requiring _____ : _____ nurse staffing ratio are/were not staffed at this level.
☐ New patients were transferred or admitted to this unit without adequate staff.
☐ Patient(s) placed inappropriately on the unit required a higher level of care than could be provided.
☐ I was forced to work beyond my scheduled hours (mandatory overtime).
☑ Other (explain in Section V)

**SECTION IIb.** Working Conditions: (specify)
Meal period missed YES/NO    Break missed YES/NO    Overtime worked? YES/NO

**SECTION III** Type of unit:
  ___Med/Surg    ___ICU/CCU    ___Stepdown/TCU    ___Nursery    ___PACU
  ___L&D    ___NICU    ___OR    ___Peds    ___Psych
  ___SNF    ___Telemetry    _X_ER    ___Post-partum    ___Other

Patient Classification System Name: _____
Census _____ Acuity: high _X_ average ____ low ____ Unit capacity _____ _RN tech, no ESS_
Staffing system (difference between acuity hours and staffed hours) _____    Clerk? ☐Yes ☑No _at us 12_ _00.00_

**SECTION IV** Patient care staffing count:

| | Regular | Float/Casual | Registry | Regular | Float/Casual | Registry |
|---|---|---|---|---|---|---|
| RN | | | | ○ | | ○ |
| LVN | | | OTHER | | | |
| | | | | | | |

**SECTION VI** Complete this section as appropriate.
Patients affected (This may need to be filled out at the end of your shift. Use appropriate Nursing care: not done/not done effectively (i.e. assessment, evaluation, personal care, treatments, teaching, charge duties, transfer/admission delayed, etc.)

Potential/actual hazard that resulted from this situation: _Warning for city charge duties as I was only 2 yrs oriented to my shift (day) to them by Cynthia RN prior_    _07/08/2005_

**SECTION VII - Action:** _Penny Hutchings_
Notified supervisor:            Name / Title          Date / Time

Supervisory response: _____

Other persons notified: _MD Torrebene & MD Adams 07/08/2005_
                                 Name/Title

Other persons' response: _____

Exhibit D

**ASSIGNMENT DESPITE OBJECTION / INPATIENT**

You must first verbally protest your assignment to your supervisor at the time you believe the assignment is unsafe or unsafe. This is usually at the beginning of the shift, but may occur at any time. If your supervisor does not make a satisfactory adjustment to the assignment, complete this form to the best of your knowledge and distribute ADO copies according to the instructions on the reverse side.

**SECTION I**

I/We _Lisa Maria Boccignone RN_

Registered Nurse(s) employed at _M. IIS-Peninsula ER_   Unit/Dept _1700-0730_

hereby protest my/our assignment as: ☐ primary nurse ☑ charge nurse ☐ relief charge ☐ team leader ☐ team member

on _July 8, 2005_ _noon_

given to me/us by _Draft / Penny / Katherine_

As a patient advocate, in accordance with the California Nursing Practice Act, this is to confirm that I notified you that, in my professional judgment, today's assignment is unsafe and places my patients at risk. As a result, the facility is responsible for any adverse effects on patient care. I will, under protest, attempt to carry out the assignment to the best of my ability.

_Date of Chese 07/10_

**SECTION IIa.** See Title 22 Revisions on reverse side.

I am objecting to the aforementioned assignment on the grounds that: (check all that apply)

☑ I was given an assignment where I did not receive
  ☐ orientation to the unit.
  ☐ training to competently perform my assigned duties and responsibilities.
☑ I was given an assignment which posed a potential threat to the health and safety of my patients (explain in Section V).
☐ Staffing/Skill mix, I/we was insufficient to
  ☐ meet the individual patient care needs/requirements of my patients.
  ☐ perform effective assessments of patients assigned to me.
  ☐ meet the teaching/discharge needs identified by my patient's condition.
  ☐ provide breaks to prevent fatigue, accidents, and/or errors.
☑ The unit is/was staffed with
  ☐ unqualified/unlicensed/uncertified staff.
  ☐ excessive registry personnel whose competency was not communicated to me.
☐ Direct patient care duties did not allow time for charge nurse duties (clinical supervision/coordination of care).
☐ ICU/CCU patient(s) requiring ☐ 1:1 or ☐ 1:2 nurse staffing ratio are not staffed at this level.
☐ New patients were transferred or admitted to unit without adequate staff.
☐ Patient(s) placed inappropriately on the unit required a higher level of care than could be provided.
☐ I was forced to work beyond my scheduled hours (mandatory overtime).
☑ Other (explain in Section V)

**SECTION IIb.** Working Conditions: (circle)   Meal period missed? YES/NO   Break missed? YES/NO   Overtime worked? YES/NO

**SECTION III** Type of unit:

| | | | | |
|---|---|---|---|---|
| ___ Med/Surg | ___ ICU/CCU | ___ Stepdown/TCU | ___ Nursery | ___ PACU |
| ___ L&D | ___ NICU | ___ OR | ___ Peds | ___ Psych |
| ___ SNF | ___ Telemetry | ___ ER | ___ Post/partum | ___ Other |

Patient Classification System: Name: _____

Census ___ acuity high ___ average ___ low   Unit capacity _Drak, 1 MD, ⊖ tech or social._

Staffing system: _discrepance between acuity hours and staffed hours_

**SECTION IV** Patient care staffing count:   Clerk? ☐ Yes ☑ No c.t.(e)

| | Regular | Float/(Start up) | Registry | Regular | Float/Casual | Registry |
|---|---|---|---|---|---|---|
| RN | | | | | | |
| | | | | | | |

_to pre-arm all duties..._

**SECTION VI** Complete this section as appropriate.

Patient(s) affected. (This may need to be filled out at the end of your shift, if appropriate.) Nursing care not done/not done effectively (i.e. assessments, evaluation, personal care, treatments, teaching, charge duties, transfer/admissions delayed, etc.)

Potential/actual hazard that resulted from this situation: _Unprepared for all nurses @ HYS_
_patient care was potentially compromised by_
_being understaffed & UA accredited to duties_

**SECTION VII - Action:**

Notified Supervisor: _Penny Hutchings Manager ED_   Date/Time _07/11/05_

Supervisory response: _____   Date/Time _07/10/05 22:0_

Other persons notified: _MD Molender_   Name/Title

Other persons' response: _____

Exhibit E



*Mills-Peninsula*
*Health Services*

A Sutter Health Affiliate

1783 El Camino Real
Burlingame, CA 94010
650.696.5400

January 1, 2006

Lisa Maria Boccignone
853 Commodore Drive #274
San Bruno, CA 94066

Dear Lisa Maria:

It gives me a great pleasure to be able to congratulate you on your **1st** anniversary with Mills-Peninsula Health Services, and to present your award pin.

You are a vital part of our team, and I sincerely appreciate your hard work and dedication.

Again, my warmest congratulations and sincere thanks.

Sincerely,

Robert W. Merwin
Chief Executive Officer
Mills-Peninsula Health Services

Enclosure

Exhibit F



*Mills-Peninsula*
*Health Services*

A Sutter Health Affiliate

1783 El Camino Real
Burlingame, CA 94010
650.696.5400

January 4, 2006

Lisa Boccignone
853 Commodore Drive #274
San Bruno, CA 94066

Dear Lisa,

After reviewing your application for the Loan Forgiveness Program, we find that you do not meet the eligibility requirements for an award at this time. Written disciplinary actions within the last year of employment are cause for disqualification. Please refer to the guidelines enclosed.

If you have any further questions or concerns please contact Cynthia Cherin in Employee Services at (650) 696-5467 or email cherinc@sutterhealth.org .

Sincerely,

MPHS Loan Forgiveness Program Committee

A 100 Top U.S. Hospitals Award Winner

www.mills-peninsula.org



*Mills-Peninsula*
*Health Services*

A Sutter Health Affiliate

1783 El Camino Real
Burlingame, CA 94010
650.696.5400

May 12, 2006

Lisa Boccignone
853 Commodore Drive #274
San Bruno, CA 94066

Dear Lisa,

After reviewing your application for the Loan Forgiveness Program, we find that you do not meet the eligibility requirements for an award at this time. Written disciplinary action within the last year of employment is cause for disqualification. Please refer to the guidelines enclosed.

If you have any further questions or concerns please contact Cynthia Cherin in Human Resources at (650) 696-5467 or email cherinc@sutterhealth.org .

Sincerely,

MPHS Loan Forgiveness Program Committee

email to Shawn
Persons name
AIT HR Student loans
Rententian bonus

A 100 Top U.S. Hospitals Award Winner

www.mills-peninsula.org

APR 0 6 2006

## MILLS-PENINSULA HEALTH SERVICES

### RN Loan Forgiveness Program/Educational Grant Application

**Applicant Information**

Name: LISA MARIA Bocci *NONE* Employee Number: 3601 3681

Department: Emergency Room     Manager: Penny Hutchings/Bobbi Foster

Hire Date: 01/2005  Scheduled Hours: 19 - 0730  RN license number: 652432

Home Address: 853 Commodore Dr # 274

San Bruno, CA 94066

Home Phone: 650 872-0639     Work Phone: 650 - 696 -5446

**School Information**

School name and Address:

Golden West College

17847 Golden West St.

Huntington Beach CA 92647

Graduation Date: Dec 20, 2004     Degree: AA, ADN

**Loan Information (one lender only please)**

Lender's Name: ACS
Lender's Address: PO Box 7051
Utica, New York 13504- 7051
Lender's Phone #: 1-800 - 835 -4611

*Attach copy of most recent loan statement(s). Copies of web page loan transactions/summaries acceptable only if lender contact information is complete above and on attached documents.*

Employee Signature: _Lisa M. Bocci RN_     Date: 04/06/06

Department Manager: _____     Date: _____

*Important Note:*
*Although Mills Peninsula intends to continue to offer this program, it reserves the right to change, amend, and/or discontinue this program at any time. Discontinuation of this program will not affect any disbursements and agreements incurred while the program was in force.*

# Mills-Peninsula Health Services (MPHS)
## Loan Forgiveness Program
### For Registered Nurses

## Purpose

This program is intended to assist registered nurses in reducing debt from loans incurred to pay for their nursing degree.

## Eligibility

Eligibility Requirements:
- Must be a MPHS employee at the time of application and grant disbursement(s)
- Must possess a valid California RN license
- Must have at least six months of experience as a permanently licensed Registered Nurse at MPHS
- Must have an outstanding loan balance which was applied to an accredited RN program
- Must maintain a satisfactory performance with annual evaluations that meet MPHS standards with no written disciplinary actions
- Must maintain benefited status during participation in the loan forgiveness program
- Must be willing to abide by the **Loan Forgiveness Program Agreement**

## Application procedure and deadlines

Applications must be approved by the employee's Department Manager and are to be submitted to **Employee Services** no later than **April 15th** and/or **November 15th**.

## Funding

Funding for the program is limited and not all applicants may be funded. The size of the grant awarded is based on the following: (1) the hours worked at Mills-Peninsula Health Services (MPHS) during the six-month period prior to the employee's application for a loan forgiveness grant, (2) the amount of the balance of the employee's educational loan(s) and (3) the number of applicants to the program and MPHS' ability to fund the program. Reimbursements are paid semi-annually with an *annual* limit of *$5,000.00 per applicant*. The amount disbursed to a registered nurse for the purpose of the loan forgiveness is based on the hours paid during the previous six-month period. Reimbursements are reviewed annually.

**Awardees will be notified in writing of their application status.**

Exhibit G

*Mills-Peninsula*
*Health Services*

A Sutter Health Affiliate

## LITY ASSURANCE OCCURRENCE REPORT

**006. /20**
723·  23MAR69  F  36
E  ERS
6AUG05
*46435442*

| *COMPLETING THIS FORM* ROUTE TO: | ▷ DEPARTMENT MANAGER | 36039 |
|---|---|---|
| | ▷ RISK MANAGEMENT | |
| | ▷ OUTCOMES MANAGEMENT | |

Privileged and Confidential: For the exclusive use of the Quality
Assurance / Risk Management Program (Evidence Code 1157)

### CURRENCE INFORMATION

DO NOT MAKE COPIES
DO NOT FILE IN PATIENT RECORD

| OCCURRENCE DATE 10/6/05 | TIME | LOCATION OF OCCURRENCE | DEPT./RM ER | UNIT/DEPT ER | ROOM NO. | OTHER | MEDICAL RECORD NO. | AGE 36 | SEX ☐M ☑F |

N INVOLVED
☐ TIENT  ☐ VISITOR  ☐ STUDENT
TREATMENT  ☑ MED STAFF  ☐ OTHER
SS (if not a pt.)

NAME OF PERSON INVOLVED (if no addressograph): **MD Brody**
CITY   STATE   ZIP CODE   PHONE NUMBER

### CURRENCE CATEGORY

| ☐ Property edication Infusion / ransfusion all | ☐ Tx / Procedure ☑ Physician Related ☑ Communication ☐ Complaint ☐ Skin Breakdown | ☐ Complication / Unexpected Event ☐ Diet Related ☐ Against Medical Advice ☐ Pt. Placement | ☐ Consent Related ☐ Code Blue ☐ Equipment / Medical Device ☐ Violent Gesture | ☐ Inappropriate Behavior ☐ Perinatal Problem ☐ Return to OR ☐ Security Related | ☐ Safety Related ☐ Adverse Reaction ☑ Other *verbal orders lack of commun undersatff* |

### RIEF OBJECTIVE STATEMENT OF FACTS

On 08/06 - was taking care of Pt.: 7/2005. She is a non-comunicative person with severe Cerebral plsy, who came in with her family c̄ C.C. ABD pain. Because her history c̄ this facility MD Brody gave orders to medicate her r pain q 30 minutes c̄ 1mg dilaudid. He gave me verbal orders for versed hen she was to go to CT in the attempts to obtain clear images. I was also told that the PO contrast was necessary and if she could not drink it, put it in by NG tube. ███ was able to drink almost all of the contrast - ut soon after experienced projective vomit. (USE OTHER SIDE IF NECESSARY)

| EE's NAME **hris DeGuzman** | EMPLOYEE ☐ YES ☐ NO | PHONE/EXT 5946 | ADDRESS/DEPT ED | DATE 08/07/05 | TIME 0600 |
| SUPERVISOR NOTIFIED ☑ YES ☐ NO | NAME OF SUPERVISOR **Bobbi Foster** | | | | |

(narcotics, sedatives, psychotropics, diuretics)

### PATIENT FALLS

| ED OSITION | BEDRAILS IN USE ☐ UPPER ☐ L UPPER ☐ N LOWER ☐ L LOWER | PT'S MENTAL STATUS ☐ ALERT ☐ CONFUSED ☐ UNCONSCIOUS | MEDS WITHIN LAST 3 HOURS | MED | TIME |
| ☐ HIGH ☐ LOW | ACTIVITY ☐ BR ONLY ☐ BRP | RESTRAINTS ☐ ON ☐ OFF ☐ NOT ORDERED | CALL LIGHT WITHIN REACH ☐ YES ☐ NO ☐ NA | MED | TIME |
| | ☐ UP W/ ASSIST ☐ UP AD LIB | | | | |

### PHYSICIAN NOTIFICATION

| PHYSICIAN NOTIFIED ☐ YES ☐ NO **Brody** | DATE 8/06/05 | TIME 01:10 | NAME OF EXAMINING PHYSICIAN (IF DIFFERENT) |
| EXAM ☐ YES ☐ NO TREATMENT TS | IF YES, NATURE OF TESTS / TREATMENT |

### PREPARED / REVIEWED

| PREPARED BY **Lisa Maria Battaglione** | POSITION RN | DATE 8/10/05 | TIME 2000 |
| REVIEWED BY | POSITION | DATE | TIME |

127779 (1/03)

**REDACTED**

QUALITY ... SURANCE OCCURRENCE REPORT ...
TO BE COMPLE... BY DEPARTMENT MANAGER/DE... ...EE

Privileged and Confidential: For the exclusive use of the Quality
Assurance / Risk Management Program (Evidence Code 1157)

**DO NOT MAKE COPIES**

**...RRENCE SEVERITY**

...r, potential only ☐ Error, no harm ☐ Increased monitoring, no harm ☐ Change in condition, no harm ☐ Intervention/increased LOS ☐ Permanent harm ☐ Death

**...ECTIVE ACTIONS**

| ...ES AND PROCEDURES | DATE | EQUIPMENT / SUPPLIES / CONDITION | DATE | OTHER |
|---|---|---|---|---|
| ...uated | | ☐ Evaluated | | ☐ No action at this time |
| ...ommended change | | ☐ Recommend change | | ☐ Other _____ |
| ...nged | | ☐ Changed | | |
| ...eloped | | ☐ Make additional / new purchase | | |
| ...rced | | ☐ Removed / Repaired / Corrected | | |

| ...TOR / INSTRUCTION / COUNSELING | | | | ☐ Recommend return demonstration |
|---|---|---|---|---|
| ...cuss at staff meeting | | ☐ Inservice education | | ☐ Temporary restriction of duties/privileges |
| ...vidual counseling # ____ | | ☐ Recommend QA/QI monitor | | |

**...ITIONAL FOLLOW-UP AND COMMUNICATION**

...was an extremly stressful & busy night c̄ only 3RNS, IMD
...) more than 15 patients. I had recieved so many verbal orders
...om MD Brody that, I thought giving her Zofran 4mg would be
...since he wanted her CT c̄ PO & IV contrast. I informed
...D Brody that I gave her the Zofran and he said, I should have
...ected c̄ him first. Do to the amount of narcotics in this woman's
...id), MD Brody wanted to be informed if any thing went wrong, in ...
...) as a precution I put her on a portable cardiac monitor. MD
...rody said the portable monitor was not necessary - but for her ...
...fty I felt it was. The CT went well, the Pt was safe & returned
...o the ED. She continued to have projectile vomiting & MD
...rody asked me if I gave her Phenergan 12.5mg IVP. I told
...im "no" since he did not order it. At 0300 (08/07/05)
...= gave her the phenergan and the episodes of vomiting stopped
...I continued to monitor & reassess her until she was D/C'd @ 05:20
...= a follow ... in place to be removed @ her PMD's in 2 DAYS. I spoke to
...hris De Guzman, Brian Johnson, & MD Brody & Bobbe Foster about this
...vent - and @ the time I & Did not write an incident
...eport as I beleived it to be handled at the nursing Level.
...I learned 3 lessons ① never assume anything even if I think it
...s in the best interests of the patient ② always ask first before
...ny thing and ③ always put the patient first.

| DEPARTMENT MANAGER SIGNATURE | DOES RISK MANAGEMENT NEED TO BE NOTIFIED IMMEDIATELY? ☐ YES ☐ NO | DATE | TIME |
|---|---|---|---|
| _____ | | _____ | |
| _____ | | | |

Exhibit H

**California Office of
Administrative Law**

**Home   Most Recent Updates   Search   Help ©**

# Welcome to the online source for
# California Code of Regulations

22 CA ADC § 70217

◀ Term ▶

22 CCR s 70217

Cal. Admin. Code tit. 22, s 70217

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
TITLE 22. SOCIAL SECURITY
DIVISION 5. LICENSING AND CERTIFICATION OF HEALTH FACILITIES, HOME HEALTH
AGENCIES, CLINICS, AND REFERRAL AGENCIES
CHAPTER 1. GENERAL ACUTE CARE HOSPITALS
ARTICLE 3. BASIC SERVICES
This database is current through 7/13/07, Register 2007, No. 28

s 70217. Nursing Service Staff.

(a) Hospitals shall provide staffing by licensed nurses, within the scope of their licensure in accordance with the following nurse-to-patient ratios. Licensed nurse means a registered nurse, licensed vocational nurse and, in psychiatric units only, a licensed psychiatric technician. Staffing for care not requiring a licensed nurse is not included within these ratios and shall be determined pursuant to the patient classification system.

No hospital shall assign a licensed nurse to a nursing unit or clinical area unless that hospital determines that the licensed nurse has demonstrated current competence in providing care in that area, and has also received orientation to that hospital's clinical area sufficient to provide competent care to patients in that area. The policies and procedures of the hospital shall contain the hospital's criteria for making this determination.

Licensed nurse-to-patient ratios represent the maximum number of patients that shall be assigned to one licensed nurse at any one time. "Assigned" means the licensed nurse has responsibility for the provision of care to a particular patient within his/her scope of practice. There shall be no averaging of the number of patients and the total number of licensed nurses on the unit during any one shift nor over any period of time. Only licensed nurses providing direct patient care shall be included in the ratios.

Nurse Administrators, Nurse Supervisors, Nurse Managers, and Charge Nurses, and other licensed nurses shall be included in the calculation of the licensed nurse-to-patient ratio only when those licensed nurses are engaged in providing direct patient care. When a Nurse Administrator, Nurse Supervisor, Nurse Manager, Charge Nurse or other licensed nurse is engaged in activities other than direct patient care, that nurse shall not be included in the ratio. Nurse Administrators, Nurse Supervisors, Nurse Managers, and Charge Nurses who have demonstrated current competence to the hospital in providing care on a particular unit may relieve licensed nurses during breaks, meals, and other routine, expected absences from the unit.

Licensed vocational nurses may constitute up to 50 percent of the licensed nurses assigned to patient care on any unit, except where registered nurses are required pursuant to the patient classification system or this section. Only registered nurses shall be assigned to Intensive Care Newborn Nursery Service Units, which specifically require one registered nurse to two or fewer infants. In the Emergency Department, only registered nurses shall be assigned to triage patients and only registered nurses shall be assigned to critical trauma patients.

Nothing in this section shall prohibit a licensed nurse from assisting with specific tasks within the scope of his or her practice for a patient assigned to another nurse. "Assist" means that licensed nurses may provide patient

care beyond their patient assignments if the tasks performed are specific and time-limited.

(1) The licensed nurse-to-patient ratio in a critical care unit shall be 1:2 or fewer at all times. "Critical care unit" means a nursing unit of a general acute care hospital which provides one of the following services: an intensive care service, a burn center, a coronary care service, an acute respiratory service, or an intensive care newborn nursery service. In the intensive care newborn nursery service, the ratio shall be 1 registered nurse: 2 or fewer patients at all times.

(2) The surgical service operating room shall have at least one registered nurse assigned to the duties of the circulating nurse and a minimum of one additional person serving as scrub assistant for each patient-occupied operating room. The scrub assistant may be a licensed nurse, an operating room technician, or other person who has demonstrated current competence to the hospital as a scrub assistant, but shall not be a physician or other licensed health professional who is assisting in the performance of surgery.

(3) The licensed nurse-to-patient ratio in a labor and delivery suite of the perinatal service shall be 1:2 or fewer active labor patients at all times. When a licensed nurse is caring for antepartum patients who are not in active labor, the licensed nurse-to-patient ratio shall be 1:4 or fewer at all times.

(4) The licensed nurse-to-patient ratio in a postpartum area of the perinatal service shall be 1:4 mother-baby couplets or fewer at all times. In the event of multiple births, the total number of mothers plus infants assigned to a single licensed nurse shall never exceed eight. For postpartum areas in which the licensed nurse's assignment consists of mothers only, the licensed nurse-to-patient ratio shall be 1:6 or fewer at all times.

(5) The licensed nurse-to-patient ratio in a combined Labor/Delivery/Postpartum area of the perinatal service shall be 1:3 or fewer at all times the licensed nurse is caring for a patient combination of one woman in active labor and a postpartum mother and infant The licensed nurse-to-patient ratio for nurses caring for women in active labor only, antepartum patients who are not in active labor only, postpartum women only, or mother-baby couplets only, shall be the same ratios as stated in subsections (3) and (4) above for those categories of patients.

(6) The licensed nurse-to-patient ratio in a pediatric service unit shall be 1:4 or fewer at all times.

(7) The licensed nurse-to-patient ratio in a postanesthesia recovery unit of the anesthesia service shall be 1:2 or fewer at all times, regardless of the type of anesthesia the patient received.

(8) In a hospital providing basic emergency medical services or comprehensive emergency medical services, the licensed nurse-to-patient ratio in an emergency department shall be 1:4 or fewer at all times that patients are receiving treatment. There shall be no fewer than two licensed nurses physically present in the emergency department when a patient is present.

At least one of the licensed nurses shall be a registered nurse assigned to triage patients. The registered nurse assigned to triage patients shall be immediately available at all times to triage patients when they arrive in the emergency department. When there are no patients needing triage, the registered nurse may assist by performing other nursing tasks. The registered nurse assigned to triage patients shall not be counted in the licensed nurse-to-patient ratio.

Hospitals designated by the Local Emergency Medical Services (LEMS) Agency as a "base hospital", as defined in section 1797.58 of the Health and Safety Code, shall have either a licensed physician or