a registered nurse on duty to respond to the base radio 24 hours each day. When the duty of base radio responder is assigned to a registered nurse, that registered nurse may assist by performing other nursing tasks when not responding to radio calls, but shall be immediately available to respond to requests for medical direction on the base radio. The registered nurse assigned as base radio responder shall not be counted in the licensed nurse-to-patient ratios.

When licensed nursing staff are attending critical care patients in the emergency department, the licensed nurse-to-patient ratio shall be 1:2 or fewer critical care patients at all times. A patient in the emergency department shall be considered a critical care patient when the patient meets the criteria for admission to a critical care service area within the hospital.

Only registered nurses shall be assigned to critical trauma patients in the emergency department, and a minimum registered nurse-to-critical trauma patient ratio of 1:1 shall be maintained at all times. A critical trauma patient is a patient who has injuries to an anatomic area that : (1) require life saving interventions, or (2) in conjunction with unstable vital signs, pose an immediate threat to life or limb.

(9) The licensed nurse-to-patient ratio in a step-down unit shall be 1:4 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a step-down unit shall be 1:3 or fewer at all times. A "step down unit" is defined as a unit which is organized, operated, and maintained to provide for the monitoring and care of patients with moderate or potentially severe physiologic instability requiring technical support but not necessarily artificial life support. Step-down patients are those patients who require less care than intensive care, but more than that which is available from medical/surgical care. "Artificial life support" is defined as a system that uses medical technology to aid, support, or replace a vital function of the body that has been seriously damaged. "Technical support" is defined as specialized equipment and/or personnel providing for invasive monitoring, telemetry, or mechanical ventilation, for the immediate amelioration or remediation of severe pathology.

(10) The licensed nurse-to-patient ratio in a telemetry unit shall be 1:5 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a telemetry unit shall be 1:4 or fewer at all times. "Telemetry unit" is defined as a unit organized, operated, and maintained to provide care for and continuous cardiac monitoring of patients in a stable condition, having or suspected of having a cardiac condition or a disease requiring the electronic monitoring, recording, retrieval, and display of cardiac electrical signals. "Telemetry unit" as defined in these regulations does not include fetal monitoring nor fetal surveillance.

(11) The licensed nurse-to-patient ratio in medical/surgical care units shall be 1:6 or fewer at all times. Commencing January 1, 2005, the licensed nurse-to-patient ratio in medical/surgical care units shall be 1:5 or fewer at all times. A medical/surgical unit is a unit with beds classified as medical/surgical in which patients, who require less care than that which is available in intensive care units, step-down units, or specialty care units receive 24 hour inpatient general medical services, post-surgical services, or both general medical and post-surgical services. These units may include mixed patient populations of diverse diagnoses and diverse age groups who require care appropriate to a medical/surgical unit.

(12) The licensed nurse-to-patient ratio in a specialty care unit shall be 1:5 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a specialty care unit shall be 1:4 or fewer at all times. A specialty care unit is defined as a unit which is organized, operated, and maintained to provide care for a specific medical condition or a specific patient population. Services provided in these units are more specialized to meet the needs of patients with the specific condition or disease process than that which is required on medical/surgical units, and is not otherwise covered by subdivision (a).

(13) The licensed nurse-to-patient ratio in a psychiatric unit shall be 1:6 or fewer at all times. For purposes of psychiatric units only, "licensed nurses" also includes licensed psychiatric technicians in addition to licensed vocational nurses and registered nurses. Licensed vocational nurses, licensed psychiatric technicians, or a combination of both, shall not exceed 50 percent of the licensed nurses on the unit.

(14) Identifying a unit by a name or term other than those used in this subsection does not affect the requirement to staff at the ratios identified for the level or type of care described in this subsection.

(b) In addition to the requirements of subsection (a), the hospital shall implement a patient classification system as defined in Section 70053.2 above for determining nursing care needs of individual patients that reflects the assessment, made by a registered nurse as specified at subsection 70215(a)(1), of patient requirements and provides for shift-by-shift staffing based on those requirements. The ratios specified in subsection (a) shall constitute the minimum number of registered nurses, licensed vocational nurses, and in the case of psychiatric units, licensed psychiatric technicians, who shall be assigned to direct patient care. Additional staff in excess of these prescribed ratios, including non-licensed staff, shall be assigned in accordance with the hospital's documented patient classification system for determining nursing care requirements, considering factors that include the severity of the illness, the need for specialized equipment and technology, the complexity of clinical judgment needed to design, implement, and evaluate the patient care plan, the ability for self-care, and the licensure of the personnel required for care. The system developed by the hospital shall include, but not be limited to, the following elements:

(1) Individual patient care requirements.

(2) The patient care delivery system.

(3) Generally accepted standards of nursing practice, as well as elements reflective of the unique nature of the hospital's patient population.

(c) A written staffing plan shall be developed by the administrator of nursing service or a designee, based on patient care needs determined by the patient classification system. The staffing plan shall be developed and implemented for each patient care unit and shall specify patient care requirements and the staffing levels for registered nurses and other licensed and unlicensed personnel. In no case shall the staffing level for licensed nurses fall below the requirements of subsection (a). The plan shall include the following:

(1) Staffing requirements as determined by the patient classification system for each unit, documented on a day-to-day, shift-by-shift basis.

(2) The actual staff and staff mix provided, documented on a day-to-day, shift-by-shift basis.

(3) The variance between required and actual staffing patterns, documented on a day-to-day, shift-by-shift basis.

(d) In addition to the documentation required in subsections (c)(1) through (3) above, the hospital shall keep a record of the actual registered nurse, licensed vocational nurse and licensed psychiatric technician assignments to individual patients by licensure category, documented on a day-to-day, shift-by-shift basis. The hospital shall retain:

(1) The staffing plan required in subsections (c)(1) through (3) for the time period between licensing surveys, which includes the Consolidated Accreditation and Licensing Survey process, and

(2) The record of the actual registered nurse, licensed vocational nurse and licensed psychiatric technician assignments by licensure category for a minimum of one year.

(e) The reliability of the patient classification system for validating staffing requirements shall be reviewed at least annually by a committee appointed by the nursing administrator to determine whether or not the system accurately measures patient care needs.

(f) At least half of the members of the review committee shall be registered nurses who provide direct patient care.

(g) If the review reveals that adjustments are necessary in the patient classification system in order to assure accuracy in measuring patient care needs, such adjustments must be implemented within thirty (30) days of that determination.

(h) Hospitals shall develop and document a process by which all interested staff may provide input about the patient classification system, the system's required revisions, and the overall staffing plan.

(i) The administrator of nursing services shall not be designated to serve as a charge nurse or to have direct patient care responsibility, except as described in subsection (a) above.

(j) Registered nursing personnel shall:

(1) Assist the administrator of nursing service so that supervision of nursing care occurs on a 24-hour basis.

(2) Provide direct patient care.

(3) Provide clinical supervision and coordination of the care given by licensed vocational nurses and unlicensed nursing personnel.

(k) Each patient care unit shall have a registered nurse assigned, present and responsible for the patient care in the unit on each shift.

(l) A rural General Acute Care Hospital as defined in Health and Safety Code Section 1250(a), may apply for and be granted program flexibility for the requirements of subsection 70217(l) and for the personnel requirements of subsection (j)(1) above.

(m) Unlicensed personnel may be utilized as needed to assist with simple nursing procedures, subject to the requirements of competency validation. Hospital policies and procedures shall describe the responsibility of unlicensed personnel and limit their duties to tasks that do not require licensure as a registered or vocational nurse.

(n) Nursing personnel from temporary nursing agencies shall not be responsible for a patient care unit without having demonstrated clinical and supervisory competence as defined by the hospital's standards of staff performance pursuant to the requirements of subsection 70213(c) above.

(o) Hospitals which utilize temporary nursing agencies shall have and adhere to a written procedure to orient and evaluate personnel from these sources. Such procedures shall require that personnel from temporary nursing agencies be evaluated as often, or more often, than staff employed directly by the hospital.

(p) All registered and licensed vocational nurses utilized in the hospital shall have current licenses. A method to document current licensure shall be established.

(q) The hospital shall plan for routine fluctuations in patient census. If a healthcare emergency causes a change in the number of patients on a unit, the hospital must demonstrate that prompt efforts were made to maintain required staffing levels. A healthcare emergency is defined for this purpose as an unpredictable or unavoidable occurrence at unscheduled or unpredictable intervals relating to healthcare delivery requiring immediate

ornia Code of Regulations

medical interventions and care.

<General Materials (GM) - References, Annotations, or Tables>

Note: Authority cited: Sections 1275, 1276.4 and 100275(a), Health and Safety Code. Reference: Sections 1250(a), 1276, 1276.4, 1797.58 and 1790.160, Health and Safety Code.

### HISTORY

1. Restoration of text as it existed prior to 11-12-2004 and addition of explanatoryNote (Register 2005, No. 33).

2. Editorial correction implementing restoration of text as it existed prior to 11-12-2004 (Register 2005, No. 36).

22 CCR s 70217, **22 CA ADC s 70217**
1CAC

**22 CA ADC s 70217**

END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

◖ Term

◖Doc 2 of 2

Cite List    Docs In Sequence    Table of Contents

**THOMSON**
✳
**WEST**

This site is provided by West.
© 2007 West | Privacy | Accessibility

7/30/2007 1:

# Exhibit I

**Employee Name:** Lisa Maria Boccignone RN
**Department Name:** Emergency Department
**Manager name:** Foster/Hutchings

Rebuttal Letter to Performance Correction Notice Dated August 24, 2005

In response to my; Investigatory Leave, Final Written Warning, Policy Violation, Performance Transgression, & Behavior/ Conduct Infraction, I feel the need to express my concerns & Performance Improvement Plan.

In the Incident Description area of the form, the dates are all wrong. Items #1-4 Occurred on or about August 6th to the early morning hours of August 7th. I informed Bobbi Foster of these events as soon as she came into work on Monday August 8th. A few days later I was told to file a Incident report for her & Penny, which I did. And we (Bobbi, Penny, & I) had a personal meeting and review of these incidents (Zoll, Pt transfer without IV, Medication without order, and PES patient On or about august 9th or 10th ).

I was under the impression that since we had all ready discussed and dismissed these incidents as learning events, that it was over, and for me to absorb, ask more questions, and go to my peers & charge nurses for direction and guidance. Which is what I did when incident #5 occurred.

I was surprised to see these 4 incidents on my Performance Correction Notice as I was told by both Bobbi Foster & Penny Hutchings that "our discussions are for learning purposes only and are not punitive". If these "discussions" are not punitive, then why am I being written up for them, when 2 weeks prior I was told that I wasn't going to be written up? That seems punitive to me. And to go from "learning purposes" to final written warning, without having a first written warning seems pretty harsh and punitive.

#5: Occurred on or about the morning of August 17th. I know <u>I am a brand new nurse, and I do have lots of questions and insecurities and not to mention a whole lot of learning & experiences yet to be had & knowledge to be gained.</u> So when I asked MD. Tornebene and Brian Johnson RN if that would be ok to insert the 14G IV as MD Tornebene was explaining to me the "worst case scenario" for this patient, and I being a novice nurse, I listened to him, and when I discussed it with Brian Johnson RN he agreed that in worst case scenario that is the correct action according to the ENA handbook, which all of us new nurses were given to read & answer questions from.

As for intentionally harming a patient, let alone another human being that is a concept that I find horrid and plain out mean. I would never, and will never harm another being on purpose or out of malice.

The events surrounding this patient and other events of that night I discussed with fellow nurses was not meant to be done in a boasting or bragging fashion. I was asking questions

to see if they heard if he was ok? Was it as serious as MD Tornebene thought? And then I know I also mentioned this other patient that MD. Tornebene & myself could not figure out, he didn't want any pain medicine, but was screaming in pain when ever his friends came in the room, and every time any one suggested pain relief he declined it. So Doctor T said maybe some IV fluids will perk him up, since all his tests are negative. Then MD. Tornebene gave me a talk about how fluid resuscitation can make a person feel better over all and that sometimes it may be psychosomatic it does have it place in medicine.

I honestly think that it was a combination of the two patient situations I was discussing that MD. White over heard, and that since he was not involved in the conversation directly (he was making blow darts with uterine swabs, 18G IV needles and chest tubes) that maybe he misinterpreted the conversation. I am not saying he is lying, or that what he heard is false. I am saying that he might not have gotten all the facts regarding the 2 separate cases.

And in order from incidents 1-5 are my explanations again:

#1& 3: Removing Zoll from Patient without consent of patients nurse. This occurred on the early am hours of August 7th when I was told by MD Brody, that under all circumstances that the oral contrast must remain and be in the patient as he needs good films of her abdomen, and he also stated that he didn't care how I got it in, "PO, NG-Tube, Gastric Levague or however" but it must stay in her. I being concerned for her health and well being was uncomfortable giving her Dilaudid 1mg every 30 minutes because she was around 70lbs and has sever cerebral palsy. She is extremely limited in her movements, except for her uncontrollable muscular spasms. It was a crazy night, and 4 incidents occurred on this night. There was only 3 nurses, more than 15 patients, and still patients in the waiting room to come back. I got worried for her safety, and I did not want her to aspirate on her secretions and emesis, so I asked a senior nurse Brian Johnson if he thought it would be ok to give an ant emetic since she has no allergies, can't stop vomiting, CT tech is here, and I still had to give her Versed. Brain agreed that it was appropriate as it was patient safety related, I gave the medication with out the order, I told MD Brody ASAP, and he told me that he had wished I had asked him first but he understood how stressful everything was and that he forgave me. I then asked Brian Johnson if I could take his portable monitor, and told him that he being the senior nurse is more likely more familiar with this equipment, I also said there is another one in room 2 but I can not get it to work nor do I know how these pads connect. I was under the impression that Brain & I were having an open dialog, which turned out to be false, and I thoroughly and completely apologized to him, and he said he wouldn't even mention it, and that it was not that big of a deal. I started crying out of frustration and stress overload, and MD Brody consoled me, and asked if this was regarding the Zofran? I said no, there are just too many really sick people in here right now, and I can not get this patient to stop vomiting, I had cleaned her 9 times. I thought it was sweet of MD Brody to offer support. And he added that he knew this family and they are high maintaince & high stress.

And during these events and others we were on divert status, with 3 RN's and 1 MD. We

had all the beds full and a waiting room full of people waiting to get back to be seen. I am not using this as an excuse, yet it did add to the stress of the night and the stress amongst all colleges.

#2: I know I gave report 6 hours earlier to Marie on TCU and I told her that there was no IV access in place as none was ordered. I noticed in your Performance Improvement Plan is that "what I do for a patient must be covered by a physicians order". In this case I had no physician order for an NS Lock, IV or fluids. And I know now that "admission = NS Lock" and I do understand I must express this to the physician in charge of this patient so I can perform an invasive procedure and maintain patient safety. When Chris Deguzman RN asked me around 0500 on the 7th if I had sent a patient to TCU without an IV I stated the truth and that I told the RN receiving report that he had no IV access as all of his meds were PO, and no physician had ordered any. She told me fine & that she was too busy to pick up this patient, that he didn't belong on her unit, and that she refused to come pick him up and to have him transported by transport services. Upon hearing this Chris Deguzman RN (my charge) told me to file an Incident Report as he was familiar with this nurse and knew that one would be coming for me. I find it hard to believe that it took her over 6 hours to realize her patient did not have IV access, but that is her call & not mine.

#4: This brings us to the PES patient & Donna RN in PES. Earlier in the evening she told me that she had arranged for this patient to go to a woman's detox center, and that she had a cab voucher, all I needed to do was road test her, get her to sober up, eat, get dressed and be out of the ER by 21:30. Donna added that if this patient would not listen to me, to get her involved. I went 3 rounds with this particular patient about getting out to the shelter & getting help, and being safe. She (the patient) did not want anything to do with me. She ate some of the food I gave her & some juice. But then kept on insisting she was going to her home. I contacted Donna 3 times, and all 3 times Donna was able to get her to agree to go. On the 3rd time, Donna said to me that if she doesn't listen to me or doesn't want to go, that she (Donna) would take care of it. After the 3rd time of this patient being hostile towards me and uncooperative I walked her back to PES, since Donna said she would handle it, and before I did I asked Chris Deguzman RN (charge nurse) what should I do? He said walk her over, I need the monitored bed, and Donna said she would handle it. At no time did I ever say anything rude to the patient or did I treat her with any disrespect. I was shocked to find out that Donna Had interpreted it that way, and after having a face to face talk with her, she said she was really stressed that night too, they are understaffed, she is working doubles, and that she appreciated my apology letter, and said I didn't need to write her one as it was no big deal. We hugged, and I thought that problem was solved.

For My personal Performance Improvement Plan: I plan on gaining wisdom, experience & knowledge from fellow nurses, mainly ones with experience and a knowledge base far grander than my own.

I will continue to consult with my charge nurse before I do any procedure that I feel is

invasive or any where near out of scope of practice.

I will not give any medications with out MD orders, nor will I perform any invasive procedures (ex: IV starts, meds, foley caths) with out direct physicians orders.

I will make a conscience effort to make suggestions to any and all physicians, if there is something I need an order for, (ex: NG-Tube, IV, Meds) if these interventions are in the best interests of the patient and are for patient safety.

I would like to be able to come to Bobbi Foster or Penny Hutchings with any questions or concerns I may have regarding my nursing practice and performance.

I do want to be the best nurse I can be, and I do believe that with continued support, suggestions, and counseling that I can become that and more.

I also have realized through this experience that my odd sense of humor, and true honesty is a bit jarring to my fellow coworkers. I have and had no ill intentions towards them, and I do want to keep open the lines of communication, so we all can be a strong solid team that is really supportive and there for each and every member of our organization.

I do regret that these events have been so punitive as I was depending on the remainder of my retention bonus to pay off my relocation up here. And I sincerely mean it that I would like to be part of the ED team and spend the next 30 or more years with Mills-Peninsula.

And I do think it is a very positive and a valuable learning tool to meet with both of you to discus my performance, because I do have the desire to improve and want to be an asset to the organization.

Thank you again for all of the guidance & support you have given me.

Sincerely,

Lisa Maria Boccignone

CC: copies ENA guidelines

# PERFORMANCE CORRECTION NOTICE

**Disciplinary Level:**
- ☐ Verbal Warning
- ☐ Written Warning
- ☒ Investigatory Leave
- x Final Written Warning

**Employee Name:** Lisa Maria Boccignone

**Department Name:** Emergency Dept.

**Manager Name:** Foster/Hutchings

**Subject:**
- x Policy procedure violation
- x Performance transgression
- x Behavior/conduct infraction
- ☐ Workflow impact problem
- ☐ Other

**Prior Notifications:**

| Type | Date | Subject |
|---|---|---|
| ☐ Verbal | | |
| ☐ Written | | |
| ☐ Final Written | | |

## Incident Description:
*Be sure to include time, place, date of occurrence, person present as well as organization impact*

- 8/05 - Removing pacemaker (Zoll) from a critical patient without consent of patient's nurse
- 8/05 - Transferring a patient to TCU without IV access
- 8/05 - Administering a drug without a physician order.
- 8/05 — Inappropriate behavior around a PES patient
- 8/05 - Use of a 14 gauge IV in a 16 year old patient.

All the incidences listed above occurred in the ED at Peninsula and involved patients in the ED at the time.

## Performance Improvement Plan:

*1. Measurable/Tangible improvement goals. (i.e. I expect you to....)*

We expect that you will practice within your scope, ensure that physician orders are a part of the process and that what you do for your patient is covered by a physician order.

We expect that you will handle PES patients in a manner appropriate to their diagnosis and respect their dignity at all times.

We expect that you will work with your peers to ensure that ED policy and procedures are followed with all patients.

We expect that in the future if you are unsure of common procedures for the care of an ED patient that you consult with your peers or other resources before moving forward with care.

*2. Training or special direction to be provided:*

We expect that you will use the written resources that have been provided to you for review.

We expect you to come to one of us (Manager/Director), or to the Charge Nurse if you have questions or do not understand a response to your questions.

We expect that you will use your peers as a resource when deciding what action to take with an ED patient.

*3. Interim performance evaluation necessary?*

We anticipate meeting with you every 2 weeks, time to be determined based on scheduling.

*4. Our Employee Assistance Program (EAP) Provider, The Assist U, can be confidentially reached to assist you at 800-750-5595. This is strictly voluntary. A booklet regarding the Assist U is provided for you.*

*5. In addition, I recognize that you may have certain ideas to improve your performance. Therefore, I encourage you to provide your own Personal Implement Plan Input and Suggestions.*
*(Attach additional sheets or Employee Original if needed)*

## Outcomes and Consequences:

Positive: If you meet your performance goals and demonstrate your critical thinking skills, no further disciplinary action will be taken regarding this issue. In addition, you will no longer need to meet with Director/Manager on an every 2-week basis.

**Negative:** If at any time patient care issues are brought to our attention, investig[a], and we [...] issues; it will lead to immediate termination of employment.

Scheduled review date: **9/9/05**

**Employee Comments and/or Rebuttal:**
    [Fill in Employee Comments/Rebuttal Here]
    (Attach additional sheets or Employee Original if needed)

_Lisa Mastroginni_  08/24/05    _Bobbi Foster, RD Dir._  8/24/05
Employee Signature    Date    Manager Signature    Date

Linda Campagna RN 8/24/05
CNA Nurse Rep

rebuttail Letter to be

attached.

Performance Correction Notice Lisa Maria
10/8/02

Exhibit J

# PERFORMANCE CORRECTION NOTICE

**Employee Name:** Lisa Maria Boccignone

**Department Name:** ED

**Manager Name:** Foster/Hutchings

**Disciplinary Level:**
- [ ] Verbal Warning
- [ ] Written Warning
- [ ] Investigatory Leave
- [x] Final Written Warning

**Subject:**
- [ ] Policy procedure violation
- [ ] Performance transgression
- [ ] Behavior/conduct infraction
- [ ] Workflow impact problem
- [ ] Other

**Prior Notifications:**

| Type | | Date | Subject |
|---|---|---|---|
| [ ] | Verbal | | [Fill in Subject Here] |
| [ ] | Written | | [Fill in Subject Here] |
| [x] | Final Written | 8/30/05 | Patient Care |

**Incident Description:**

Over a 4-week period in February Lisa Maria was observed using a cell phone to text message during work hours.  She was repeatedly reminded to stop and to take care of patients.
2/15/06 - while caring for a demented patient Lisa Maria was heard threatening the patient by saying "I can rff you too."
2/15/06 - Lisa Maria went to the lounge and slept while she was on duty even though she is aware that sleeping while on duty is not allowed.  During this same time period Lisa Maria was observed taking long breaks for lunch and had to be reminded that her meal break is 30 min long.  When changing an elderly patient Lisa Maria was observed using excess force to remove the diaper rather than turning the patient to remove it in a more gentile manner. —

**Performance Improvement Plan:**

1. Measurable/Tangible improvement goals.
   I expect that phone messaging during work will cease.
   I expect that your breaks will be taken according to policy.
   I expect that you will not sleep at any time while you are on duty.
   I expect that your work with fellow employees and patients will be in compliance with all of the Standards of Conduct and Customer Service.

2. Training or special direction to be provided:
   I recommend that you continue to use Assist U
   I will provide you with another copy of the Standards of Conduct and Customer Service.

3. Interim performance evaluation necessary?
   Your performance will be formally re-evaluated in 30 days and on an ongoing basis after that.

4. Our Employee Assistance Program (EAP) Provider, The Assist U, can be confidentially reached to assist you at 800-750-5595. This is strictly voluntary. A booklet regarding the Assist U is provided for you.

5. In addition, I recognize that you may have certain ideas to improve your performance. Therefore, I encourage you to provide your own Personal Implement Plan input and Suggestions.

**Outcomes and Consequences:**

**Positive:**
If you meet your performance goals and work to the established professional standards no further disciplinary action will be taken regarding this issue. —

**Negative:**
This is your second final written warning.  If at any time you fail to meet your performance goals by not working in accordance with established professional standards it will result in termination of your employment with MPHS.

**Scheduled review Date:**

**Employee Comments and/or Rebuttal:**
(Attach additional sheets or Employee Original if needed)

Rebuttal to follow 03/16/2006

_Lisa Maria_____ RN    03/16/2006    _Bobbi Foster, RN_    3/16/06
Employee Signature    Date    Manager Signature    Date
                                                     ED Director

1 Original – Employee Services.    Copy – Manager    Copy – Employee    Copy – Personnel File

Performance Correction Notice Boccignone, Lisa Maria
10/8/02

# Exhibit K

**EDD    COPY    , TRANSCRIPT**

Lots of slightly inaudible noise & talking.  Sounds like they were introducing Mills witnesses.

Judge: Hearing is now conveniened.  Today is Thurs, 3/1/07, we're in session at San Francisco, California, presiding is administrative law judge DJ Sorvino, hearing is being recorded.  Present is the claimant, Lisa Maria, am I pronouncing your last name correctly?

LMB:  Boccignone

Judge:  Boccignone, ok.  Representing her today, your name sir?

RHG:  Robert Gold, from Gold & Associates.

Judge:  Ok, and with you today?

RHG:  my legal assistant, Elizabeth Winchell.

Judge:  W-I-N-C-H-E-L-L?

EW:  correct.

Judge:  Representing the employer, Mills Peninsula Health services, is, your name sir?

OC:  George McKennan (???)

Judge:  and with you today is, your name please?

BF:  Barbara Foster

Judge:  and we have an observer...

CC:  Claudia Christianson

Judge:  ok, and you'll be observing?

CC:  yes

Judge:  ok and in this matter, Ms. Boccignone has appealed from a department determination dated October 10, 2006 which found Ms. Boccignone in case #1996856 not qualified for benefits based on a finding she was discharged for misconduct connected with work.  Misconduct is defined as a substantial breach of an important duty owed by the employee to the employer, which shows a willful or wanton disregard to that duty and intends to injure the employer.  The employers account is reimbursable.  There is an additional issue of whether the claimant had good cause for failure to appear at a previously scheduled hearing.  Good cause includes things like mistakes, inadvertence, surprise and excusable neglect.  It does not include negligence, carelessness or procrastination.
The order of testimony will begin with the employer who has the burden of proof, then Ms. Boccignone will present her evidence in testimony.  I'll be asking questions.  After you have heard and understood the

F: she was a 12 hour person she had a schedule set up where she worked so many in one then she'd be off for a period of time

RHG: oh no, I'm sorry we're not on the same page I'm not saying she's off schedule because she was not scheduled to be there, she was placed on suspension

BF: oh, at the end of the month of February, not prior

RHG: so there was four days of that she was placed on suspension correct

BF: right, after it was the end of the month that she was put on suspension

RHG: that would cut down on the four weeks

BF: No, this was four weeks prior

RHG: well it says over a four week period of February and February has 28 days so I'm just trying to be specific <??>

BF: alright, I understand, but over a period of time over a period of four weeks it came to light in the month of February

RHG: ok

BF: cause her peers were finally had reached a point where they were complaining bitterly

RHG: ok, we'll talk about her peers in one second, uh are you aware of the fact that Lisa uh had a miscarriage on February 2, 2006

BF: yes I was

RHG: ok so there was a line here that Lisa Maria went to the lounge and slept while on duty even though she's aware that sleeping on duty's not allowed isn't fatigue a normal symptom of women who have a miscarriage after the first couple of weeks <01:00:19>

BF: uh

RHG: again, that's a yes or no question, you're a nurse

BF: No, I wouldn't answer that with a yes

RHG: you don't think when women have miscarriages and they have the blood and the fetus come out they have fatigue and emotional depression for the first couple of weeks after they have miscarried

BF: yes, I would agree with that

2

RHG: you would agree or would not

BF: I would agree, but if Lisa had was still having that then she should not have returned to work to her night shift and her regular duty

RHG: well obviously you knew about it correct

BF: I knew that she had had a miscarriage

RHG: right, and you're the supervisor you're the charge nurse, correct

BF: no, I'm the director

RHG: you're the director, you're the top lady

BF: um huh

RHG: so you're the one who would make the decision overall if someone's capable of being at the hospital or not wouldn't you

BF: no her doctor made that decision in returning her to work

RHG: but you're her supervisor

BF: right

RHG and if you feel the person who's working because of a physical ailment even though their trying to be a good trooper is working shouldn't' be there it's your job to send them home isn't it

OC: objection she's answered that question he's repeating his question

Judge: it's been asked and answered

RHG: ok, let me go over this for one second please so she's she's being criticized for text messaging cell phone use is not allowed in the hospital, is that correct

BF: it, it's allowed

RHG: uh, so why is she being criticized

BF: because she was spending the better part of her shift according to her peers text messaging to where they had to remind her to get up and take care of her patients

RHG: ok <can't understand>, who is this

BF: that's my assistant

2

Exhibit L



*Mills-Peninsula*
*Health Services*

A Sutter Health Affiliate

## REASONABLE ACCOMMODATION REQUEST FORM

Title 1 and Title V of the Americans with Disabilities Act of 1990 (ADA) and California's Fair Employment & Housing Anti Disability Discrimination Law prohibit employment discrimination against qualified individuals with disabilities. Mills Peninsula Health Services (MPHS) supports the Americans with Disabilities Act (ADA) and California's Anti Disability Discrimination Law (FEHA) and will not discriminate in any employment activity against a qualified applicant or employee with a disability. We will make reasonable accommodations to persons with qualifying disabilities unless to do so poses undue hardship. MPHS's Employee Services and Department Manager shall review this request for accommodation in confidence. An examination by a physician of MPHS's choosing may be required to arrive at a reasonable accommodation resolution. Please attach a note from your provider indicating what the reasonable accommodation is.

MPHS may require that you complete the "Authorization for Disclosure of Medical Information" form, as it may be necessary to contact your healthcare provider. This information, if obtained, would be held in confidence and only used to determine the need for reasonable accommodation and implementing accommodation solutions. If you choose not to authorize these disclosures, MPHS will evaluate your request on the basis of the best information available.

To:  Bobbi Foster
(Department Head)

From:  Lisa Maria Boccignone RN
(Name of person requesting accommodation)

Address:  853 Commodore Dr #274
Street                                      Apt. #

San Bruno         CA              94066
City               State            Zip

Telephone: Home: 650-872-0639   Alternate #: 650-515-6944

1.  I am requesting accommodation because (*circle one*):    A    or    (B)

    (A)    I am applying for employment. The accommodation requested would allow me to perform the essential job functions of the position I am applying for (position title): _____

    (B)    I am currently employed by MPHS and request a reasonable accommodation. My current job title is:  R N

2.  My specific functional limitation is _Pregnancy_. The accommodation I am requesting is described below. (Describe the type of accommodation; if it is a purchasable item list model, number, cost, where it can be obtained, etc., suggestions for work site or examination site modifications or specific job duties which may be restructured or shared to facilitate employment, or utilize a MPHS program, activity or service.)
    not lifting over 30lbs, limit exposure
    to infectious materials & Xrays

Over

3. What is the requested duration of your requested accommodation? (Please be specific)

august 04 2006 — Jan 1st 2007

4. Describe how this accommodation will assist you. *(Please attach additional sheets as necessary)*

Prevent infections & harm to the fetus

5. Please provide your healthcare provider's information:

Name: Neil St.-son

Address: 1828 El Camino Real STE 805
   *Street*

   Burlingame                    CA           94010
   *City*                     *State*          *Zip*

Phone: 650 - 692-3819

Fax: 650- 552- 0386

## EMPLOYEE CERTIFICATION

I certify that I have a disability or medical condition that requires reasonable accommodation, which will be met by acquiring the equipment, services, or work adjustments described above.

Signature: _____  Date: 08 / 04 / 2006

❖ Return this completed form to your Manager. They will in turn send it to Human Resources.

## Mills-Peninsula Health Services
### Pregnancy Information Form

**EMPLOYEE:** Complete this section and forward to your physician to complete. Return completed form to your Manager.

Name: LISA Maria Bocaignone

Site: [X] Mills  both  [X] Peninsula  [ ] Other

Home Address: 853 Commodore Dr # 274

Department: Emergency

City: San Bruno CA  Zip: 94066

Manager/Supervisor: Bobbi Foser

Home Phone: 650-873-0639

Job Title: R N   Shift: 1900-073

Signature: Lisa Maria Bocaignone

Date: 08/04/06

I authorize my physician to furnish my employer any information regarding my condition that relates to my work environment.

Job Duties and Environment (To be described by Employee):

All RN Duties, including moving pts, assisting patients, triage, invasive procedures, exposures to potentially infectious materials

Estimated last day of work: Jan 1, 2007

Estimated return to work date: May 6, 200

**PHYSICIAN:** Complete this section and return to the employee. Thank you.

The above named person is under my care for pregnancy, and will be examined by me at regular intervals. After reviewing the above description of the patient's duties and working environment, it is my opinion that she should be able to perform her work without undue risk of injury to the health of mother, child, patients or fellow employees. I recommend that she should not work beyond the date indicated.

Estimated date of Delivery: 1/30/07

Employment should not exceed estimated date of: 36 WKS  Jan 1

Recommendations or limitations: not lifting in excess of 30 lbs, limiting exposure to infectious wastes & x-rays.

Physician Name (printed):
PENINSULA WOMENS HEALTH
A MEDICAL GROUP INC.
1828 EL CAMINO REAL STE 805
BURLINGAME, CA 94010
Neil Silverman

Address: 1828 El Camino Real Ste

City: Burlingame, CA 94010

Signature: Neil Silverman M.D.

Date: 08/04/2006

Phone: 650-692-3818

**DEPARTMENT MANAGER COMMENTS:** Manger forward to Employee Services, Attn: Annette J. Barraza, Benefits

Signature:

Date:

**EMPLOYEE SERVICES COMMENTS:**

Signature:

Date:

Mills-Peninsula Health Services
Employee Services
1783 El Camino Real
Burlingame, CA 94010
Phone: 650-696-5635
Fax: 650-696-5698

*Mills-Peninsula*
*Health Services*

A Sutter Health Affiliate

# REASONABLE ACCOMMODATION REQUEST FORM

Title I and Title V of the Americans with Disabilities Act of 1990 (ADA) and California's Fair Employment & Housing Anti-Disability Discrimination Law prohibit employment discrimination against qualified individuals with disabilities. Mills-Peninsula Health Services (MPHS) supports the Americans with Disabilities Act (ADA) and California's Anti Disability Discrimination Law (FEHA) and will not discriminate in any employment activity against a qualified applicant or employee with a disability. We will make reasonable accommodations to persons with qualifying disabilities unless to do so poses undue hardship. MPHS's Employee Services and Department Manager shall review this request for accommodation in confidence. An examination by a physician of MPHS's choosing may be required to arrive at a reasonable accommodation resolution.

MPHS may require that you complete the "Authorization for Disclosure of Medical Information" form, as it may be necessary to contact your healthcare provider. This information, if obtained, would be held in confidence and only used to determine the need for reasonable accommodation and implementing accommodation solutions. If you choose not to authorize these disclosures, MPHS will evaluate your request on the basis of the best information available.

To: **Bobbi Foster**
(Department Head)

From: **LISA MARIA BOCCIGNONE RN**
(Name of person requesting accommodation)

Address:
**853 Commodore Dr # 204**
Street

**San Bruno          CA          94066**
City                State          Apt #        Zip

Telephone:
(Home) **650-872-0639**
(Work) **650-696-5446**

# REQUEST FOR REASONABLE ACCOMMODATION

1. I am requesting accommodation because (circle one):          **A**    or    **B**

   **(A)**     I am applying for employment. The accommodation requested would allow me to perform the essential job functions of the position I am applying for (position title):

   _____

   **(B)**     I am currently employed by MPHS and request a reasonable accommodation. My current job title is:   _Registered nurse_

2. My specific functional limitation is _Pregnancy_
   The accommodation I am requesting is described below. (Describe the type of accommodation; if it is a purchasable item list model, number, cost, where it can be obtained, etc., suggestions for work site or examination site modifications or specific job duties which may be restructured or shared to facilitate employment, or utilize a MPHS program, activity or service.)

   _____
   _____
   _____

3. What is the requested duration of your requested accommodation?

   _____

4. Describe how this accommodation will assist you. (**Please attach additional sheets as necessary**)

   _____

5. Please provide your healthcare provider's information:

**Name:**   _Neil Stinson_

**Address:**   _1828 El Camino Real    STE 805_

**Street**    _Burlingame_                    Apt #  _CA    94010_

**City**    _650 - 692 - 3818_                **State**                    Zip

**Phone:**

**Fax:**   _____

## EMPLOYEE CERTIFICATION

I certify that I have a disability or medical condition that requires reasonable accommodation, which will be met by acquiring the equipment, services, or work adjustments described above.

**Signature:** _Oria McBean_                    **Date:** _____

MPHS Employee Services
Personnel Policy #1.16                                             Page 8 of 10

Exhibit M



PEOPLE

# BENEFITS

Effective Jan. 1 – Dec. 31, 2007





**Mills-Peninsula Health Services**

A Sutter Health Affiliate



# BENEFITS

## employee benefits guide

**Effective Jan. 1 – Dec. 31, 2007**

*Medical   Dental   Vision   Flex Spending Accounts*
*Long-Term Disability.   Life Insurance*

## Easy steps to staying informed

It is important to stay up to date about your benefits program to ensure you take advantage of all it has to offer. Here are four easy steps:

- Read this booklet to familiarize yourself with the Mills-Peninsula benefits program;
- Follow the steps shown in Your Enrollment Guide on page 6 to sign up for benefits;
- Carefully review each issue of the employee newsletter, Weekly Update, as well as all memos entitled "RE: Your Benefits" that are sent to your home or distributed with your paycheck;
- Call the Benefits Office with any questions as well as when a family or job status change affects your benefits.

## Important Note for RNs:

If you are a registered nurse covered by the CNA contract, your labor agreement takes precedence over the benefits described in this booklet and the procedures to be followed in connection with those benefits, to the extent they differ. If you are a per diem employee, you have the option to purchase medical insurance at Mills-Peninsula's cost. If you are a contractual per diem employee, you have the option to purchase medical and dental insurance at Mills-Peninsula's cost.

## Discrepancies between this Benefits Book and official plan documents

This Benefits Book contains brief summaries of the benefit programs Mills-Peninsula provides for eligible employees. The purpose of these summaries is to acquaint employees with the general provisions of the applicable plans. For purposes of brevity and simplicity, they do not contain full statements of each of the terms, conditions and limitations of the plans. Consequently, if there is any real or apparent conflict between this Benefits Book and the terms, conditions or limitations of the official plan documents, the provisions of the official plan documents will control. Employees are therefore encouraged to review those documents for more detailed information concerning the plans. You may request copies of those documents from the Benefits Office.

# Your Mills-Peninsula Health Services Benefits Program

**Effective Dates: 1/1/2007 - 12/31/2007**

Please note that this booklet is intended to summarize the provisions of Mills-Peninsula's benefit plans. Although e effort has been made to ensure the accuracy of this booklet, if this booklet differs from applicable plan documents, the terms and conditions of those documents will prevail. You may request copies of those documents from the Ber Office.

Although Mills-Peninsula intends to continue indefinitely the plans described in this booklet, it reserves the right t change, amend, require contributions and change those contributions, and/or to terminate any plan at any time for active, retired and/or terminated employees. Termination of a plan will not affect any claim incurred while the pla was in force.

## Resources

**Information:**

| Benefits Office: | Carol Cruise | Ext. 5017 |
|---|---|---|
| | Carol Hing | Ext. 5784 |

**Medical Plans:**

MPHS Point of Service Health Plan
Benefit Risk Management Services
administrator - (Group #10081)    1-800-988-8373
customersupport@brmsonline.com

US Scripts Pharmacy
Information    1-800-460-8988
(Group #1560)
www.usscripts.com

Mills-Peninsula PPO
Plus and Classic Plans    1-800-988-8373
customersupport@brmsonline.com

Mills-Peninsula Medical Group
Member Services    650-240-8096

Pacificare HMO (66766)    1-800-624-8822
www.pacificare.com

CCN    1-800-988-8373

**Dental Plans:**

Delta Dental Premier Plan    1-888-335-8227
(Group #2444)
www.deltadentalca.org

**Vision Plan:**

Vision Service Plan    1-800-877-7
(Group #108419)
www.vsp.com

**Flexible Spending Accounts:**

Medical Reimbursement    1-800-988-8
Fax: 866-410-0

Dependent Care    1-800-988-8
Fax: 866-410-0

**Voluntary – Sheltered Retirement Plans – 403( Accounts:**

Lincoln Financial Services    1-800-359-8
Rod Acord (Medical Center)    925-659-0
Peter Morris (Health Center)    650-578-0

Fidelity Investments (67797)
Customer Service    1-800-343-0
R.M. Weber Insurance Services
Dan Taylor    1-800-659-3

**Employee Assistance Program:**

Assist U    1-800-750-5

**Long-Term Disability Plans:**

Hartford    1-800-289-9
UNUM    1-800-421-0
MetLife    1-800-300-4

**Sutter Health Retirement Services:**

| Lisa Swift | A-L | 1-916-286-4 |
| Kathy Milam | M-Z | 1-916-286-4 |
| Or toll free | | 1-888-280-9 |

# Your Enrollment Guide

To help you enroll for benefits, the chart below shows your benefit options, the actions you need to take to enroll or waive your participation, and the deadlines.

You will find online benefits (vbas) Reference Guide in the envelope included with this booklet.

During the Annual Enrollment period, online instructions will be available in Human Resources or go to www.vbas.com/sutter.

| Your Benefit Options | Actions to take | Deadlines |
|---|---|---|
| **Medical Plans:**<br>Mills-Peninsula Point of Service<br>Mills-Peninsula PPO<br>Pacificare HMO<br>Waive participation<br>    (option available online) | Enroll online at www.vbas.com/sutter<br>Enroll online at www.vbas.com/sutter<br>Enroll online at www.vbas.com/sutter<br>Enroll online at www.vbas.com/sutter | Enroll online no later than effective date. ,<br>Enroll online no later than effective date. ,<br>Enroll online no later than effective date. ,<br>Enroll online no later than effective date. , |
| **Dental Plan:**<br>Delta Dental Premier Plan<br>Waive participation | Enroll online at www.vbas.com/sutter<br>No action required. | Enroll online no later than effective date. ,<br>None. |
| **Vision Plan:**<br>Vision Service Plan<br>Waive participation | Enroll online at www.vbas.com/sutter<br>No Action required. | Enroll online no later than effective date. ,<br>None. |
| **Flexible Spending Accounts:**<br>Health Care Expense Account and/or<br>Dependent Care Assistance Account<br><br>Waive participation | Enroll online at www.vbas.com/sutter<br><br>No action required. | Day before effective date. ,<br><br>None. |
| **Life Insurance Plans:**<br>Group Term Life/AD&D<br>    Insurance Plan<br><br>Optional Life Insurance Plan<br><br>Long Term Disability Plan<br><br>Retirement Plan<br><br>Voluntary 403(b) Retirement Plan | Enroll online at www.vbas.com/sutter (no option to waive).<br><br>Enroll online at www.vbas.com/sutter<br><br>No action required.<br><br>Fill out and return election form.<br><br>Contact a representative listed under Resources on page 4, or request carrier information from Benefits Office. | As soon as possible and whenever beneficiary designation changes.<br><br>Enroll online no later than effective date. ,<br><br>None.<br><br>Submit no later than effective date. ,<br><br>None. |

, Your effective date is the first of the month following 60 days from your hire date or the date you become eligible for benefits. We recommend you enroll online within one week of your orientation date to ensure ample time for processing prior to your effective date.

# General Health Plan Information

## Section highlights

The boxed section below is a brief summary of the general rules that apply to all of the medical, dental and vision plans. Details follow.

### Eligibility[*]

You must be a benefit status employee and work a regular schedule of at least 40 hours in each biweekly pay period.*

### Enrollment

Enroll online at www.vbas.com/sutter prior to your effective date. Unless you have a family or job status change or your special enrollment rights apply, you may only change your coverage at annual enrollment. Note: you must enroll online to participate in health coverage.

### Costs

You and Mills-Peninsula share the cost of coverage options. You pay your share of the cost of coverage through pre-tax premiums, which saves you money in taxes.

### Coordination of benefits

If you are covered by another group health plan in addition to Mills-Peninsula's, the plans work together to pay medical benefits based on which plan is primary and which is secondary.

### When coverage ends

In most cases, coverage for you and your dependents ends the last day of the month in which you terminate, are no longer a benefit status employee, or request termination of your coverage at annual enrollment or due to a family or job status change.

### Coverage continuation

If your coverage terminates, you and your dependents may be eligible for medical, dental and vision continuation coverage or may be able to convert to an individual medical plan.

## Am I eligible to participate?

You may participate in the medical, dental and vision plans if you are classified as a benefit status employee on the Mills-Peninsula payroll and work a regular schedule of at least 40 hours in each biweekly pay period.* Your participation begins on your effective date, which is the first of the month after 60 days from your hire date or, if later, your benefit status date.

Persons who, for payroll purposes, are treated as independent contractors or leased employees, even if later determined to be common law employees, are not considered eligible employees under the plan. In addition, employees who are in a job classification covered by a collective bargaining agreement are excluded from coverage under the plan unless eligibility under the plan has specifically been extended to such employees through the collective bargaining agreement.

## Are dependents eligible to participate?

Dependents who are eligible for coverage under the medical, dental and vision plans include your:

- Spouse, unless legally separated or divorced;
- Unmarried children up to age 19 who are more than 50 percent dependent on you for financial support (this includes stepchildren, legally adopted children or children placed for adoption, and children under legal guardianship);
- Unmarried children of any age who are incapable of self-sustaining employment due to a physical handicap or mental retardation before attainment of age 19 and qualify as your dependents for federal income tax purposes;
- For coverage under the Mills-Peninsula Point of Service Health Plan and Mills-Peninsula PPO Plan: unmarried children between ages 19 and 25 if they qualify as your dependents for federal income tax purposes;
- For coverage under the Pacificare, Delta Dental and Vision Service Plan: unmarried children up to 19 and to age 25 if they are full-time students at an accredited school and qualify as your dependents for federal income tax purposes as determined by the claim administrator;

---

* All per diem employees have the option to purchase medical coverage. Contractual per diem employees may purchase medical and dental coverage. For more information, contact the Benefits Office (see Resources on page 4).

## General Information (continued)

- If dependents are eligible for coverage with both parents, they may not carry dual coverage with MPHS. Employees with spouses or domestic partners also employed by Mills-Peninsula and eligible for benefits may be enrolled in individual plans, or may enroll in a single plan. However, their dependents may only be covered by one parent.

## Can I add new dependents to my medical coverage?

If you have dependents due to birth, adoption, placement of adoption or marriage, you must enroll them within 60 days of the event. Their coverage will be effective as indicated in the chart below right. You and your dependents may not be eligible for all of these plans. See the section on page 16 entitled Your Medical Options. See special enrollment rights on page 59.

## How do I enroll?

Go to www.vbas.com/sutter to enroll no later than your effective date as defined on page 6. If you are covered under another group health plan or an individual health insurance policy and want to waive medical coverage, you must enroll online no later than your effective date. You will be eligible for a cash out payment if you are a benefit status employee and waive benefits online and are not enrolled in your spouse's plan at MPHS. The cash out payment is paid biweekly in your paycheck.

If you do not enroll during your initial enrollment period and later wish to do so, you must wait until the annual enrollment period, unless you have a qualifying family or job status change or qualify under special enrollment rights.

### Dependent coverage effective dates

| | Birth | Adoption | Marriage* |
|---|---|---|---|
| Point of Service | Immediate | Physical custody | Immediate |
| MPHS PPO | Immediate | Physical custody | 1st of next month |
| Pacificare | Immediate | Physical custody | Immediate |
| Delta Dental | 1st of next month | 1st of next month | 1st of next month |
| Vision | 1st of next month | 1st of next month | 1st of next month |
| Flexible Spending Account | 1st of next month | 1st of next month | 1st of next month |

* Enrollment form must be submitted within 60 days of qualifying event for coverage.

## Health Plan Biweekly Contributions*

| | Mills-Peninsula Point of Service Health Plan | Mills-Peninsula PPO Plus | Mills-Peninsula PPO Classic | Pacificare HMO | Vision Service Plan | Delta Dental |
|---|---|---|---|---|---|---|
| **Noncontractuals:** | | | | | | |
| Employee Only | $5.00 | N/A | $12.00 | $12.00 | $3.00 | $3.00 |
| Employee Plus Spouse/Partner | $26.00 | N/A | $28.00 | $28.00 | $5.00 | $6.00 |
| Employee Plus Children | $24.00 | N/A | $26.00 | $26.00 | $5.00 | $6.00 |
| Employee Plus Family | $30.00 | N/A | $35.00 | $35.00 | $5.00 | $8.00 |
| **RN Contractuals:** | | | | | | |
| Employee Only | $0 | $9.23 | $0 | $6.92 | $2.31 | $0 |
| Employee Plus One Dependent | $16.15 | $25.38 | $20.77 | $20.77 | $4.62 | $6.92 |
| Employee Plus Two or More Dependents | $18.46 | $30.00 | $20.77 | $20.77 | $4.62 | $6.92 |

* For per diem, COBRA, and leave of absence rates, contact the Benefits Office.

# Chart of Administration Information for the Mills-Peninsula Benefit Plans

| | Mills-Peninsula Point of Service Health Plan | Mills-Peninsula PPO Plans | Pacificare | Delta Dental Premier Plan | Vision Plan Accounts | Flexible Spending | Life/AD&D Insurance Plan | Supplemental Life Insurance | Long-Term Disability |
|---|---|---|---|---|---|---|---|---|---|
| **Plan Name** | Mills-Peninsula Health Services Point of Service Health Plan | Mills-Peninsula Health Services PPO Classic and PPO Plus | Mills-Peninsula Health Services Pacificare HMO Plan | Mills-Peninsula Health Services Dental Premier Plan | Mills-Peninsula Health Services Vision Service Planning Account | Mills-Peninsula Health Services & IRC Section 125 Flexible Spending Benefits for Employees of Program | Mills-Peninsula Health Services & Accidental Death, Dismemberment and Loss of Sight Health Insurance for Employees of Mills-Peninsula Health Services | Group Basic Life Supplement Life Disability Plan for Employees of Mills-Peninsula Health Services | Group Long-Term Disability Plan for Employees of Mills-Peninsula Health Services |
| **Plan Number** | 506 | 506 | 506 | 506 | 506 | 508/509 | 506 | 506 | 506 |
| **Type of Plan** | Welfare benefit plan; Group medical benefits | Welfare benefit plan; Group medical benefits | Welfare benefit plan; Group medical benefits | Welfare benefit plan; Group medical benefits | Welfare benefit plan; Group medical benefits | IRC Section 125 flexible spending account program | Welfare benefit plan; Group basic plan, Group life, AD&D, and supplemental life and dependent life benefits | Welfare benefit plan; Group supplemental life and dependent life benefits | Welfare benefit plan; Group long-term disability benefits |
| **Plan Year** | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 |
| **Source of Plan Contributions** | Mills-Peninsula Health Services and participating employees | Mills-Peninsula Health Services and participating employees | Mills-Peninsula Health Services and participating employees | Mills-Peninsula Health Services and participating employees | Mills-Peninsula Health Services and participating employees | Participating employees | Mills-Peninsula Health Services and participating employees | Mills-Peninsula Health Services and participating employees | Mills-Peninsula Health Services |
| **Type of Administration/ Funding** | Benefits are furnished under a health care plan funded by the plan sponsor Benefits are self insured | Benefits are furnished under a health care plan funded by the plan sponsor Benefits are self insured | Benefits are furnished under a health care plan funded by the plan sponsor Benefits are fully insured | Benefits are furnished under a health care plan funded by the plan sponsor Benefits are self insured | Benefits are furnished under a health care plan funded by the plan sponsor Benefits are self insured | Benefits are provided from Mills-Peninsula general assets | Benefits are provided in accordance with the provisions of the applicable group policy | Benefits are provided in accordance with the provisions of the applicable group policy | Benefits are provided in accordance with the provisions of the applicable group policy |
| **Plan Administrator** | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 |
| **Agent for Service of Legal Process** | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 |

# Exhibit N

STATE OF CALIFORNIA - State and Consumer Services Agency                                                          ARNOLD SCHWARZENEGGER, Governor

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

1515 Clay Street, Suite 701, Oakland, CA 94612
(510) 622-2973  TTY (800) 700-2320  Fax (510) 622-2952
www.dfeh.ca.gov



September 19, 2007

Robert Harlan Gold
Attorney at Law
GOLD & ASSOCIATES
235 Montgomery Street
San Francisco, CA  94104

RE:    E200708A0014-00-psc
       BOCCIGNONE/MILLS-PENINSULA SUTTER HEALTH

Dear Robert Harlan Gold:

## NOTICE OF FILING OF <u>AMENDED CLOSED</u> DISCRIMINATION COMPLAINT

Enclosed is a copy of your client's amended closed complaint that has been filed with
the Department of Fair Employment and Housing in accordance with California
Government Code sections 12960 and/or 12980.  Also enclosed is a copy of your
client's Notice of Case Closure, which constitutes your client's right-to-sue notice.

Please note that under Government Code section 12962, you are responsible for
**service of the amended complaint** on respondent(s).  You should also enclose a copy
of the Notice of Case Closure along with the amended complaint.  These documents
must be served within **60 days** of the filing date of the amended complaint.
Government Code section 12962, subdivision (b), further provides that complaints must
be served either personally or by certified mail with return receipt requested.

For additional information, please read the enclosed Notice of Case Closure that
explains the conditions for filing a private lawsuit in the State of California.

Sincerely,

Herbert Yarbrough
District Administrator

Telephone Number: (510) 622-2967

Enclosures

Cc:  Case file

DFEH-200-50a (01/05)

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES A...    ARNOLD SCHWARZENEGGER, Governor

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

1515 Clay Street, Suite 701, Oakland, CA 94612
(510) 622-2973 TTY (800) 700-2320 Fax (510) 622-2952
www.dfeh.ca.gov



July 13, 2007


Robert Harlan Gold
Attorney At Law
Gold & Associates
235 Montgomery Street
San Francisco, CA 94104

RE:    E200708A0014-00-psc
       Boccignone/Mills-Peninsula Sutter Health

Dear Robert Harlan Gold:

## NOTICE OF CASE CLOSURE

This letter informs that the above-referenced complaint that was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective July 13, 2007 because an immediate right-to-sue notice was requested. DFEH will take no further action on the complaint.

This letter is also the Right-To-Sue Notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

If a federal notice of Right-To-Sue is wanted, the U.S. Equal Employment Opportunity Commission (EEOC) must be visited to file a complaint within 30 days of receipt of this DFEH *Notice of Case Closure* or within 300 days of the alleged discriminatory act, whichever is earlier.

Notice of Case Closure
Page Two

DFEH does not retain case files beyond three years after a complaint is filed, unless the case is still open at the end of the three-year period.

Sincerely,

Herbert Yarbrough
District Administrator

cc:    Case File

Bibbi  Foster
Director of Emergency Department
Mills-Peninsula Sutter Health
1725 El Camino Real
Burlingame, CA  94010

DFEH-200-43 (06/06)

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY

ARNOLD SCHWARZENEGGER, Governor

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

1515 Clay Street, Suite 701, Oakland, CA 94612
(510) 622-2973 TTY (800) 700-2320 Fax (510) 622-2952
www.dfeh.ca.gov

July 13, 2007

Robert Harlan Gold
Attorney At Law
Gold & Associates
235 Montgomery Street
San Francisco, CA 94104

RE:  E200708A0014-00-psc
Boccignone/Mills-Peninsula Sutter Health

Dear Robert Harlan Gold:

## NOTICE TO COMPLAINANT'S ATTORNEY

Enclosed is a copy of your client's complaint of discrimination filed with the Department of Fair Employment and Housing on 7/13/2007 pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also enclosed is a copy of your client's Notice of Case Closure, which constitutes your client's right-to-sue notice.

Please note that under Government Code section 12962, you are responsible for **service of the complaint** on respondent(s). You should also enclose a copy of the Notice of Case Closure along with the complaint. These documents must be served within **60 days** of the filing date of the complaint. Government Code section 12962(b) further provides that complaints must be served either personally or by certified mail with return receipt requested.

For additional information, please read the enclosed Notice of Case Closure that explains the conditions for filing a private lawsuit in the State of California.

Sincerely,

Herbert Yarbrough
District Administrator

Enclosure:    Complaint of Discrimination
              Notice of Case Closure

DFEH-200-06 (01/05)

TATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                                    ARNOLD SCHWARZENEGGER, Governor

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

515 Clay Street, Suite 701, Oakland, CA 94612
510) 622-2973 TTY (800) 700-2320 Fax (510) 622-2952
www.dfeh.ca.gov



July 13, 2007


Robert Harlan Gold
Attorney At Law
Gold & Associates
235 Montgomery Street
San Francisco, CA 94104

RE:    E200708A0014-00-psc
       Boccignone/Mills-Peninsula Sutter Health

Dear Robert Harlan Gold:

### NOTICE OF CASE CLOSURE

This letter informs that the above-referenced complaint that was filed with the
Department of Fair Employment and Housing (DFEH) has been closed effective
July 13, 2007 because an immediate right-to-sue notice was requested. DFEH will
take no further action on the complaint.

This letter is also the Right-To-Sue Notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the
Fair Employment and Housing Act against the person, employer, labor organization
or employment agency named in the above-referenced complaint. The civil action
must be filed within one year from the date of this letter.

If a federal notice of Right-To-Sue is wanted, the U.S. Equal Employment
Opportunity Commission (EEOC) must be visited to file a complaint within 30 days
of receipt of this DFEH *Notice of Case Closure* or within 300 days of the alleged
discriminatory act, whichever is earlier.

Notice of Case Closure
Page Two

DFEH does not retain case files beyond three years after a complaint is filed, unless the case is still open at the end of the three-year period.

Sincerely,

Herbert Yarbrough
District Administrator

cc:    Case File

Bibbi  Foster
Director of Emergency Department
Mills-Peninsula Sutter Health
1725 El Camino Real
Burlingame, CA  94010

DFEH-200-43 (06/06)

# Exhibit O

http://www.unununuununununununununununun·--

## The BRMS Advantage

- ▸ TRUSTED AND VALUED RELATIONSHIPS
- ▸ BENEFIT ADMINISTRATION WITH VBAS®
- ▸ CASE STUDIES AND TESTIMONIALS

*V/bas®*

### The BRMS Advantage

**Personal Service and Genuine Care**

We work directly with each customer - on a personal level - to ensure we align with your corporate goals, improve your employee benefit efficiency and effectiveness, and reduce your healthcare costs.

With a senior member of our executive team overlooking all accounts, and an Account Management Team (consisting of a seasoned Account Executive who is supported by Account Representatives and a toll free Customer Support Call Center), each client receives personal care and direct access to the answers they need.

*BRMS focuses on building quality relationships*

### Your Account Management Team



**Building Trusted & Valued Relationships to Reduce Healthcare Costs**

BRMS focuses on building quality relationships — both internally and externally — to ensure we align with your corporate healthcare goals, and reduce your costs, so you can focus on building relationships with your employees.

benefit and Risk Management Services – employee benefit administration solutions

home | © 2006 brms | California web design by graviate design studio
the brms advantage | about us | services | contact us | site map | privacy
policy

Learn More

**Exclusive Employee Benefit Administration Technology**
Our Virtual Benefits Administration System (Vbas®) is BRMS' exclusive, proprietary technology
solution that manages your member's benefit data, eligibility, enrollment, reporting and
consolidated billing online.

Vbas® empowers employers and employees to manage the entire benefit process via the internet,
eliminating timely processes, paperwork and errors.

**Employer Advantage**

One secure database houses all employee data

Online communication reduces paperwork

Automated systems enforce plan eligibility

Billing reconciliation reduces errors

Consolidated billing provides one invoice

HR and Payroll data exchange saves time and ensures data integrity

Pre-scheduled custom reports are ready when you need them

**Employee Advantage**

Empowerement to manage their own benefits

24-7 online access anytime, anywhere

Toll-free customer support to answer benefit questions

Learn More

**Experience & Knowledge**
BRMS' experienced senior management team has been working in the employee benefit industry
since the mid-1970's and is comprised of inventive seasoned professionals with a passion for
developing creative solutions that contain
healthcare costs.

Managing over $600 million in employee benefit
premiums annually, our executives are known
for providing valuable insight to HR
professionals and health insurance committees
on a multiplicity of employee benefit
management topics, including:

*Vbas ®], we were able*

*to make better*

*benefit decisions*

*and cut our*

*administration*

*costs in half.*

...fit and Risk Management Services – employee benefit administration solutions

Stockton School District

Employee benefit risk assessments and plan management through:

Creative funding options

Custom, hands-on consultation

Advanced web-based administration solutions

Ongoing education on new regulations, compliance issues and industry standards

Learn More



# brms
### Benefit & Risk Management Services



HOME
PROVIDER DIRECTORY
VBAS® MEMBER ACCESS
BROKER SITE

**The BRMS Advantage** | **About Us** | **Services** | **Contact Us** | **Broker Site**

- ► About Us
- ► WHITE PAPERS
- ► PRESS RELEASES
- ► EXECUTIVE TEAM
- ► EDI CARRIERS
- ► JOB OPPORTUNITIES
- ► BROKER SITE

## Benefit Administration & Healthcare Risk Management Specialists

*Leading
benefit administrator
and healthcare
risk manager*

Established in 1994, Benefit & Risk Management Services, Inc. (BRMS) is a leading benefit administrator and healthcare risk manager that delivers innovative technology and administration solutions that control rising healthcare costs.

One of the first to introduce employee benefit administration technology solutions, our services are powered by our exclusive Virtual Benefits Administration System (Vbas®) — a proprietary database and administration system that allows employers to save time and money by automating management of the benefit supply chain and empowering employees to self-service their benefits.

Our clientele includes both public and private sector organizations, including industry leading IT companies, vineyards, hospitals, credit unions, homebuilders, school districts, unions and more.



### Education Division
#### Custom Solutions for the Special Challenges Schools Face

As employee benefit and healthcare managers, we have led the education industry in creative membership and eligibility administration solutions. One of our first clients was a California Unified School District. Ten years later, we are still containing costs for that same client along with over 50 other School Districts throughout the state. In addition, BRMS is helping school districts throughout the country – from New York to California, and Florida to Idaho — to contain their benefit costs with our innovative administration and technology solutions.

**Mission:**
To exceed our customer's expectations by improving healthcare information access and management, simplifying the benefit administration process, and reducing healthcare costs with best-in-class technology and well-trained staff.

benefit and Risk Management Services — employee benefit administration solutions

http://www...



*Vbas*®

home | the brms advantage | about us | services | contact us | site map | privacy policy

© 2006 brms | California web design by gravitate design studio

With a special Education Division, staffed by a team of industry veterans with dedicated experience in the Education market, we help School Districts throughout the nation to streamline and reduce employee benefit expenses. Contact us for more information.

View our Education Market Case Studies



### Healthcare Division
*Specializing in Healthcare Service*

*Provider Employee Benefits*

BRMS has extensive experience in working with healthcare service providers, from large hospitals to mental health, counseling, and care program providers, to name a few. Presently, BRMS manages the consolidated billing and eligibility, as well as the COBRA, FSA, HIPAA and retiree healthcare accounts for over 40 Healthcare facilities representing more than 35,000 employees. In addition, we offer various levels of TPA services designed especially for hospitals and other healthcare service providers who have self-insured their Medical, Dental and Visions programs. These lives all have multi-level network benefits in which BRMS has purchased or contracted (on their behalf) one or more of the network tiers.

Given our extensive expertise in managing the unique challenges that healthcare organizations face when considering self-funding, many providers turn to BRMS to reduce their risk and increase their administration efficiencies. Contact us for more information.

**BRMS Services:**

Vbas® Online Benefit Administration & Enrollment

Employee Communication

Online Enrollment

Data Management

EDI Transfers

...fit and Risk Management Services – employee benefit administration solutions.

Automated Reports
Benefit Statements
Consolidated Billing

**Third Party Administration Services**
Claims Administration
FSA/HSA/HRA Administration
COBRA Administration
Customer Support Call Center
Auditing

**Risk Management**
Risk Assessment and Insurance Underwriting
Self-Insured Coverage
Fully-Insured Coverage
Re-Insurance Underwriting and Placement
Medical Management
Utilization Review
Data Warehousing & Reporting
PPO Network Management

Benefit & Risk Management Services, Inc.
10860 Gold Center Drive, Suite 300
Rancho Cordova , CA 95670
Toll Free: 800.959.4767
Phone: 916.858.2950
Fax: 916.858.2970
Email: info@brmsonline.com

http://www.unisoluticsolar_nex_arar

# brms
Benefit & Risk Management Services



HOME
PROVIDER DIRECTORY
VBAS9 MEMBER ACCESS
BROKER SITE

| The BRMS Advantage | About Us | Services | Contact Us | Broker Site |

## Services

- **RISK MANAGEMENT**
- **THIRD PARTY ADMINISTRATION**
- **VBAS9 ONLINE BENEFIT ADMINISTRATION & ENROLLMENT**
- **RISK ASSESSMENT AND INSURANCE UNDERWRITING**
- **MEDICAL MANAGEMENT**
- **UTILIZATION REVIEW**
- **DATA WAREHOUSING & REPORTING**
- **PPO NETWORK DEVELOPMENT**

*We excel in alternative strategies to manage your risk.*

## Risk Assessment and Underwriting

BRMS specializes in asset protection and cost containment - proactively identifying and controlling your healthcare risk.

We excel in alternative strategies to manage your risk, such as self-funding, expert underwriting and placement of reinsurance and stop-loss (if required), and affordable fully-insured coverage with leading healthcare insurance providers.

### Self-Funded Coverage

BRMS can help you determine whether and how to self-fund your company's employee benefit program.

We have the expertise to educate you on the advantages and risks of self-funding and how to protect those risks with stop-loss insurance programs. We will walk you through a step-by-step plan to explore whether this alternative funding solution is a good fit for your company.

In implementing a self-funded benefit program, we employ seasoned industry veterans to design an optimal benefit plan for each organization and benefit group.

You also receive extensive reporting with our inclusive data warehouse, to review and analyze claims activity for better decision making.

When losses occur due to unforeseen situations, we aggressively take action to control the loss with a fully-staffed utilization review and medical management teams.

Learn More about Self-Funding

Fully-Insured Coverage



BRMS

http://www.brmsonline.com/demo/index.htm





# Sutter Health
### With You. For Life.

Virtual Benefits Administration System (Vbas)

## Welcome to your
## Online Benefits!



### Secure Sign In

**Site Security**

2007-06-11

11-JUN

To sign in, enter your Lawson Employee Number in the above field.

**User Name**

**Password**

Your initial password is the last four digits of your Social Security number and the year of your birth. For example, if your SSN was 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 and your birth year was 1970, then your password would be 67891970.

[SIGN IN]

◇ Forgot Your Password, Click Here

If you do not know or have an email address associated with your User Account, please contact your HR or Benefits Department directly.

◇ Minimum System Requirements, Click Here

◇ System Maintenance Schedule, Click Here

◇ Privacy Policy, Click Here

Exhibit P



**Mills-Peninsula**
**Health Services**
A Sutter Health Affiliate

RECEIVED
MAR 2 3 2006
EMPLOYEE SERVICES



**COPY**
## LEAVE OF ABSENCE FORM

### EMPLOYEE DATA

Emp. Name: **LISA MARIA BOCCIGNON**    Home Address: **853 Commodore Dr.**

Position: **RN**    Emp. No. **3601368**    City: **San Bruno**    Zip: **94066**

Department: **Emergency**    Home Phone: **650 - 872 - 063.**

Work Site:    Mills ☑    Peninsula ☑    Other ☐

Scheduled Hours Per Pay period: **72**    Department Manager: **Penny / Babbi**

Hire Date: **Jan 2005**    Manager Notified: ☑Yes ☐No Date: **02/28/20**

### EMPLOYEE REQUEST

Request is for:    ☑ Leave of Absence    ☐ Extension of Original Leave of Absence

My last day scheduled to work will be (or was): **02/17/06**.

I will be off from work starting **02/17/06** and expect to return to work on: **02/26/06**.
(First Day not at Work)    (Estimated Date of Return)

### I will be away from work for the reasons checked below: (check all that apply)

⇨ **Illness or non-work-related injury** ☑

   Do you want to use your PTO when your Old Sick/ESL are depleted?    ☑Yes ☐ No

⇨ **Hospitalization** ☐
   ▪ _____(date)    Comments:
   Do you want to use your PTO when your Old Sick/ESL are depleted?    ☐ Yes ☐ No

⇨ **Surgery** ☐
   ▪ _____(date)    Elective?: Yes or No
   Do you want to use your PTO when your Old Sick/ESL are depleted?    ☐Yes ☐No

⇨ **Work-related Injury or Illness** ☐
   ▪ Date of injury: _____    ▪ Date injury first reported:_____
   Do you want to use your PTO when your Old Sick/ESL are depleted?    ☐Yes ☐No

⇨ **Military Leave (Active or Reserve duty)** ☐
   *A copy of your orders must be attached*
   Do you want to use your PTO when your salary continuation has ended?    ☐Yes ☐No

⇨ **Pregnancy, childbirth or related medical condition** ☐

   Do you want to use your PTO when your Old Sick/ESL are depleted
   during Pregnancy Disability?    ☐Yes ☐No

   a.    **Birth of my child** ☐
      ▪ Date of birth or expected birth: _____

   b.    **Placement of a child with me for adoption or foster care** ☐
      ▪ Date of placement or expected placement: _____

⇒ **Absence due to a "serious health condition" of my son, daughter, spouse or parent** ❑
  ▪ Relationship of individual to me: _____
  *(The term "son or daughter" is defined under FMLA as a biological, adopted, or foster child, a stepchild, a
  ward, or a child of a person standing in loco parentis; who is under age 18, or 18 years of age or olde
  incapable of self-care because of a mental or physical disability. The term "parent" does not include pare
  law. A certification form will be provided for the health-care provider to complete. The form must be submi
  Employee Services within 15 calendar days. For more information, refer to Personnel Policy #2.19)*

⇒ **Do you want to use eligible ESL(Old Sick) hours through Kin Care (AB109)?**    ❑Yes ❑No
  *(Hours may be available if you need time off to care for a parent, spouse or child)*

⇒ **Will apply for Paid Family Leave Program**    ❑Yes ❑No
  To provide care for parents, children, spouse or registered domestic partner or to bond with a new chil
  ▪ Relationship of individual to me: _____

By submitting this request, I hereby acknowledge receiving a copy of the Mills-Peninsula Health Services' Leave of abse
policies and the Leave of Absence book. I understand that failure to abide by the policies contained in the Leave book a
failure to return to work at the end of the approved leave period may result in delay or denial of leave, or it may re
disciplinary action up to and including voluntary termination of your employment. I further acknowledge that leaves of ab
may be concurrently charged against my entitlement to leave under all appropriate federal and state laws and that all re
are subject to approval by my Department Manager and Employee Services.

I certify that the above statements are true.

Employee's Signature: _~~Jae McCarron~~_    Date: 03 / 24 / 2006

# Return this form to the Disability Management Office in Employee Services.

---

**EMPLOYEE SERVICES APPROVAL (TO BE COMPLETED BY EMPLOYEE SERVICES ONLY)**

Provisional Designation of Federal Medical Leave Act of 1993 & California Family Rights Act

☒ No, does not qualify for FMLA/CFRA:  _Late Notification_
  ➢ Has not worked 1250 hours in the previous 12 months ❑
  ➢ And/or has not employed at MPHS for 1 year ❑
  ➢ Has already used 12 weeks of FMLA/CFRA in the last 12 month period ❑

❑ Yes, qualifies for FMLA/CFRA.  Pending receipt of Medical Certification

FMLA/CFRA notification letter provided to Employee on _3 /24/06_ by _Cde_ , Employee Services

❑ Kin Care Leave: Eligible for _____ hours of CSL, Old Sick, or ESL *(Pending receipt of Medical Cert.)*

---

Mills-Peninsula Health Services
Employee Services, Disability Mgmt.
1783 El Camino Real
Burlingame, CA 94010
**Phone:** (650) 696-5635
**Fax** (650) 696-5698

CC: Manager, Payroll, *(Workers' Comp. Coordinator or the Staffing Office if applicable)*      Loareq.doc 1/0

Exhibit Q

Filed 2/14/02

## CERTIFIED FOR PUBLICATION

## COURT OF APPEAL, FOURTH DISTRICT

## DIVISION TWO

## STATE OF CALIFORNIA

FREDERICK PHILLIPS,

      Plaintiff and Appellant,

v.

ST. MARY REGIONAL MEDICAL
CENTER,

      Defendant and Respondent.

E029143

(Super.Ct.No. VCV 018084)

OPINION

APPEAL from the Superior Court of San Bernardino County. John M. Tomberlin, Judge. Reversed.

Kampf, Schiavone & Associates and James L. Price for Plaintiff and Appellant.

Foley & Lardner, Richard M. Albert, Muira K. Mishra, and Michael A. Graham for Defendant and Respondent.

### 1. Introduction

Plaintiff Frederick Phillips filed a wrongful termination action against defendant St. Mary Regional Medical Center, a nonprofit, religious corporation, alleging that defendant retaliated against him for filing a complaint for race and sex discrimination with the Department of Fair Employment and Housing (DFEH) and the Equal

1

Employment Opportunity Commission (EEOC). Plaintiff claimed that defendant violated the public policy set forth in the Fair Employment and Housing Act (FEHA),[1] article I, section 8 of the California Constitution (Section 8), and Title VII of the Civil Rights Act of 1964 (Title VII).[2] In response to a demurrer filed by defendant, the trial court found, as a matter of law, that plaintiff failed to state a cause of action for wrongful termination because the cited authorities were inadequate to overcome the religious-entity exemption under the pre-amended version of FEHA.

In challenging the court's decision sustaining defendant's demurrer, plaintiff argues that all three sources of public policy were adequate to support his claims for wrongful termination. Although we reject plaintiff's reliance on FEHA, which at the time of plaintiff's termination completely exempted religious entities from liability under its provisions, we agree with plaintiff that Section 8 and Title VII are alternative sources of fundamental and well-established public policy sufficient to support plaintiff's common law cause of action for wrongful termination. Accordingly, we reverse the trial court's judgment.

## 2. Background

In November of 1995, plaintiff began his employment as a social worker at St. Mary Regional Medical Center.

---

[1] Government Code section 12900 et seq.

[2] 42 United States Code section 2000e et seq.

2

In January of 1998, plaintiff filed a complaint with DFEH for race and sex discrimination. In his complaint, plaintiff alleged that, because he was an African-American male, defendant subjected him to discriminatory treatment with regards to certain employment benefits, including pay raises, job duties, and family care and medical leave under the Family Rights Act.[3] On August 19, 1998, plaintiff and defendant entered a settlement agreement resolving the allegations of discrimination.

Less than three months later, on November 9, 1998, defendant terminated plaintiff's employment at the medical center.

In November of 1998, plaintiff filed another complaint with DFEH alleging that defendant suspended and later terminated him because of his earlier complaint for race and sex discrimination. Defendant informed plaintiff that the reason for its employment decision was plaintiff's poor judgment in transferring a patient to another facility.

On May 24, 1999, plaintiff filed his original complaint for the following causes of action: breach of implied contract; breach of the covenant of good faith and fair dealing; retaliation in violation of FEHA; and wrongful termination in violation of public policy. Defendant filed its motion for summary judgment or summary adjudication on the ground that plaintiff's at-will employee status barred his claims for breach of implied contract and breach of the covenant of good faith and fair dealing. Defendant also asserted that it was exempt under FEHA as a nonprofit, religious corporation. As to plaintiff's final cause of action, defendant noted that plaintiff failed to identify a particular public policy.

---

[3] Government Code section 12945.1 et seq.

3

The trial court granted defendant's motion for summary adjudication as to plaintiff's first three causes of action, but denied the motion as to the last cause of action for wrongful termination in violation of public policy. The court granted plaintiff leave to amend his complaint to identify a particular public policy.

On April 19, 2000, plaintiff filed his first amended complaint for wrongful termination in violation of public policy under FEHA, Section 8, and Title VII. In his complaint, plaintiff alleged that defendant terminated him in retaliation for filing a complaint with DFEH and EEOC for race and sex discrimination.

Defendant demurred to plaintiff's first amended complaint on the ground that plaintiff failed to plead facts sufficient to state a cause of action. In support of its demurrer, defendant made the following arguments: FEHA could not support plaintiff's public policy claim because it was exempt from FEHA as a matter of law; Section 8 did not provide the basis for a wrongful termination claim based on retaliation; and Title VII did not apply because plaintiff failed to file his complaint with the EEOC.

At the hearing on August 29, 2000, the trial court noted that plaintiff's complaint included allegations that he had filed claims with both DFEH and EEOC. During the same hearing, the trial court noted that the parties had failed to provide adequate briefing on how the Legislature's recent amendment limiting the religious-entity exemption under FEHA affected plaintiff's claim for wrongful termination in violation of public policy. On this subject, the court requested that the parties submit supplemental briefing.

4

In his supplemental brief, plaintiff argued that the court should consider California's current public policy, as manifested in the amended version of FEHA, because defendant should have foreseen that the Legislature would limit the religious-entity exemption. Defendant responded that the amended version of FEHA could not serve as the basis of plaintiff's wrongful termination in violation of public policy cause of action because the amendments could not be applied retroactively, and because religious-entity liability was not the firmly established public policy in California at the time of plaintiff's termination.

After receiving all further briefing from the parties, the trial court sustained defendant's demurrer without leave to amend.

### 3. Standard of Review

On appeal from a judgment of dismissal following the sustaining of a demurrer, we exercise our independent judgment in determining whether the complaint states, or can be amended to state, a cause of action as a matter of law.[4] In making this determination, we assume the truth of all properly pleaded material facts.[5]

### 4. Wrongful Termination in Violation of Public Policy

The tort cause of action for wrongful termination in violation of public policy provides a vehicle for recourse that otherwise would be unavailable under general rules of

---

[4] *Crowley v. Katleman* (1994) 8 Cal.4th 666, 672.

*[footnote continued on next page]*

5

the at-will employment doctrine.[6] First recognized by the California Supreme Court in *Tameny v. Atlantic Richfield Co.*,[7] this public policy exception allows an employee to bring a tort cause of action against an employer who terminates an at-will employment on a ground that violates fundamental public policy.[8] The exception is based on the principle that, although an employer may terminate an at-will employee for no reason, or any arbitrary or irrational reason, the employer has no power to terminate the employee for a reason contrary to the law or fundamental public policy.[9]

Despite broad acceptance of the public policy exception, "[t]he difficulty . . . lies in determining where and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee. This determination depends in large part on whether the public policy alleged is sufficiently clear to provide the basis for such a potent remedy."[10]

---

[footnote continued from previous page]

[5] *Crowley v. Katleman, supra,* 8 Cal.4th at page 672; *Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 218.

[6] *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 887; *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1089, overruled in part by *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80, footnote 6.

[7] *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 178.

[8] *Stevenson v. Superior Court, supra,* 16 Cal.4th at page 887.

[9] *Gantt v. Sentry Insurance, supra,* 1 Cal.4th at page 1094.

[10] *Gantt v. Sentry Insurance, supra,* 1 Cal.4th at page 1090.

To support a wrongful discharge claim, the policy must be "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interest of the individual; (3) well established at the time of the discharge; and (4) substantial and fundamental."[11]

By limiting the sources of public policy to constitutional and statutory provisions, the California Supreme Court recognized that the concept of public policy was "notoriously resistant to precise definition."[12] Thus, "courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, 'lest they mistake their own predilections for public policy which deserves recognition at law.' [Citation.]"[13] Moreover, "[a] public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees

---

11  *Stevenson v. Superior Court, supra,* 16 Cal.4th at page 894; see also *Kelly v. Methodist Hospital of So. California* (2000) 22 Cal.4th 1108, 1112; *Gantt v. Sentry Insurance, supra,* 1 Cal.4th 1083, 1090, citing *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 669-670.

12  *Gantt v. Sentry Insurance, supra,* 1 Cal.4th at page 1095; see also *Green v. Ralee Engineering Co., supra,* 19 Cal.4th at page 76.

[footnote continued on next page]

are protected against employer actions that contravene fundamental state policy. And society's interests are served through a more stable job market, in which its most important policies are safeguarded."[14]

### 5. FEHA

Plaintiff offers three sources of public policy, the first of which is FEHA. Plaintiff contends that Government Code sections 12920 and 12940 of FEHA serve as a source of fundamental public policy for his claim of wrongful discharge. Plaintiff also contends that, despite the religious-entity exemption in the pre-amended version of FEHA, the court should have applied the amended version of FEHA retroactively because defendant's liability for such discriminatory conduct was foreseeable.

We conclude that, while FEHA may be a source of fundamental public policy, well-established law, as set forth in the pre-amended version of FEHA, at the time of plaintiff's termination bars his common law claim under FEHA.

FEHA establishes a civil right to be free from job discrimination based on certain classifications including race and sex.[15] Government Code section 12920 provides: "It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment

*[footnote continued from previous page]*
13 *Gantt v. Sentry Insurance, supra,* 1 Cal.4th at page 1095.

14 *Gantt v. Sentry Insurance, supra,* 1 Cal.4th at page 1095.

*[footnote continued on next page]*

without discrimination or abridgement on account of race, religious creed, color, national origin, ancestry, physical disability, medical disability, medical condition, marital status, sex, age, or sexual orientation." FEHA's provisions prohibiting discrimination may provide the policy basis for a claim for wrongful discharge in violation of public policy.[16]

However, FEHA does not serve as a policy basis where another statutory provision exempts defendant from liability. In *Jennings v. Marralle*,[17] the plaintiff sued the defendant for wrongful termination in violation of public policy under FEHA against age discrimination. There, the plaintiff alleged that the defendant terminated her to prevent her from receiving her benefits under defendant's pension plan.

In *Jennings*, the California Supreme Court noted that, while FEHA stated a public policy against employment discrimination based on age, FEHA also limited its application to employers of five or more employees.[18] The court advised that, in extracting public policy from legislation, courts must consider the entire statutory scheme in conjunction with any language limiting its application.[19] Government Code section

---

*[footnote continued from previous page]*

[15] Government Code section 12921; *Stevenson v. Superior Court, supra,* 16 Cal.4th at page 891.

[16] *Stevenson v. Superior Court, supra,* 16 Cal.4th at page 909.

[17] *Jennings v. Marralle* (1994) 8 Cal.4th 121.

[18] *Jennings v. Marralle, supra,* 8 Cal.4th at page 130.

*[footnote continued on next page]*

12926, subdivision (d), defines "employer" as "any person regularly employing five or more persons." The court reasoned: "We agree with plaintiff that the public policy declared by the Legislature in section 12920 applies to all employers. It does not follow, however, that in declaring that policy the Legislature intended to create the basis for a common law tort action and to thereby subject employers whom it expressly exempted from FEHA coverage to liability for age discrimination."[20] The court concluded that FEHA's age discrimination policy did not support the plaintiff's cause of action for wrongful discharge in violation of public policy against a defendant that employed fewer than five employees.[21]

In *Kelly v. Methodist Hospital of So. California*,[22] the California Supreme Court addressed another limitation on qualified employers. As here, in *Kelly*, the defendant was a nonprofit, religiously-affiliated hospital. The defendant terminated plaintiff, a 50-year-old nurse, because she refused to return to work after her medical leave expired. In her lawsuit, plaintiff included a claim for wrongful termination based on age in violation of public policy under FEHA.

---

*[footnote continued from previous page]*

[19] See *Jennings v. Marralle, supra*, 8 Cal.4th at page 134; see also *Stevenson v. Superior Court, supra*, 16 Cal.4th at page 904.

[20] *Jennings v. Marralle, supra*, 8 Cal.4th at page 134.

[21] See *Jennings v. Marralle, supra*, 8 Cal.4th at page 136.

[22] *Kelly v. Methodist Hospital of So. California, supra*, 22 Cal.4th 1108.

Government Code section 12926, subdivision (d) provided that an "employer" did not include a nonprofit religious entity. Before the amendments, as discussed below, qualified religious entities enjoyed complete exemption from FEHA's requirements.[23] Therefore, the court found the defendant exempt from the plaintiff's claim for wrongful termination in violation of public policy under FEHA.[24]

Likewise, in this case, defendant, as a nonprofit, religious corporation, is exempt from plaintiff's common law claim under FEHA. And, plaintiff does not challenge defendant's qualification as a nonprofit, religious entity within the meaning of Government Code section 12926, subdivision (d).

Nevertheless, plaintiff, in citing *Dabbs v. Cardiopulmonary Management Services*,[25] argues that the current version of FEHA, which limited the scope of the religious-entity exemption, may serve as the basis of public policy for her wrongful termination claim.

In 1999, the Legislature enacted Government Code section 12922, which provides: "Notwithstanding any other provision of this part, an employer that is a religious corporation may restrict eligibility for employment in any position involving the

---

23  *Kelly v. Methodist Hospital of So. California, supra*, 22 Cal.4th at pages 1116, 1119.

24  *Kelly v. Methodist Hospital of So. California, supra*, 22 Cal.4th at page 1126.

25  *Dabbs v. Cardiopulmonary Management Services* (1987) 188 Cal.App.3d 1437.

11

performance of religious duties to adherents of the religion for which the corporation is organized."[26]  The Legislature also enacted Government Code section 12926.2. Subdivision (c) of that provision reads: "Notwithstanding subdivision (d) of Section 12926 and except as otherwise provided in paragraph (1) or (2), 'employer' includes a religious corporation or association with respect to persons employed by the religious association or corporation to perform duties, other than religious duties, at a health care facility operated by the religious association or corporation for the provision of health care that is not restricted to adherents of the religion that established the association or corporation."[27]

As stated earlier, to support a wrongful discharge claim, the public policy must be, among other things, well established at the time of plaintiff's termination.[28]  Obviously, legislation enacted after plaintiff's termination neither existed, nor was well established at the pertinent time.  Although the pre-amended version of FEHA was inconsistent with federal civil rights law,[29] we cannot impose civil liability upon an employer under

---

[26]  Statutes 1999, chapter 913, section 1.

[27]  Statutes 1999, chapter 913, section 2.

[28]  *Stevenson v. Superior Court, supra*, 16 Cal.4th at pages 890, 894.

[29]  See *Kelly v. Methodist Hospital of So. California, supra*, 22 Cal.4th at page 1118 (discussing Title VII).

12

FEHA—a legislative scheme that expressly precluded application of its provision to such employers.[30]

Furthermore, the newly enacted provisions of FEHA are not retroactive. Generally, statutes do not apply retroactively unless the Legislature clearly indicated otherwise.[31] Also, a retroactive statute affects the parties' rights and obligations that exist before the statute's adoption.[32] In regards to the FEHA amendments, plaintiff concedes that the Legislature made no express provision for retroactive application. Under the circumstances in this case, the amendments substantially affect defendant's liability under FEHA. This case does not resemble the situation presented in *Dabbs*, which involved an act, that became operative two months after the plaintiff's termination, but neither changed nor conflicted with existing statutory law and policy that supported the plaintiff's wrongful discharge claim.[33] In this case, the presumption against retroactive application would preclude plaintiff's reliance on the newly-enacted provisions of FEHA as the basis of public policy for his wrongful discharge claim.

---

[30] See *Jennings v. Marralle, supra*, 8 Cal.4th at page 132.

[31] *Murray v. Oceanside Unified School Dist.* (2000) 79 Cal.App.4th 1338, 1348, quoting *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244.

[32] *Borden v. Division of Medical Quality* (1994) 30 Cal.App.4th 874, 880.

[33] *Dabbs v. Cardiopulmonary Management Services, supra*, 188 Cal.App.3d at pages 1443-1444.

13

We conclude that the trial court properly found that FEHA did not support plaintiff's cause of action for wrongful discharge in violation of public policy.

### 6. Section 8

Plaintiff also claimed that defendant terminated his employment in violation of public policy as set forth in Section 8. Section 8 provides: "A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin."

Although defendant acknowledges that Section 8 may provide the public policy for discrimination claims, defendant argues that Section 8 does not support wrongful termination claims based on an employer's retaliatory conduct. Defendant's argument lacks merit.

Courts have found Section 8 as an alternative source of public policy for wrongful termination claims.[34] Section 8 reflects fundamental and firmly established public policy against employment discrimination based on certain classifications including race and sex.[35]

---

[34] See, e.g., *Rojo v. Kliger* (1990) 52 Cal.3d 65, 88-91; *Sistare-Meyer v. Young Men's Christian Assn.* (1997) 58 Cal.App.4th 10, 14-15; *Badih v. Myers* (1995) 36 Cal.App.4th 1289, 1296; *Blom v. N.G.K. Spark Plugs (U.S.A.), Inc.* (1992) 3 Cal.App.4th 382, 387.

[35] See *Rojo v. Kliger, supra*, 52 Cal.3d at page 90 (sex); *Sistare-Meyer v. Young Men's Christian Assn., supra*, 58 Cal.App.4th at pages 14-15 (race); *Carmichael v. Alfano Temporary Personnel* (1991) 233 Cal.App.3d 1126, 1132 (race and sex).

In *Badih v. Myers*,[36] the defendant claimed that, as an employer with fewer than five employees, he was not subject to liability under FEHA for the plaintiff's wrongful termination claim based on pregnancy discrimination. The plaintiff, however, argued that her wrongful termination claim was not only based on FEHA, but also the public policy set forth in Section 8. The court therefore determined whether pregnancy discrimination constituted a form of sex discrimination under Section 8. Although pregnancy discrimination was not a specifically enumerated category of prohibited discrimination under Section 8, the court, after reviewing certain statutes and court decisions, agreed that pregnancy discrimination should be treated as a form of sex discrimination. In citing the California Supreme Court's decision in *Rojo v. Kliger*,[37] the court held that because Section 8 expresses fundamental public policy against sex discrimination, it provided the public policy basis for maintaining a cause of action for wrongful discharge based on pregnancy discrimination.

As stated above, although defendant may agree that Section 8 provides an alternative source of public policy against discrimination, defendant challenges plaintiff's characterization of his claim as one based on discrimination, as opposed to retaliation. Defendant argues that, while Section 8 states a public policy against discrimination based on race and sex, it provides no policy in regards to employer retaliation. Defendant notes

---

36  *Badih v. Myers, supra*, 36 Cal.App.4th 1289.

37  *Rojo v. Kliger, supra*, 52 Cal.3d at pages 90-91.

that Section 8 neither explicitly mentions the term "retaliation," nor implicitly prohibits an employer from retaliating against an employee "for filing a charge with a government agency."

Quoting from *Sequoia Ins. Co. v. Superior Court*,[38] defendant states that "[A] constitutional or statutory provision must sufficiently describe the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law."[39] As noted by plaintiff, however, the quoted language is prefaced by the clause: "Although one should not assume that the employer's *precise act* (e.g., discharging an employee for refusing to commit a crime) must be specifically prohibited for the public policy exception to apply . . . ."[40] In *Sequoia*, the plaintiff failed to point to a specific provision of any law in support of his wrongful termination claim.

Here, plaintiff referred to Section 8's prohibition against employment discrimination based on race and sex. In his complaint, plaintiff alleged that defendant terminated his employment in retaliation for filing a claim of race and sex discrimination with the EEOC. As in *Badih v. Myers*,[41] while this form of discrimination is not

---

[38] *Sequoia Ins. Co. v. Superior Court* (1993) 13 Cal.App.4th 1472.

[39] *Sequoia Ins. Co. v. Superior Court, supra*, 13 Cal.App.4th at page 1480.

[40] *Sequoia Ins. Co. v. Superior Court, supra*, 13 Cal.App.4th at page 1480.

[41] *Badih v. Myers, supra*, 36 Cal.App.4th 1289.

16

enumerated specifically in Section 8, employment discrimination often manifests itself in retaliatory conduct.

Indeed, one category of wrongful discharge claims occurs where an employer terminates an employee for "reporting an alleged violation of a statute of public importance."[42] One court explained: "[A] violation of the statute is *also* a violation of public policy, and if an employer fires an employee who complains to the authorities about such violation, then the termination is a termination in violation of public policy. And such termination, being in contravention of a fundamental public policy, is hence actionable as the tort of wrongful termination in violation of public policy."[43] Courts have allowed wrongful termination claims in the following circumstances: where an employer discharged an employee for complaining about the employer's use of defective parts;[44] where an employer terminated an employee in retaliation for supporting a coworker's sexual harassment claim;[45] where an employer fired employees in retaliation for reporting immigration violations;[46] where an employer fired an employee in

---

[42]  *Gantt v. Sentry Insurance, supra*, 1 Cal.4th at page 1091; *Hobson v. Raychem Corp.* (1999) 73 Cal.App.4th 614, 632.

[43]  *Jie v. Liang Tai Knitwear Co.* (2001) 89 Cal.App.4th 654, 661-662; see also *Blom v. N.G.K. Spark Plugs (U.S.A.), Inc., supra*, 3 Cal.App.4th at page 389.

[44]  *Green v. Ralee Engineering Co, supra*, 19 Cal.4th at page 73.

[45]  *Gantt v. Sentry Insurance, supra*, 1 Cal.4th at page 1085.

[46]  *Jie v. Liang Tai Knitwear Co., supra*, 89 Cal.App.4th at page 657.
*[footnote continued on next page]*

17

retaliation for attempting to implement anti-discrimination policies,[47] and, as here, where an employer terminated an employee for filing complaints of race and sex discrimination with the EEOC.[48]

In *Rojo v. Kliger*,[49] the California Supreme Court noted that the plaintiffs alleged that they were terminated for refusing to submit to their employer's sexual advances and that they were terminated in retaliation for exercising their fundamental right to be free from sexual harassment.[50]  The court indicated that under either theory, the plaintiffs' causes of action for wrongful discharge in violation of public policy were sufficient to survive demurrer.[51]

For these reasons, we reject defendant's attempt to draw a distinction between retaliation and discrimination. ". . . *Tameny* and its progeny confirm, implicitly and explicitly, that discharge of an employee in retaliation for resisting employer violations of laws that secure important public policies contravenes those policies, and gives rise to a

---

*[footnote continued from previous page]*

[47] *Blom v. N.G.K. Spark Plugs (U.S.A.), Inc., supra*, 3 Cal.App.4th at page 385.

[48] *Carmichael v. Alfano Temporary Personnel, supra*, 233 Cal.App.3d at page 1128.

[49] *Rojo v. Kliger, supra*, 52 Cal.3d 65.

[50] *Rojo v. Kliger, supra*, 52 Cal.3d at page 91.

[51] *Rojo v. Kliger, supra*, 52 Cal.3d at page 91.

common law action in tort."[52]  We hold that the trial court erred in sustaining defendant's demurrer as to plaintiff's wrongful termination claim based on defendant's retaliation in violation of Section 8's policy against race and sex discrimination.

### 7. Title VII

In addition to FEHA and Section 8, plaintiff also offered Title VII as an alternative source of public policy against employment discrimination.

Defendant argues that, because it directly conflicted with the California Legislature's intent at the time of plaintiff's termination, Title VII could not serve as the policy basis for defendant's wrongful discharge claim.  Although defendant acknowledges that courts have relied on federal law to support such claims, defendant contends that no court has relied on federal authority that directly conflicted with California law.

We begin our analysis with the relevant provisions of Title VII.  42 United States Code section 2000e-2 states: "It shall be an unlawful employment practice for an employer . . . ¶ . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."

---

[52] *Blom v. N.G.K. Spark Plugs (U.S.A.), Inc., supra*, 3 Cal.App.4th at page 389.

42 United States Code section 2000e-3(a) provides:  "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

Lastly, 42 United States Code section 2000e-1(a) states:  "This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."

These provisions indicate that, while federal law is consistent with state law in prohibiting retaliatory discharge for filing a charge of race and sex discrimination, federal law contradicts state law, as it existed at the time of plaintiff's termination, in applying this policy to religious entities.[53]

As discussed above, to support a wrongful termination claim, the policy must be "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the

---

[53] See *Kelly v. Methodist Hospital of So. California, supra,* 22 Cal.4th at pages 1118-1119.                              *[footnote continued on next page]*

20

individual; (3) well established at the time of the discharge; and (4) substantial and fundamental."[54] Without question, federal law condemning employment discrimination based on race and sex satisfies the last three requirements.

The question, however, is whether Title VII is an appropriate source of public policy. "The employer is bound, at a minimum, to know the fundamental public policies of the *state and nation* as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law."[55] Under circumstances as the one presented here, where the public policies of the state and the nation are in direct conflict, the precise issue is whether federal law that is inconsistent with state law can serve as the source of public policy for a state common law cause of action for wrongful termination.

Before evaluating this issue, we first note that in the absence of a conflict between state and federal policies, federal statutory and constitutional law may provide the policy basis for a wrongful termination claim.[56] While the claim is a state law cause of action,[57] there is no requirement that the public policy basis for the cause of action be derived

---

[footnote continued from previous page]

54 See *Stevenson v. Superior Court, supra*, 16 Cal.4th at page 894.

55 *Gantt v. Sentry Insurance, supra*, 1 Cal.4th at page 1095 (emphasis added); see *Stevenson v. Superior Court, supra*, 16 Cal.4th at page 889.

56 See, e.g., *Green v. Ralee Engineering Co., supra*, 19 Cal.4th at page 90.

57 See *Rains v. Criterion Systems, Inc.* (9th Cir. 1996) 80 F.3d 339, 343-344.

[footnote continued on next page]

solely from state law.[58]  Rather, federal law, and in particular, Title VII, may supply an alternative public policy basis for a wrongful termination claim.[59]

In *Green v. Ralee Engineering Co.*,[60] the California Supreme Court held that statutorily authorized federal administrative regulations on airline safety provided the necessary public policy basis for plaintiff's wrongful termination claim.[61]  The court noted that its conclusion was consistent with the rule that public policy be tethered to specific statutory or constitutional provisions.[62]

In response to defendant's argument that the common law claim should not be based on federal authority that neither prohibits the act of retaliatory termination, nor provides for civil damages, the court found that the defendant's argument lacked merit because employers are "responsible for knowing 'the fundamental public policies of the state *and nation*.' [Citation.]"[63]  The court also noted that, in *Tameny*, the first case in

---

[footnote continued from previous page]

    58  See *Jie v. Liang Tai Knitwear Co., Ltd., supra,* 89 Cal.App.4th at page 665.

    59  See *Rains v. Criterion Systems, Inc., supra,* 80 F.3d at page 344; *Elliott v. LTD Direct Marketing, Inc.* (D. Ariz. 1997) 1 F.Supp.2d 1031, 1033, footnote 1.

    60  *Green v. Ralee Engineering Co., supra,* 19 Cal.4th 66.

    61  *Green v. Ralee Engineering Co., supra,* 19 Cal.4th at page 90.

    62  *Green v. Ralee Engineering Co., supra,* 19 Cal.4th at pages 74, 90.

    63  *Green v. Ralee Engineering Co., supra,* 19 Cal.4th at page 87.

which the court recognized the common law cause of action for wrongful termination, the claim was based in part on federal antitrust laws.[64] Thus, so long as the other requirements are satisfied, the public policy for a wrongful termination claim may be delineated in federal statutory, constitutional, and even regulatory provisions.[65]

In this case, although a conflict exists between state and federal law, we have found no authority restricting the use of federal law as public policy for a wrongful discharge claim in the face of conflicting state law. Nevertheless, defendant, during oral argument, contended that, in allowing plaintiff to assert a claim for wrongful discharge in violation of federal public policy that is contrary to clear state legislative intent, we are in effect infringing upon the Legislature's authority to define California's public policy. We disagree. California has not limited the definition of public policy solely to remedies provided by state statutory or regulatory provisions. In enacting FEHA, the state Legislature intended to supplement existing state and federal remedies for employment discrimination.[66]

In fact, nothing in FEHA or Title VII prevents a plaintiff from raising alternative theories for his wrongful termination claim. As stated above, "[t]he absence of an FEHA remedy would not negate the existence of a common law tort remedy if another law

---

[64] *Green v. Ralee Engineering Co., supra*, 19 Cal.4th at page 88.

[65] *Green v. Ralee Engineering Co., supra*, 19 Cal.4th at page 90.

[66] *Stevenson v. Superior Court, supra*, 16 Cal.3d at pages 891-892.

created the right on which this action is predicated."[67] Even if a plaintiff relies on a policy that conflicts with FEHA, such conflict does not preclude plaintiff from submitting an alternative policy ground.[68] Unlike other states that either do not provide a common law public policy exception to the at-will employment doctrine,[69] or do not allow a common law claim to be based on statutory sources that provide their own remedies,[70] California law allows a plaintiff to rely on alternative anti-discrimination remedies in order to afford the plaintiff the maximum opportunity to vindicate his civil rights.[71]

In particular, under California law, despite FEHA's limitation on religious-entity liability, FEHA was not intended to provide an exclusive remedy for civil rights violations.[72] "An examination of [FEHA] supports the view it lacks the

---

[67] *Jennings v. Marralle, supra*, 8 Cal.4th at page 130.

[68] See, e.g., *Badih v. Myers, supra*, 36 Cal.App.4th at page 1296.

[69] See, e.g., *Leathem v. Research Foundation of the City University of New York* (S.D. N.Y. 1987) 658 F.Supp. 651, 654; *Borden v. Johnson* (1990) 196 Ga.App. 288, 289.

[70] See, e.g., *Diberardinis-Mason v. Super Fresh* (E.D. Pa. 2000) 94 F.Supp.2d 626, 632, citing *Jacques v. Akzo Int'l Salt, Inc.* (1993) 422 Pa.Super. 419, 428-429; *Cormier v. Littlefield* (1998) 13 F.Supp.2d 127, 129; *Hughes v. Bedsole* (4th Cir. 1995) 48 F.3d 1376, 1383, footnote 6.

[71] *Rojo v. Kliger, supra*, 52 Cal.3d at pages 74-75.

[72] Government Code section 12993, subdivision (a); *Stevenson v. Superior Court, supra*, 16 Cal.4th at page 899; *Nelson v. United Technologies* (1999) 74 Cal.App.4th 597, 611-612.

24

comprehensiveness necessary to infer a legislative intent to displace all preexisting or alternative remedies for employment discrimination. For example, with the exception of cases involving harassment, the FEHA applies only to 'employers' of five or more persons, it excludes religious associations or nonprofit corporations, and it does not protect against discrimination on grounds of sexual orientation."[73] Plaintiffs are not bound by FEHA's limitations, but rather, are free to seek alternative sources of law to support their wrongful discharge claim.[74] Therefore, limitations, including those that define which employers are subject to liability for employment discrimination under FEHA, do not apply to common law causes of action for wrongful discharge in violation of public policy based on policy found elsewhere.[75]

As with the California Legislature, Congress has promoted liberal construction of its employment discrimination laws to afford the greatest protection to the victims of discrimination.[76] The remedies afforded under Title VII do not preempt a state law claim

---

[73] See *Rojo v. Kliger, supra,* 52 Cal.3d at page 80 (statutory citations omitted); see also *Stevenson v. Superior Court, supra,* 16 Cal.4th at page 898, footnote 7.

[74] *Rojo v. Kliger, supra,* 52 Cal.3d at page 82, see *Carmichael v. Alfano Temporary Personnel, supra,* 233 Cal.App.3d at page 1132 (common law claim was not barred by FEHA's statute of limitations); *Badih v. Myers, supra,* 36 Cal.App.4th 1289, 1293, 1296 (common law claim was not barred by FEHA's requirement that qualifying employer regularly employ five or more persons).

[75] See *Badih v. Myers, supra,* 36 Cal.App.4th at page 1293.

[76] See *Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727, 738; *Robinson v. Adams* (9th Cir. 1987) 847 F.2d 1315, 1319.    *[footnote continued on next page]*

for wrongful termination in violation of public policy.[77] The Congress specifically provided: "Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State . . . ."[78] The employment discrimination laws of California and the nation, therefore, provide alternative remedies to achieve the goal of combating inequality in the workplace.[79]

In allowing plaintiff to rely on public policy based on the law of the nation, as opposed to the state, another important consideration is whether the employer had adequate notice of such theory of liability. The requirement that the public policy be delineated in a statutory or constitutional provision balances the competing interests of "(1) providing the employer with proper warning it is violating fundamental public policies, (2) ensuring employees are protected against employer actions that contravene fundamental policy, and (3) guaranteeing to the public that employers' interests will not be protected at the expense of society's most important policies. [Citations.]"[80]

---

[footnote continued from previous page]

[77] *California Federal Sav. and Loan Ass'n. v. Guerra* (1987) 479 U.S. 272, 282-283; *Rains v. Criterion Systems, Inc., supra*, 80 F.3d at page 345.

[78] 42 United States Code section 2000e-7.

[79] *California Federal Sav. and Loan Ass'n. v. Guerra, supra*, 479 U.S. at pages 282-283; *Johnson v. Railway Express Agency* (1975) 421 U.S. 454, 459.

[80] *Green v. Ralee Engineering Co., supra*, 19 Cal.4th at page 84; see also *Stevenson v. Superior Court, supra*, 16 Cal.4th at page 889.    [footnote continued on next page]