EXHIBIT A

CALENDARED

+ mem RSL

ROBERT H. GOLD (STATE BAR NO. 146136)
GOLD & ASSOCIATES
235 Montgomery Street, Suite 747
San Francisco, CA 94104
Telephone: (415) 354-5400
Facsimile: (415) 354-5405

Attorney for Plaintiff L. M. Boccignone

ENDORSED FILED
SAN MATEO COUNTY

NOV 14 2007

Clerk of the Superior Court
By J. Obaob
DEPUTY CLERK

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**SAN MATEO COUNTY,**

**UNLIMITED JURISDICTION**

**L. M. BOCCIGNONE,**

*Plaintiff,*

v.

**SUTTER HEALTHCARE (MILLS PENINSULA HEALTH SERVICES), BARBARA "BOBBI" FOSTER, CLAUDIA CHRISTENSEN and DOES 1-97,**

*Defendants.*

Case No. 460718

**SECOND AMENDED COMPLAINT FOR:**
**1. INTENTIONAL AND/OR NEGLIGENT MISREPRESENTATION [OF EMPLOYMENT BENEFIT OF REPAYMENT OF STUDENT LOANS]**
**2. BREACH OF CONTRACT,**
**3. SEX DISCRIMINATION**
**4. SEXUAL HARASSMENT**
**5. SEXUAL HARASSMENT IN VIOLATION OF THE CALIFORNIA CONSTITUTION**
**6. FALSE LIGHT [Defamation]**
**7. VIOLATION OF THE CONFIDENTIALITY OF MEDICAL INFORMATION ACT**
**8. WRONGFUL TERMINATION IN VIOLATION OF CALIFORNIA CONSTITUTION ARTICLE 1, SECTION 8**
**9. COMMON LAW WRONGFUL DISCHARGE**
**10. CANCER DISCRIMINATION**
**11. PREGNANCY DISCRIMINATION**
**12. RETALIATION**

**JURY TRIAL DEMANDED [AT THIS TIME]**

Plaintiff L. M. BOCCIGNONE, in conjunction with the following causes of action against defendants, each and all of them, alleges as follows:

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

**PARTIES**

1. Plaintiff was first recruited by SUTTER HEALTH'S subsidiary: MILLS-PENINSULA HEALTH SERVICES and then hired in late January, 2005 to be an E. R. Registered Nurse. Upon the filing of the Original Complaint, the Plaintiff, being ignorant of the true names of all the Defendants and having designated the Defendants in the Complaint by the fictitious names of Does Number One (1), Two (2) and Three (3) and having since discovered some of the true names of Defendants to be SUTTER HEALTH (MILLS-PENINSULA HEALTH SERVICES is a wholly owned subsidiary of SUTTER HEALTH, hereafter referred to MILLS-PENINSULA), filed an Amended Complaint on July 31, 2007, substituting fictitious names wherever it appeared in the Complaint for said names to be substituted. Named Defendants here are both corporate and personal entities with conflicting interests. The latter were named individually, as a jury may find their individual personal actions to be so egregious, wanton and reckless, as to be outside the scope of their foreseeable employment description and/or their employer's scope of liability (Is an Employer responsible if an Employee violates the Penal Code for instance?) that one or both named defendant's individual actions and/or intent to harm Plaintiff may be found to be individually egregious enough by a jury, or after a finding of intent, that said intent carried such wanton and reckless *personal behavior*, as to assign a separate percentage liability upon these named Personal Defendants, separate from the any liability assigned to the Employer Defendant Sutter Health. As Plaintiff is already contemplating administrative adjudication for corporate in-house counsel's possible abetting fraudulent acts herein and violation of his professional oath; it is clearly foreseeable that the named Personal Defendants FOSTER and CHRISTIANSEN may be found to be individually, by a trier of fact, in contradiction to the legality of their actions as employees of Sutter Health, to have separate liability from their employer. It should be noted that any Administrative action against Sutter Health in-house

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

counsel would be brought by another counsel and/or law firm than present Plaintiff's counsel; as present counsel would be a percipient witness to any alleged claims. Additionally, Plaintiff's parents believe that an attorney who specializes in said actions would best handle said matter. Plaintiff's parents, for all purposes regarding this litigation are clients of Plaintiff's counsel and should not be directly contacted by defendant's counsel, and may consider this notice of said representation and request not to notice the family of the young girl defendants have "hazed", took away health insurance as her baby was born two months premature, and continue to retaliate against when job prospects contact to confirm employment and R.N. training requirements.

2. Mills Peninsula Health Services (hereinafter Mills-Peninsula) is a subsidiary of Sutter Health a ***non-profit*** entity. Mills-Peninsula's principal place of business is Peninsula Hospital, leased from the County of San Mateo on a 50-year-lease to Sutter Health Corporation (a ***non-profit*** entity with enormous ***for-profit*** commercial real estate holdings, nearly two dozen ***for-profit*** pharmacies and other ***for- profit*** subsidiaries, separate from the alleged ***non-profit*** healthcare business it operates only in California. Peninsula Hospital's 50-year-lease (which is a public record) makes inference, as well as specific reference, to Sutter Health's required delivery of community patient care, public services, and obeying all applicable rules, regulations as well as the doctrine of good faith and fair dealing when entering into private contracts, presumably written or oral. It is alleged Sutter Health remains a solely California medical corporation due to California's draconian Medical Malpractice tort recovery liability limit, for over ten years limited at $250,000.00 other than medical expenses, (which has never have been readjusted for *real time* inflation since its enactment) as Defendant Sutter Heath, seeks to ape Duane Reade Drug Stores in New York and Los Remedios, (already active in California's above referenced restricted medical malpractice tort recovery environment), and create Registered Nurse and/or Nurse

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

Practitioner Clinics whereupon these Nurse Supervised "drop-in" clinics will be manned by non union (non California Nurse's Association) staff as supervisory personal may not belong to C.N.A. by definition and while it is believed a doctor's supervisory presence will be required under California law—it is likely that Human Resources and the "bean counters", not the healing staff of Sutter Health, will have supervisory control over these "***for-profit***" units under Sutter Health's ***non-profit*** status. This is applicable to the instant matter as Plaintiff, a Union Nurse, who reported in writing regulation mistakes within her department, and requested union representation when brought to task by her administrative superiors, was first insulted by an illegal investigation into her private life; then suffered the ignored if not encouraged "hazing" of her other night-shift co-workers, [interestingly, rarely complaints from doctors—at least any who will sign their name to anything] to the point where her Employer had to abruptly fire her. This solution, firing a single registered nurse (R.N.) rather than fire over five or six R.N.'s who contributed to such infractions, encouraged by the named Defendants, as the public viewing of the interior of Plaintiff's vagina and the public viewing of her fetus (less than a year after she had already miscarried a prior baby) as if Plaintiff were an animal or a "*less than racial group*" in 1930's Germany. These events occurred while C.N.A. was operating without a union contract and Sutter Health was taking a "*hard line*" with union nurse's, ignoring C.N.A.'s claim**, that the Nurse's public statement regarding Sutter Health was that there complaints were not about money, but about how abused they were by the employer, and that that abuse can unintentionally ricochet on to patient care**. It is likely that many of the R.N. "scabs" who filled slots at other Sutter "R. N. lock out facilities", such as Alta Bates Hospital, will be hired as the non-union "supervisor" nurses at Sutter's planned "drop-in" clinics discussed all over the world wide web, including such sites as "Sutter Watch".

3. Upon the filing of the Complaint, the Plaintiff, being ignorant of the true name of the Defendant and having designated the Defendant in the Complaint by the fictitious name of Doe Number One (1), and having discovered the true name of Defendant to be MILLS-PENINSULA HEALTH SERVICES (hereafter MILLS-PENINSULA), amends the Complaint by substituting the fictitious name wherever it appears in the Complaint.

4. Upon the filing of the Complaint, the Plaintiff, being ignorant of the true name of the Defendant and having designated the Defendant in the Complaint by the fictitious name of Doe Number Two (2), and having discovered the true name of Defendant to be SUTTER HEALTH, amends the Complaint by substituting the true name for the fictitious name wherever it appears in the Complaint.

5. Upon the filing of the Complaint, the Plaintiff, being ignorant of the true name of the Defendant and having designated the Defendant in the Complaint by the fictitious name of Doe Number Three (3), and having discovered the true name of Defendant to be CLAUDIA CHRISTENSEN, amends the Complaint by substituting the true name for the fictitious name wherever it appears in the Complaint.

6. Plaintiff is informed and believes and therefore alleges that Defendant SUTTER HEALTH is a private non-profit corporation domiciled in the State of California. Plaintiff believes that MORE THAN **99.5%** of this entity's assets are located in California. Plaintiff is informed by public record and/or documents, and believes and therefore alleges that Defendant SUTTER HEALTH owns, rents, operates, and/or manages Defendant MILLS-PENINSULA and many other hospitals; employs nurses and other staff at MILLS-PENINSULA; and negotiates numerous Collective Bargaining Agreements, under which some nurses, security guards, medical support technicians, custodial help and other staff are employed at MILLS-PENINSULA as well as other SUTTER HEALTH facilities.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

7. Plaintiff is informed and believes and therefore alleges that Defendant MILLS-PENINSULA is a private, ***non-profit*** California subsidiary of SUTTER HEALTH, domiciled in San Mateo County. MILLS-PENINSULA consists of Mills Health Center located at 100 South San Mateo Drive in San Mateo, California, and Peninsula Medical Center located at 1501 Trousdale Drive in Burlingame, California. The latter is the former Peninsula Hospital referred to above, on the 50-year-lease to Sutter Health corporation by the County of San Mateo, in exchange for financial and public service pledges.

8. In the remainder of this pleading, Defendants MILLS-PENINSULA and SUTTER HEALTH are referred to collectively as MILLS-PENINSULA.

9. Plaintiff is informed by public document, therefore believes and alleges that Defendant BOBBI FOSTER is the Emergency Department Director of MILLS-PENINSULA, and that Defendant FOSTER is domiciled in San Mateo County, California.

10. Plaintiff is informed and therefore believes and alleges that Defendant CLAUDIA CHRISTENSEN is the Director of Human Resources of MILLS-PENINSULA.

11. The true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants named herein as DOES 4 through 100, inclusive, are presently unknown to Plaintiff, who therefore names said Defendants by fictitious names. Plaintiff will amend this Complaint to show the true identities and capacities of Doe Defendants when the same have been ascertained. Plaintiff alleges on information and belief that each of the fictitiously named Defendants is in some way responsible for the events, transactions, and occurrences referred to herein, whether individually or in their employment capacity.

12. At all times herein mentioned, each and every defendant was the agent and/or employee of each and every other defendant, and in so doing the things alleged each defendant was acting within the course and scope of such agency and employment, and in so doing the acts herein alleged each defendant was acting with the consent, permission, and/or

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

authorization of each of the remaining defendants.  All defendant actions herein alleged were approved or ratified by the officers/supervisors of each defendant or their superiors.

## JURISDICTION AND VENUE

13. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 11 of this Complaint as though fully set forth herein.

14. Jurisdiction and venue are proper in San Mateo County Superior Court because:  all parties are wholly or partially domiciled within the territorial limits of this Court's jurisdiction, Defendant SUTTER HEALTH regularly does business through MILLS-PENINSULA within the territorial limits of this Court's jurisdiction, the events giving rise to the instant action all occurred within the territorial limits of this Court's jurisdiction, and many, if not all, of the witnesses are located within the territorial limits of San Mateo County Superior Court's jurisdiction as well as a primary cause of action as a violation of the California Constitution, Article I, Section 8.  Furthermore, Plaintiff suffered damages in an amount sufficient to sustain this Court's unlimited jurisdiction.

## STATEMENT OF FACTS

15. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 13 of this Complaint as though fully set forth herein.  Plaintiff files this Amended Complaint pursuant to an Order of the Court.

16. Plaintiff was hired as an Emergency Department Registered Nurse (R.N.) by MILLS-PENINSULA HEALTH SERVICES on approximately January 23rd or January 24th of 2005. Plaintiff now resides in San Mateo County, California.  When Defendant MILLS-PENINSULA HEALTH SERVICES recruited Plaintiff for employment at a job fair, in Southern California.  Plaintiff was at the time a resident of Huntington Beach, California. Presently, there is no claim of wrongdoing made by Defendants outside of San Mateo County, California.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

17. Plaintiff's position at MILLS-PENINSULA was her first employment as a Registered Nurse after finishing Nursing School. She was recruited with inducements including, but not necessarily limited to, employer's promise to pay her student loans, and moving allowances for her 350 mile relocation from Southern California to Northern California. These inducements are separate contract issues from the at-present not-raised breach of collective bargaining agreement/C.N.A. union contract.

18. From the start of Plaintiff's employment at MILLS-PENINSULA on January 23rd or January 24th of 2005 through May 30, 2005, Plaintiff received positive, if not glowing, written evaluations of her work, technical competence, critical thinking, interpersonal relations, and customer service. (See Performance Recognition attached as Exhibit A. See Exhibit B—*Rose Grams* from other MILLS-PENINSULA staff and patients, with patient names redacted to protect their medical privacy. All Exhibits attached to this Amended Complaint are incorporated herein by reference.)

19. Defendants have a pattern and practice of irregularities in employment-related documents; one example is the Performance Recognition attached as Exhibit A—which states it is an appraisal of work from January 24, 2005 through May 30, 2005, but the signatures of Defendant Foster and Plaintiff Boccignone are dated May 7, 2005. Plaintiff is informed and believes and therefore alleges that employment documents generated by Mills-Peninsula pertaining to Plaintiff were the responsibility of Defendants FOSTER and CHRISTENSEN throughout this matter, until or unless further evidence indicating other individuals, such as in-house counsel, arises. It is Plaintiff's belief under California law, Defendant Sutter Health has a duty to inform in-house counsel related to this matter that they may have personal liability for actions undertaken in the past eighteen [18] months regarding Plaintiff contrary and/or different to that of the employer, Defendant Sutter Health.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

20. On July 8, 2005, Plaintiff made a written objection to being assigned as the virtual *charge nurse* (in lay person's language, the "Supervisor") on shift in the Emergency Department. (See *Assignment despite objection*/inpatient attached as Exhibit C. Exhibit C documents that although Plaintiff was a new and inexperienced R. N., and therefore on a less expensive union pay scale, she was the only R.N. on shift qualified to do P.O.C. [Point of Care] testing, resulting, and care.) Plaintiff did not feel qualified at that point in time for such responsibilities.

21. On July 10, 2005, Plaintiff made a written objection to being assigned as the *virtual charge nurse on shift in the Emergency Department*. (See attached, as Exhibit D, Assignment Despite Objection/Inpatient, documenting that that although Plaintiff was a new and inexperienced R. N., she was the only R.N. Sutter provided on that shift qualified to perform all P. O. C. [Point of Care] labs, testing, resulting, and other patient care duties.)

22. On August 24, 2005, Defendants accused Plaintiff of poor performance of her nursing duties on the August 6th to August 7, 2005 night shift, and disciplined Plaintiff by giving her a "final written warning" and placing her on unpaid leave (suspension)—despite Plaintiff's objection that the cause of her difficulties was that the Emergency Department was understaffed (only three licensed nurses on duty with ***over*** fifteen patients[1]) in violation of California law (Title 22, California Code of Regulations, § 70217).

23. On or about January 2, 2006, Plaintiff Boccignone received a bonus in connection with her employment. On January 4, 2006, Plaintiff Boccignone received a congratulatory letter for a year's service at MILLS-PENINSULA. (See Exhibit E.) On January 6, 2006, she was denied repayment of her student loans. (See Exhibit F.)

[1] Title 22, California Code of Regulations, § 70217 states in pertinent part at subsection(a) (8), "In a hospital providing basic **emergency medical services** or comprehensive emergency medical services, **the licensed nurse-to-patient ratio in an emergency department shall be 1:4 or fewer** at all times that patients are receiving treatment." (Emphasis added.)

24. On or about July 3, 2006, union representative Shawn Bartlett filed a grievance against Defendant Foster on behalf of Plaintiff Boccignone for forcing Plaintiff to sign a mostly blank job evaluation form and threatening Plaintiff with possible employment termination in 90 days.

25. The grievance hearing, scheduled for August 29, 2006, never occurred. On August 28th Plaintiff Boccignone's doctor (obstetrician) placed her on bed rest through August 30th. Plaintiff was not expected to appear again at work until the first week of September, which was cancelled. Plaintiff was ordered to come to Mills-Peninsula on September 8, 2006, a Friday, for what she thought would be a meeting regarding her employment. At said meeting, she was terminated with a letter dated September 7, 2006. Furthermore, named Defendant Claudia Christensen explained to Plaintiff how to fill out her paper work for E.D.D. [unemployment], but when Plaintiff applied for unemployment it was denied by Defendants; cumulating not only in financial discomfort but the necessitating of her not being able to afford COBRA health insurance coverage and her needing to have her premature baby on Medi-Cal, at the expense of the State of California taxpayer instead of Sutter Health as originally promised and intended.

Plaintiff is not bringing claims at this time in the Second Amended Complaint for failure by Defendants to pay Plaintiff the two (2) weeks termination pay (under the C. N. A. Collective Bargaining Agreement.) Plaintiff is claiming lost pay due to an unpaid February through March 2006 suspension for allegations pertaining to an investigation and continuing sexual harassment which began with said investigation, into her private life, as well as Defendant's failure to correctly itemize Plaintiff's pay stubs, underpaid wages, pay for meal breaks (pursuant to *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal. 4th 1094, 155 P.3d 284), and for waiting time penalties and any other penalties that the Superior Court finds to

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

be relevant to the instant matter as well as penalties under the California Confidentiality of Medical Information Act.

**FIRST CAUSE OF ACTION**

**(INTENTIONAL OR NEGLIGENT MISREPRESENTATION)**

26. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 25 of this Complaint as though fully set forth herein.

27. While in the process of recruiting Plaintiff to come work for defendants, defendants represented to Plaintiff that MILLS-PENINSULA provided repayment of Registered Nurse employees' student loans as a paid benefit of employment benefit, specifically with Defendant. MILLS-PENINSULA, once that promise came due then represented to Plaintiff that her then present disciplinary action against *an applicant for loan repayment could lead to disqualification* (see Loan Forgiveness documents attached as Exhibit F). Defendant never warned Plaintiff Boccignone that they would bring disciplinary action to disqualify her by accusing her of inadequate job performance on a shift where the Emergency Department was understaffed (more than fifteen patients and only three Registered Nurses) in violation of California Code of Regulations, Title 22, § 70217. (See Exhibits G, H, and I.) As such, the inducement of student loan payment was illusory, was breached, remains breached, and constitutes breach of a contract which is separate from the Collective Bargaining Agreement negotiated by the California Nurses Association (hereafter, the "union" or C.N.A.).

**SECOND CAUSE OF ACTION**

**(BREACH OF CONTRACT)**

28. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 27 of this Complaint as though fully set forth herein.

29. While in the process of recruiting Plaintiff to come work for defendants, defendants represented to Plaintiff that MILLS-PENINSULA provided repayment of Registered Nurse

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

employees' student loans as a company inducement for employment. MILLS-PENINSULA only when that promise came due, then represented to Plaintiff that past disciplinary actions *against an applicant for loan repayment could lead to disqualification* (see Loan Forgiveness documents attached as Exhibit F). Defendant never warned Plaintiff Boccignone that they would bring disciplinary action to disqualify her by accusing her of inadequate job performance on a shift where the Emergency Department was understaffed (more than fifteen patients and only three Registered Nurses) in violation of California Code of Regulations, Title 22, § 70217. (See Exhibits G, H, and I.) As such, the inducement of student loan payment was illusory, was breached, remains breached, and constitutes breach of a contract which is separate from the Collective Bargaining Agreement negotiated by the union, CAN; as well as a breach of the doctrine of good faith and fair dealing when negotiating a contract to repay student loans in exchange for employment relocation and not seeking other employment with other employers.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

**THIRD CAUSE OF ACTION**

**(SEX DISCRIMINATION)**

30. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 29 of this Complaint as though fully set forth herein.

31. During January of 2006, Plaintiff Boccignone became pregnant, and on February 2, 2006 Plaintiff suffered a miscarriage (a medical condition related to pregnancy, which involves significant blood loss, consequent fatigue and normal depression due to the loss of her "wanted" baby—as well as the coincidental in time loss of her grandmother.)

32. Thirteen (13) days later on February 15, 2006, Plaintiff, still fatigued, requested and received permission from her charge nurse. Brian Johnson, to nap on her break. The long experienced charge nurse readily granted this permission to sleep, as a reasonable accommodation for her medical conditions related to pregnancy, miscarriage and loss of a

loved one. Plaintiff slept during her break. During this break, there were no patients in the Emergency Department and it was quiet. Named personal Defendant FOSTER, later, retroactively withdrew this permission and weeks later she wrote up Plaintiff a "final written warning" for sleeping on the job, to build a file, in order to have good cause to fire Plaintiff. (See Exhibit J.)

33. Defendants FOSTER admitted under oath that she knew Plaintiff had suffered a miscarriage, but when questioned "isn't fatigue a normal symptom of women who have a miscarriage…" replied "no." Def. FOSTER went on to blame Plaintiff: "if Lisa had, was still having [fatigue from the miscarriage] then she should not have returned to work to her night shift and her regular duty." (See EDD Appeal hearing transcript attached hereto as Exhibit K.)

34. On or about June 1, 2006, Plaintiff was informed that she was seven to twelve weeks pregnant. On August 4, 2006, Plaintiff gave Defendant Foster Plaintiff's Obstetrician's signed written request for accommodation of Plaintiff's temporary disability due to pregnancy, specifying no lifting over 30 pounds, and limiting exposure of Plaintiff's unborn baby to x-rays and infections exposure from August 4th through Plaintiff's then-anticipated January 1, 2007 commencement of maternity leave. (See Exhibit L.) Defendant Foster and Senior Nurse, antagonist, Penny Hutchings discussed giving Plaintiff light duty, but stated they were uncertain how to comply with Plaintiff's OBGYN's pregnancy accommodation letter. Defendants never again discussed accommodating Plaintiff's pregnancy disability, and never provided light duty or any other accommodations, as apparently they did not know how to comply with said letter and acted as if they had never received said pregnancy accommodation letter from Plaintiff's O.B. G. Y.N.

35. Contrary to the signed doctor's statement delineating the needed pregnancy accommodation, Plaintiff and her unborn baby were repeatedly exposed to x-rays and numerous infections, including but not limited to Rocky Mountain Spotted Fever and Dengue Fever, as if Plaintiff

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

had never requested pregnancy disability accommodation at all via written request by her

OBGYN. Nothing was changed in Plaintiff's duties, if anything they were made more

difficult and dangerous, as apparently Hutchinson and Foster did not know how to comply

with said pregnancy accommodation letter and acted as if they had never received said

pregnancy accommodation letter from Plaintiff's O.B. G. Y.N.

36. Furthermore, Defendants owed a higher duty to Plaintiff to provide pregnancy

accommodation, as Defendants knew or should have known Plaintiff's need for

accommodation because Defendants were in the unique position of being Plaintiff's

**Employer/Health Insurer/Healthcare Provider**. (See Exhibit M.) Defendants knew of

both Plaintiff's miscarriage and her subsequent pregnancy disability. Defendant employers

had a duty under the Fair Employment and Housing Act (hereafter FEHA) regarding both

instances of pregnancy-related disability to initiate a dialogue with Plaintiff offering

disability accommodations, even if Plaintiff never requested accommodations. DFEH Right

to Sue Letters pertaining to these issues (and other issues) was noticed on July 13, 2007,

pursuant to the terms stated therein. Subsequently, Plaintiff received Right to Sue Letters

(see Exhibit N)—which include sexual harassment based on, among other things, publication

of Plaintiff Boccignone's private medical records, and invasion into her private sex life.

37. Defendant employers knew Plaintiff had had a miscarriage, as evidenced by the fact that

some MILLS-PENINSULA employee accessed Plaintiff's vaginal ultrasound, and displayed

said vaginal ultrasound on the Emergency Department overhead monitor for all to see. It is

believed if Mills-Peninsula hospital policy was followed, Plaintiff's name was labeled on the

ultrasound image. Plaintiff's HIPPA rights and rights under the California Confidentiality of

Medical Records Act were violated.

38. As Defendants are the **Employer/Health Insurer/Healthcare Provider**, they use Benefit

and Risk Management Services as a Third Party Administrator (hereafter, "TPA"); said TPA

is also a healthcare risk manager (Exhibit O). In so much as Defendants' TPA reviewed information, paid the bills for Plaintiff's injuries, and investigated work related claims (herein limited to but a cut hand, and possible infection due to being stuck by a malfunctioning safety syringe.) Defendants were in a position to know that Plaintiff's work in the Emergency Department made her pregnancy *higher risk* due to repeated exposure to X-rays, numerous infections, and other risks from many sources. Defendants were also in a position to access the results of genetic testing they performed (as Healthcare Provider) on Plaintiff's unborn baby. After creating the risk that Plaintiff could give birth to a gravely ill baby needing expensive healthcare, Defendants (the self insured **Employer/ Insurer/Healthcare Provider**) terminated Plaintiff's employment, potentially saving themselves a substantial amount of money in medical care not provided to Plaintiff and her baby (subsequently born two months premature, with a heart murmur, on Medi-Cal at the expense of the California taxpayer instead of Sutter Health as intended and expected.)

39. Plaintiff received a July 13, 2007 Right to Sue Letter from the Department of Fair Employment and Housing (hereafter "DFEH"). See Exhibit N.

40. Pregnancy discrimination is discrimination against a female employee on the basis of her sex. Pregnancy discrimination affects all women of all races, from ages 13 -53. It also is a the beginning of discriminating against mothers, especially single mothers, of babies and young children, especially by older women who have had the personal experience or have seen over the years the work environment effects on other women, of raising babies and tots, even if they are in child care, compared to work performance and Employer Audit expectations and scheduling.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

FOURTH CAUSE OF ACTION

(SEXUAL HARASSMENT)

41. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 40 of this Complaint as though fully set forth herein.

42. Defendants ratified, permitted, and/or did not stop their employees from accessing Plaintiff's medical records without her consent, and displaying Plaintiff's ultrasound picture of her vagina and amniocentesis on computer monitors to be viewed by staff, patients, and potentially the general public. Said vaginal ultrasound pictures and amniocentesis likely displayed Plaintiff's name.

FIFTH CAUSE OF ACTION

(SEX DISCRIMINATION VIOLATION OF THE CALIFORNIA CONSTITUTION)

43. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 42 of this Complaint as though fully set forth herein.

44. Defendants ratified, permitted, and/or did not stop their employees from accessing Plaintiff's medical records without her consent, and displaying Plaintiff's ultrasound picture of her vagina and amniocentesis on computer monitors to be viewed by staff, patients, and potentially the general public. Said vaginal ultrasound pictures and amniocentesis likely displayed Plaintiff's name.

45. During January of 2006, Plaintiff Boccignone became pregnant. On or about, February 2, 2006, Plaintiff suffered a miscarriage (a medical condition related to pregnancy, which involves significant blood loss and consequently fatigue.)

46. Thirteen (13) days later, on or about, February 15, 2006, Plaintiff was still fatigued, and requested permission from her charge nurse Brian Johnson to nap during her "night shift" break. This long experienced R. N. granted Plaintiff permission to sleep, a reasonable accommodation for her then medical conditions related to pregnancy, miscarriage and recent

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

loss of a loved one (grandmother). Plaintiff slept during her break. During this break, there were no patients in the Emergency Department. Defendant FOSTER, later, retroactively withdrew this permission and weeks later wrote Plaintiff up a "final written warning" for sleeping on the job so she could have a written record to fire her for cause. (See Exhibit J.)

47. Defendants FOSTER admitted under oath that she knew Plaintiff had suffered a miscarriage, but when questioned "isn't fatigue a normal symptom of women who have a miscarriage..." replied "no." Def. FOSTER went on to blame Plaintiff: "if Lisa had, was still having [fatigue from the miscarriage] then she should not have returned to work to her night shift and her regular duty." (See EDD Appeal hearing transcript attached hereto as Exhibit K.)

48. On or about June 1, 2006, Plaintiff was informed that she was seven to twelve weeks pregnant. On August 4, 2006, Plaintiff gave Defendant Foster Plaintiff's Obstetrician's signed written request for accommodation of Plaintiff's temporary disability due to pregnancy, specifying no lifting over 30 pounds, and limiting exposure of Plaintiff's unborn baby to x-rays and infections exposure from August 4th through Plaintiff's then-anticipated January 1, 2007 commencement of maternity leave. (See Exhibit L.) Defendant Foster and Senior Nurse, (antagonist and possible future named personal Defendant) Penny Hutchings discussed giving Plaintiff light duty, but stated they were uncertain how to comply with Plaintiff's O.B.G.Y.N.'s pregnancy accommodation letter. Defendants never again discussed accommodating Plaintiff's pregnancy disability, and never provided light duty or any other accommodations as apparently Hutchings and Foster did not know how to comply with said pregnancy accommodation letter and acted as if they had never received said letter from Plaintiff's O.B. G. Y.N.

49. Contrary to the signed doctor's request for accommodation of pregnancy, Plaintiff and her unborn baby were repeatedly exposed to x-rays and numerous infections, including but not

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

limited to Rocky Mountain Spotted Fever and Dengue Fever, as if Plaintiff had never requested pregnancy disability accommodation at all via written request by her OBGYN.

50. Furthermore, Defendants owed a higher duty to Plaintiff to provide pregnancy accommodation, as Defendants were in the unique position of being Plaintiff's **Employer/Health Insurer/Healthcare Provider**, and therefore knew or should have known Plaintiff's need for accommodation. (See Exhibit M.) Defendants knew of both Plaintiff's miscarriage and her subsequent pregnancy disability. Defendant employers had a duty under FEHA regarding both instances of pregnancy-related disability to initiate a dialog with Plaintiff offering disability accommodations, even if Plaintiff never requested accommodations.

51. Defendant employers knew Plaintiff had had a miscarriage, further evidenced by the fact that some MILLS-PENINSULA employee accessed Plaintiff's vaginal ultrasound, and displayed said vaginal ultrasound on the Emergency Department overhead monitor for all to see. Plaintiff's name was clearly labeled on the ultrasound image within the defendant's record keeping and she was the only patient with that last name at that hospital at that time. Plaintiff's HIPPA rights and rights under the California Confidentiality of Medical Records Act were violated.

52. As Defendants are the **Employer/Health Insurer/Healthcare Provider**, they use Benefit and Risk Management Services as a Third Party Administrator (hereafter, "TPA"); said TPA is also a healthcare risk manager (Exhibit O). In so much as Defendants' TPA reviewed information, paid the bills for Plaintiff's injuries, and investigated work related claims (not any worker's compensation disability claims, but a cut hand, and possible infection due to being stuck by a malfunctioning safety syringe), Defendants were in a position to know that Plaintiff's work in the Emergency Department made her pregnancy higher risk due to repeated exposure to X-rays, numerous infections, and other risks from many sources.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

Defendants were also in a position to access the results of genetic testing they performed (as Healthcare Provider) on Plaintiff's unborn baby. After creating the risk that Plaintiff could give birth to a gravely ill baby needing expensive healthcare, Defendants (the self insured **Employer/ Insurer/Healthcare Provider**) terminated Plaintiff's employment, potentially saving themselves a substantial amount of money in medical care not provided to Plaintiff and her baby (subsequently born two months premature, with a heart murmur, on Medi-Cal instead of Sutter Health as intended and expected as an employee health benefit, not to be paid by the taxpayers of the state of California.)

53. Plaintiff received Right to Sue Letters from the DFEH, both dated July 13, 2007.

54. Pregnancy discrimination is discrimination against a female employee on the basis of her sex.

55. Sex discrimination is prohibited by Section 8. Section 8 is the embodiment of the California public policy that (despite the general rule that a contracted employee or an employee at-will can be terminated for no reason or for arbitrary and/or irrational reasons) an employee cannot be discharged for reasons prohibited by law. (See Exhibit Q—*Phillips v. St. Mary Reg'l Medical Ctr.*, 96 Cal. App. 4th 218, 116 Cal. Rptr. 2d 770.)

**SIXTH CAUSE OF ACTION**

**(FALSE LIGHT)**

56. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 55 of this Complaint as though fully set forth herein.

57. On or about, February 11, 2006, while on break during the night shift, Plaintiff was visited at work by her boyfriend. Plaintiff and her boyfriend were sitting in his truck in the hospital parking lot, socializing and eating dinner. Plaintiff is informed and believes and therefore alleges that she and her boyfriend were seen in the truck by a security guard, presently

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

believed also to be Defendants' employee. This was approximately two weeks after Plaintiff miscarried their baby.

58. On or about, February 24, 2006, Defendant FOSTER telephoned to inform Plaintiff that she was being placed on unpaid administrative leave. A nurse union representative Linda Campagna telephoned Plaintiff later that same day, and informed Plaintiff that the administrative leave was due to a statement made by the aforementioned security guard to Defendant FOSTER that Plaintiff had been somehow lewd on that February night in the parking lot on her own, not company time. (Plaintiff will not further dignify the filthy allegation cast upon her by named personal Defendant FOSTER, as the truth of the parking lot incident is moot regarding named personal Defendant FOSTER's subsequent actions.) Sometime during the administrative leave initiated by named personal Defendant FOSTER and allegedly approved by named personal Defendant CHRISTENSEN (February 24, 2006 through March 16, 2006, wherein Defendant FOSTER investigated what Plaintiff was doing inside her boyfriend's truck), Defendant FOSTER informed Plaintiff that the security guard had written an incident report documenting said alleged lewd behavior by Plaintiff. This said *incident report* has never been produced to Plaintiff despite repeated requests by both Plaintiff herself and her union representatives. This report is supposedly held by the MILLS-PENINSULA security division in a sealed location. By March 16th Defendant FOSTER had dropped the investigation into allegations of lewd behavior. This was only after Plaintiff was publicly humiliating named Personal Defendant FOSTER's actions—questioning numerous doctors and other staff if the allegations were true, and, by doing so, creating an atmosphere of hazing in the work place, better suited to the film "Animal House" than the Emergency Department of Mills-Peninsula, in which plaintiff assisted in the saving of lives, never injuring or causing loss of life (a fact not contested during the sworn testimony of named Personal Defendant FOSTER). This hazing environment allowed by

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

supervisors named Personal Defendant FOSTER, and then-Assistant-Director/now-Director of Human Resources CHRISTENSEN led to the violation of Plaintiff's medical privacy with the publication of her vaginal ultrasound picture and ultrasound picture of her fetus for all to see. (See Exhibit S.)

59. After Plaintiff's employment by Defendants was terminated, Plaintiff had been offered nursing employment at Kaiser Permanente in South San Francisco, but the employment offer was rescinded on September 15, 2006 after Kaiser telephoned Defendants and received a negative employment reference from Mills-Peninsula.  As stated above, Defendant FOSTER'S March 16, 2006 and September 7, 2006 allegations that Plaintiff is an incompetent and dangerous nurse seem pretextual in light of the fact that Defendant FOSTER permitted Plaintiff to be assigned to work as a preceptor and/or charge nurse during the pay periods April 9-April 22, 2006, May 7-May 20, 2006, May 21-June 3, 2006, June 4-June 17, 2006, June 18-July 1, 2006, July 2-July 15, 2006, July 16-July 29, 2006, August 13-August 26, 2006, and August 27-September 9, 2006.  (See documents of Plaintiff's pay attached as Exhibit R.)

60. After Plaintiff's employment by Defendants was terminated, Plaintiff was offered R.N. positions at St. Mary's in San Francisco, and at other hospitals or medical facilities, but the employment offers were rescinded after the prospective employers telephoned Defendants and received negative employment references.

61. As a direct and proximate result of the suspension due to false light on or about February 24, 2006 through March 16, 2006, Plaintiff has suffered wage loss in an amount to be proved at trial.

62. As a direct and proximate result of the false negative employment references, Plaintiff continues to suffer wage loss in an amount to be proved at trial.  It should be noted that while Administrative decisions are not Res Judicata in Superior Court, the E.D.D. matter

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

was heard by a sole J.D. Administrative Law Judge (conscious of the weight of evidence). Defendants lost their case of allegedly firing Plaintiff for good cause—based solely on named Personal Defendant FOSTER'S sworn testimony, which was overheard by her accompanying supervisor (also sworn under oath) Defendant CLAUDIA CHRISTENSEN, and unsigned "Xeroxes" of some e-mails admittedly solicited by named Personal Defendant FOSTER, compared with a Doctor's Declaration and several doctors willing ness to be on telephone standby. The E.D.D. hearing will be a factor at the trial of the instant matter, regardless of some counsel's public writings and speaking about time-consuming and expense motions in limine and bifurcation.

**SEVENTH CAUSE OF ACTION**

**(VIOLATION OF THE CONFIDENTIALITY OF MEDICAL INFORMATION ACT)**

63. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 62 of this Complaint as though fully set forth herein.

64. Defendants ratified, permitted, and/or did not stop their employees from accessing Plaintiff's medical records without her consent, and displaying Plaintiff's ultrasound picture of her vagina and amniocentesis on computer monitors to be viewed by staff, patients, and potentially the general public. Said vaginal ultrasound pictures and amniocentesis likely displayer Plaintiff's name.

65. Defendants also ratified, permitted, and/or did not stop their employees from accessing Plaintiff's medical records (without Plaintiff's consent) to find out what room she was in on the maternity ward when she was hospitalized in MILLS-PENINSULA.

66. Defendants and their employees, through the above stated acts, violated the Confidentiality of Medical Information Act. (See California Civil Code §§ 56-56.16.)

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

**EIGHTH CAUSE OF ACTION**

**(WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY CALIFORNIA CONSTITUTION ARTICLE 1, SECTION 8)**

67. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 66 of this Complaint as though fully set forth herein.

68. Plaintiff claims that Defendants terminated her employment in violation of public policy as set forth in the California Constitution, Article 1, Section 8, which provides:

> A person may not be disqualified from … pursuing a business, profession, vocation, or employment because of sex….

69. Pregnancy discrimination, a cause of action set forth above, is a species of sex discrimination, and is therefore prohibited by Section 8. Section 8 is the embodiment of the California public policy that (despite the general rule that a contracted employee or an employee at-will can be terminated for no reason, or for arbitrary and/or irrational reasons) an employee cannot be discharged for reasons prohibited by law. (See Exhibit R—*Phillips v. St. Mary Reg'l Medical Ctr*., 96 Cal. App. 4th 218, 116 Cal. Rptr. 2d 770.)

70. It is a violation of public policy, and a violation of § 8, to terminate the employment of a pregnant woman on the grounds that her pregnancy temporary disability makes her an inconvenient employee.

71. On August 24, 2005, Defendant FOSTER gave Plaintiff a "final written warning" for poor employment performance of nursing duties. However, this warning was pretext, especially in light of the fact that Plaintiff was paid an employment-related bonus on or about January 2, 2006. Employer never let employee know whether she was coming or going.

72. On March 16, 2006, Defendant FOSTER gave Plaintiff a "final written warning" for poor employment performance of nursing duties, and allegedly being a danger to patients. However, this warning also appears to be pretext—given the fact that Plaintiff was paid as

*Preceptor* (experienced nurse who trains new, inexperienced nurses) and/or charge (the nurse who is the shift supervisor, in lay person's terms) during the pay periods of April 9-April 22, 2006, May 7-May 20, 2006, May 21-June 3, 2006, June 4-June 17, 2006, June 18-July 1, 2006, July 2-July 15, 2006, July 16-July 29, 2006, August 13-August 26, 2006, and August 27-September 9, 2006. (See documents of Plaintiff's pay attached as Exhibit R.)

73.  Defendant FOSTER alleges she terminated Plaintiff's employment on September 7, 2006 because Plaintiff was allegedly a danger to patients. However, these allegation also appear to be pretext—in light of the fact that Plaintiff was paid as preceptor (experienced nurse who trains new, inexperienced nurses) and/or charge (the nurse who is the shift supervisor, in lay person's terms) during the pay periods of April 9-April 22, 2006, May 7-May 20, 2006, May 21-June 3, 2006, June 4-June 17, 2006, June 18-July 1, 2006, July 2-July 15, 2006, July 16-July 29, 2006, August 13-August 26, 2006, and August 27-September 9, 2006. (See documents of Plaintiff's pay attached as Exhibit R.) Said pretextual allegations were disproved before an EDD Appeals Administrative Law Judge where the predominant evidence was Plaintiff's sworn testimony, FOSTER's sworn testimony, and the declaration of a Doctor supporting Plaintiff's actions in the E.R. and contrary to named Personal Defendant FOSTER'S testimony.

74.  Defendants—despite the rules and regulations set forth in the Collective Bargaining Agreement with the California Nurses Association (not being raised at this time, but possibly at a later date depending on discovery regarding the present causes of action)—ignored said union Agreement and terminated Plaintiff so she or her unborn baby would not cost Defendant any more money. Plaintiff was terminated while waiting for her agreed upon grievance hearing and still recovering from the investigation into her private life which had nothing to do with her work or her ability to work.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

**NINTH CAUSE OF ACTION**

**(COMMON LAW WRONGFUL TERMINATION)**

75. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 74 of this Complaint as though fully set forth herein.

76. Defendants fired Plaintiff from their employment without just cause (without complying with their own employment policies and procedures, and in violation of the agreed upon terms for a union grievance hearing), and asserted a pretextual reason (allegations of incompetence) for firing Plaintiff.

77. As a direct and proximate result of wrongful termination, Plaintiff sustained damages in an amount to be proved at trial.

**TENTH CAUSE OF ACTION**

**(PERCEIVED CANCER DISCRIMINATION)**

78. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

79. As Plaintiff's **Employer/Healthcare Provider/Health Insurer**, Defendants had actual or constructive knowledge that Plaintiff's thyroid condition was being treated by a medical doctor by use of radioactive iodine, and knew or should have known that this condition was considered borderline cancer. Consequently, Defendants regarded Plaintiff as being disabled by thyroid cancer, and did not want to bear the costs for this illness as the **Employer/ Healthcare Provider/Health Insurer**.

80. Defendants owed a higher duty to Plaintiff to provide disability accommodation of her chronic medical condition as Defendants were in the unique position of being Plaintiff's **Employer/Health Insurer/Healthcare Provider**, and therefore knew or should have known her need for accommodation. (See Exhibit M.) Because Defendants were in a position to know of Plaintiff's chronic (thyroid gland) medical condition, Defendant employers had a

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

duty under FEHA to initiate a dialog with Plaintiff offering disability accommodations, even if Plaintiff never requested accommodations. Defendants never initiated any dialog with Plaintiff about any disability accommodations, and no accommodations were provided. (See Exhibit N.)

81. Furthermore, employer had actual notice of plaintiff's thyroid condition because she requested medical leave for radiation treatment, but Defendants denied Plaintiff's requested medical leave. (Exhibit P.)

82. Fatigue is a common symptom of cancer and/or a diagnosis of borderline cancer. On February 15, 2006, Plaintiff was normally tired and requested permission from her charge nurse to take a break and sleep. The charge nurse, Brian Johnson, granted permission to nap, a reasonable accommodation for cancer or a diagnosis of borderline cancer, and Plaintiff slept during her break. During this break, there were no patients in the Emergency Department. Defendant FOSTER later retroactively withdrew permission, and on March 16, 2006, wrote Plaintiff a "final written warning" for sleeping on the job. (See Exhibit J.)

83. Plaintiff's perceived-by-defendant chronic illness (thyroid cancer or borderline diagnosis of cancer), and requests for medical leave of absence for treatments with radioactive iodine, were an inconvenience to Defendants.

## ELEVENTH CAUSE OF ACTION

## (PREGNANCY DISCRIMINATION)

84. Plaintiff incorporates by reference the allegations contained in paragraphs 83 of this Complaint as though fully set forth herein.

85. During January of 2006, Plaintiff Boccignone became pregnant, and on February 2, 2006 Plaintiff suffered a miscarriage (a medical condition related to pregnancy, which involves significant blood loss and consequently fatigue).

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

86. Thirteen (13) days later on February 15, 2006, Plaintiff was still fatigued and requested permission from her charge nurse to take a break and sleep. The charge nurse Brian Johnson granted permission to sleep, a reasonable accommodation for this medical condition related to pregnancy and the subsequent miscarriage. Plaintiff slept during her break. During this break, there were no patients in the Emergency Department. Defendant FOSTER, later, retroactively withdrew this permission and on March 16, 2006, wrote Plaintiff a "final written warning" for sleeping. (See Exhibit J.)

87. Defendants FOSTER admitted under oath that she knew Plaintiff had suffered a miscarriage, but when questioned "isn't fatigue a normal symptom of women who have a miscarriage…" replied "No." Def. FOSTER went on to blame Plaintiff, "if Lisa had, was still having [fatigue from the miscarriage] then she should not have returned to work to her night shift and her regular duty." (See EDD Appeal hearing transcript attached hereto as Exhibit K.)

88. On or about June 1, 2006, Plaintiff was informed that she was seven to twelve weeks pregnant. On August 4, 2006, Plaintiff gave Defendant Foster Plaintiff's Obstetrician's signed written request for accommodation of Plaintiff's temporary disability due to pregnancy, specifying no lifting over 30 pounds, and limiting exposure of Plaintiff's unborn baby to x-rays and infections exposure from August 4th through Plaintiff's then-anticipated January 1, 2007 commencement of maternity leave. (See Exhibit L.) Defendant Foster and Senior Nurse, antagonist, Penny Hutchings discussed giving Plaintiff light duty, but stated they were uncertain how to comply with Plaintiff's OBGYN's pregnancy accommodation letter. Defendants never again discussed accommodating Plaintiff's pregnancy disability, and never provided light duty or any other accommodations, as if no pregnancy accommodation letter was ever provided to Hutchings and named Personal Defendant FOSTER at all.

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

89. Contrary to the signed doctor's request for accommodation of pregnancy, Plaintiff and her unborn baby were repeatedly exposed to x-rays and numerous infections, including but not limited to Rocky Mountain Spotted Fever and Dengue Fever, as if Plaintiff had never requested pregnancy disability accommodation at all via written request by her O.B.G.Y.N.

90. Furthermore, Defendants owed a higher duty to Plaintiff to provide pregnancy accommodation as Defendants were in the unique position of being Plaintiff's **Employer/Health Insurer/Healthcare Provider**, such that they had to know of Plaintiff's need for accommodation. (See Exhibit M.) Defendants knew of both Plaintiff's miscarriage and her subsequent pregnancy disability. Defendant employers had a duty under FEHA regarding both instances of pregnancy-related disability to initiate a dialog with Plaintiff offering disability accommodations, even if Plaintiff never requested accommodations. (See Exhibit N.)

91. Defendant employers knew Plaintiff had had a miscarriage, further evidenced by the fact that some MILLS-PENINSULA employee accessed Plaintiff's vaginal ultrasound, and displayed said vaginal ultrasound on the Emergency Department overhead monitor for all to see. Per Defendants' usual custom and practice, Plaintiff's name was probably labeled on the ultrasound image within the defendant's record keeping, and she was the only patient with that last name at that hospital at that time. Plaintiff's HIPPA rights and rights under the California Confidentiality of Medical Records Act were violated.

92. As Defendants are the **Employer/Health Insurer/Healthcare Provider**, they use Benefit and Risk Management Services as a Third Party Administrator (hereafter, "TPA"); said TPA is also a healthcare risk manager (Exhibit O). In so much as Defendants' TPA reviewed information, paid the bills for Plaintiff's injuries, and investigated work related claims (herein limited to possible infection due to being stuck by a malfunctioning safety syringe), Defendants were in a position to know that Plaintiff's work in the Emergency Department

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

made her pregnancy higher risk due to repeated exposure to X-rays, numerous infections, and other risks from many sources. Defendants were also in a position to access the results of genetic testing they performed (as Healthcare Provider) on Plaintiff's unborn baby. After creating the risk that Plaintiff could give birth to a gravely ill baby needing expensive healthcare, Defendants (the self insured **Employer/ Insurer/Healthcare Provider**) terminated Plaintiff's employment, potentially saving themselves a substantial amount of money in medical care not provided to Plaintiff and her baby (subsequently born two months premature, with a heart murmur, on MediCal).

93. Plaintiff received Right to Sue Letters from the DFEH, both dated July 13, 2007.

**TWELFTH CAUSE OF ACTION**

**(RETALIATION)**

94. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 93 of this Complaint as though fully set forth herein.

95. On July 8, 2005 and on July 10, 2005, Plaintiff made written objections (Exhibits C and D) to being assigned as the virtual charge nurse (in lay person's language, the supervisor) because she was a relatively new and inexperienced nurse.

96. Plaintiff defended herself in writing for having difficulty with her employment performance on August 6, 2005 because the department was understaffed (only three Registered Nurses working to care for more than fifteen patients in violation of California Code of Regulations, Title 22, § 70217). (See Quality Assurance Occurrence Report attached as Exhibit N, and § 70217 attached as Exhibit O.)

97. On August 24, 2005, Defendants retaliated by placing Plaintiff on unpaid leave, and placing a Performance Correction Notice in Plaintiff's personnel file containing a "final written warning" that she could be fired. (See Quality Assurance Occurrence Report attached as

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

Exhibit N, § 70217 attached as Exhibit O, and Performance Correction Notice attached as Exhibit P)

98. On February 2, 2006, Plaintiff suffered a miscarriage. From February 4, 2006 through February 20, 2006, Plaintiff was ill with a sinus infection, and she called in sick to work on February 8th and February 9, 2006. On February 15, 2006, Plaintiff slept during a break with the permission of charge nurse Brian Johnson. Defendants retaliated by denying Plaintiff's request for medical leave for perceived cancer treatment on February 16-February 26, 2006.

99. Plaintiff called in sick to work on February 21st, February 22nd, February 23rd, and February 24, 2006. Defendants retaliated by placing Plaintiff on unpaid administrative leave from February 24th through March 16, 2006.

100.       On August 4, 2006, Plaintiff requested accommodation of her temporary pregnancy disability, and requested maternity leave from January 1, 2007-May 6, 2007. On August 6, 2006, Plaintiff requested days off from work on October 31st and November 1, 2006. On August 28, 2006, Plaintiff declined to work a double shift because she did not want to miss her doctor's appointment that day for amniocentesis. On August 29th and August 30, 2006, Plaintiff, pursuant to doctor's orders, called in sick as she had been placed on "bed rest." On September 7, 2006, Defendants FOSTER retaliated by signing a letter terminating Plaintiff's employment, before officially meeting and noticing Plaintiff of this action at a meeting on Friday September 8, 2006 at MILLS-PENINSULA, which was describe by named Personal Defendant FOSTER to *discuss the present situation* (paraphrased).

**WHEREFORE**, Plaintiff prays for judgment against Defendants, as follows:

**ON THE ELEVENTH CAUSE OF ACTION (PREGNANCY DISCRIMINATION):**

a.       $280,000.00 in special damages;

b.       $500,000.00 in general damages;

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

**ON THE SIXTH (FALSE LIGHT) AND NINTH (COMMON LAW WRONGFUL DISCHARGE) CAUSES OF ACTION:**

a. Special and/or general damages in an amount to be proved at trial;

**AS TO ALL OTHER CAUSES OF ACTION:**

a. $1,250,000.00;

b. Reasonable attorneys' fees;

c. All costs of suit incurred herein;

d. Exemplary damages according to proof at trial; and

d. Such other and further relief as the Court may deem proper.

**JURY TRIAL DEMANDED [AT THIS TIME]**

At this time, Plaintiff demands trial of all issues by a jury.

Dated: November 14, 2007

Respectfully submitted,

Robert H. Gold, Esq.
Attorney for Plaintiff

GOLD & ASSOCIATES
235 MONTGOMERY STREET, SUITE 747
SAN FRANCISCO, CA 94104
TELEPHONE: (415) 354-5400
FACSIMILE: (415) 354-5405

# Exhibit A

MAY 9 2005
EMPLOYEE SERVICES

# Mills-Peninsula Health Services – Performance Recognition Cover Sheet

| | | | |
|---|---|---|---|
| Employee Name: Lisa Maria Boccignone | Title: Staff Nurse | | Empl ID: 36013681 |
| Department: Emergency Services-*Introductory* | Appraisal Period From: 1/24/05 | | To: 5/30/2005 |

**Evaluator Summary/Comments:**

Enter rating for each section below using whole numbers:

| | | | | |
|---|---|---|---|---|
| Minimal Requirements: | [ ] 1 | [ ] 2 | [X] 3.0 | |
| Technical Competence: | [ ] 1 | [ ] 2 | [X] 3.0 | [ ] 4 |
| Critical Thinking: | [ ] 1 | [ ] 2 | [X] 3.0 | [ ] 4 |
| Interpersonal Relations/Customer Service: | [ ] 1 | [ ] 2 | [X] 3.0 | [ ] 4 |

**Overall Appraisal:** [ ] 1 [ ] 2 [X] 3.0 [ ] 4

An overall score of 1 or 2 requires a developmental period or extension of new employee orientation at the end of which an updated appraisal must be done.

Manager to indicate re-evaluation date here: 5/2006. Goals for improvement must be outlined on Employee Development Plan – Part A.

License Date: ______ on file in dept.
CPR/BCLS Date: ______
Date Reviewed Job Description: ______
*Attached Copies of Licenses and CPR/BCLS*

| **Evaluator Comments:** |
|---|
| **Priority to get along with others** |
| **Smiles** |
| **Strives to offer excellent care** |
| **Learning ED practice** |
| **Can be compassionate** |

| |
|---|
| **Initiative** |
| **Punctual** |
| **Professional attire** |
| |
| |

Bobbie Foster, RN Director — 5/7/05
Evaluated by [name] / [title] — Date

Lisa Maria Boccignone — 05/07/2005
Employee's Signature — Date

| **Employee Comments:** |
|---|
| |
| |
| |
| |
| |
| |

# Mills-Peninsula Health Services – Performance Recognition – Part A, Development Plan

| Goal: | Recommended Action / Education: | Timeframe for Accomplishment: |
|---|---|---|
| *Management Developed Goals/Objectives:* | | 6 months Dec |
| 1. being 100% independent in ??? ability | daily practice | c/in 3 months Aug |
| 2. accepting criticism from peers | daily practice | c/in 6 months Dec |
| 3. leadership course | course work | |
| 4. | | |
| 5. | | |
| *Employee-identified Goals/Objectives:* | | c/in 6 months December |
| 6. Delegation & skills | course work inservices | ASAP |
| 7. Neater IV starts | Daily practice / weekly | c/in 6 months |
| 8. Be more assertive | course work inservices | |

**Assessment of Prior Performance Period's Goals:**
Note: Refer to Part A of prior year's evaluation and assess achievement

**Career Development Interests:**
What are your long-range career ambitions? I want to get my TNCC, MICN, and BSN in ED/Trauma
[ ] Career interests are currently met in your present position.
[✓] Long-range career interests, preference for future assignments, and/or desirable career development activities:

1. TNCC, MICN, BSN in ED/Trauma
2. become a preceptor
3. work more independently c̄ more interpretations of EKG's

**Employee Initials:** LMB
(Signifies that the information contained in this Career Development Interests section was provided by the employee and accurately re-states the employee's own career development interests.)

## Mills-Peninsula Health Services Performance Recognition – Part B, Key Job Functions

Validation Codes: Record Audit (RA); Direct Observation (DO); Test (T); Skills Checklist (SCL); Simulation (S);Patient/Survey/Feedback (PS/FF); Co-Worker Feedback (CF).

Performance Rating Key: 1=Resists behavior; 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

| **Technical Competency Assessed** Key job functions from job description that are major/high volume, infrequently performed but consequential, recently introduced, or troublesome; include performance criteria/standards. | **Validation:** [See Key above] | **Performance Rating:** [See Key above] | **Comments:** |
|---|---|---|---|
| 1. Provides direct patient care, evaluates outcomes, consults with other health team members and adjusts nursing care plan as indicated to ensure optimal patient care. Completes initial nursing admission assessment and history and develops individual care plans for assigned patients. | DO, CF | 3.0 | Lisa Maria does consistent patient care, and is able to assess and evaluate the outcome. Documentation is accurate and thorough |
| 2. Assesses and monitors patient's medical condition and reports changes to appropriate personnel. | DO, CF | 3.0 | Monitors her patients closely while in the ED. |
| 3. Administers medications to patients within specific guidelines. (4=0 minor errors; 3=1 minor error; 2=2 minor errors; 1=1 major or 3 or more minor errors) | DO, CF | 3.0 | Careful with medication administration, cross checks and follows the principles of safe administration. |
| 4. Writes initial nursing histories, assesses patients' conditions and develops individual care plans for patients assigned to the unit. Documentation is complete and accurate. Initial nursing histories are documented in accordance with unit standards. Ongoing documentation is 100% current and accurate in accordance with unit standards. | DO, CF | 3.0 | Lisa Maria documents her care well, she completes her assessment and reviews the patients past history. Documentation reflects the patient's chief complaint as their primary reason for being in the ED. |
| 5. Assess patient's/significant other's readiness to learn, prepares for discharge and provides appropriate educational materials. Documents teaching and ensures that all disciplines participate in the teaching plan. | DO, CF | 3.0 | Does a complete job of providing discharge instructions to the patient and their family members. |

## Mills-Peninsula Health Services Performance Recognition – Part B, Key Job Functions

Validation Codes: Record Audit (RA); Direct Observation (DO); Test (T); Skills Checklist (SCL); Simulation (S);Patient/Survey/Feedback (PS/FF); Co-Worker Feedback (CF).

Performance Rating Key: 1=Resists behavior; 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

| **Technical Competency Assessed** Key job functions from job description that are major/high volume, infrequently performed but consequential, recently introduced, or troublesome; include performance criteria/standards. | **Validation:** [See Key above] | **Performance Rating:** [See Key above] | **Comments:** |
|---|---|---|---|
| 6. Assumes a professional leadership role in assisting with staff development. Orients, instructs, trains and evaluates nursing team members. Performance validated based on feedback from staff being oriented and direct observation. | DO, CF | 3.0 | Lisa Maria is still learning the ED at this point in time, consistently meeting standards of practice. Has the potential to be a future preceptor. |
| 7. Performs and functions in a leadership role which includes acting as a relief charge nurse and delegating as necessary. Willingly assumes responsibility and acts as a role model for staff. | DO, CF | 3.0 | Lisa Maria is to new to assume charge responsibilities, we hope in the future that she will be interested in assisting with Charge Nurse duties. |
| 8. Maintains a safe, comfortable and therapeutic environment for patients/families in accordance with MPHS standards. Adheres to all JCAHO and Title XXII standards and ensures equipment meets preventive maintenance standards and is fully operational. | DO, CF | 3.0 | Practices safety and follows established policies and procedures when she is working in the ED. She knows the standards from JCAHO and DHS and follows the standards. |

**Overall Section Rating:** [ ] 1 [ ] 2 [X] 3.0 [ ] 4

## Mills-Peninsula Health Services Performance Recognition – Part C, Key Generic Standards

Validation Codes: Record Audit (RA); Direct Observation (DO); Patient/Survey/Feedback (PS/FF); Co-Worker Feedback (CF).

Performance Rating Key: 1=Resists behavior; 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

| Minimal Requirements: | Does Not Meet Expectations: | Meets Expectations: | Comments: |
|---|---|---|---|
| 1. Complies with established hospital and department dress and personal grooming policies. | | 3.0 | Follows established standards |
| 2. Plans and coordinates time-off so as not to interfere with department scheduling. | | 3.0 | Flexible and cooperative with her time |
| 3. Arrives, begins and concludes work as scheduled. ~~Minimizes incremental of overtime through swiping in~~ and out within established time frames (no more than seven minutes early or late). | | 3.0 | Punctual, and follows standards |
| 4. Takes breaks and meal periods within established guidelines. Secures supervisory approval in advance when unable to take required rest periods and meal periods. | | 3.0 | Follows CN recommendations and directions |
| 5. Completes all time records according to policy. | | 3.0 | Follows policy |
| 6. Works in a manner which ensures his/her own safety and the safety of others. Knowledgeable about department safety/disaster plan. | | 3.0 | Practices safety, knows the safety policies, if on duty here would assist in disaster. |
| 7. Compliant with all Infection Control standards and annual TB test. | | 3.0 | Compliant with IC policies |
| 8. Provides documentation of valid license/certification as required by the job. | | 3.0 | Maintains license and certifications to continue working in the ED |
| 9. Attends/reads minutes for at least 75% of staff meetings. Keep up-to-date with necessary departmental communications and policies. | | 3.0 | Attends regular and mandatory staff meetings and reads departmental updates when posted. |
| 10. Completes required annual M3 coursework and all required unit specific competencies. | | 3.0 | Completes required training on line with a minimum or reminders. |

Appr l Period:

## Mills-Peninsula Health Services Performance Recognition – Part C, Key Generic Standards

Validation Codes: Record Audit (RA); Direct Observation (DO); Patient/Survey/Feedback (PS/FF); Co-Worker Feedback (CF).

Performance Rating Key: 1=Resists behavior; 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

| **Overall Appraisal:**<br>[ ] 1 Not all minimum requirements fully met<br>[X] 3 All minimum requirements fully met | | | |
|---|---|---|---|
| **Critical Thinking Skills** | **Validation:** (See Key Above) | **Performance Rating:** (See Key Above) | **Comments:** |
| 1. Takes initiative to share relevant information, issues and concerns directly and assertively with appropriate persons. | DO/CF | 3.0 | Takes it upon herself to report necessary information as appropriate. |
| 2. Identifies potential problem situations and takes appropriate action to minimize any negative impact. | DO/CF | 3.0 | Can see the problems before they happen and acts to prevent any negative outcome. |
| 3. Knows when to get help from immediate supervisor or other resources as appropriate. | DO/CF | 3.0 | Reports 'up' appropriately. |
| 4. Solves problems effectively and creatively. | DO/CF | 3.0 | Consistent problem solving skills-experienced |
| 5. Effectively prioritizes work; meets deadlines. | DO/CF | 3.0 | Can prioritize without difficulty |
| 6. Uses supplies and resources conservatively. | DO/CF | 3.0 | Uses supplies appropriate and without excess waste |
| **Overall Appraisal:** [ ] 1 [ ] 2 [X] 3.0 [ ] 4 | | | |
| **Interpersonal Relations/Customer Service - Standards of Conduct** | **Validation:** (See Key Above) | **Performance Rating:** (See Key Above) | **Comments:** |
| 1. INTEGRITY and ACCOUNTABILITY - Demonstrates uncompromising ethics<br>(#1&2) Accountable for actions. Adheres to Sutter Health Standards for business conduct, Mills-Peninsula policies and procedures and Standards of Conduct. | DO/CF | 3.0 | Accountable for her assignment and reporting the outcomes to the Charge Nurse. She follows established policies and procedures to do this. |
| 2. EXCELLENCE – Continuously exceeds organizational, professional and customer expectations.<br>(#7) Completes and demonstrates job duties/tasks and takes initiative to follow through until service is completed. | DO/CF | 3.0 | Lisa Maria has worked to work to earn the respect of her peers and the ED physicians. She cares about her patients and their families when they are in the ED. |

## Mills-Peninsula Health Services Performance Recognition – Part C, Key Generic Standards

Validation Codes: Record Audit (RA); Direct Observation (DO); Patient/Survey/Feedback (PS/FF); Co-Worker Feedback (CF).

Performance Rating Key: 1=Resists behavior; 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

| Standard | Validation | Rating | Comments |
|---|---|---|---|
| 3. HONESTY – Commitment to truthful and open conduct in all aspects of work and workplace relationships. (#24) Performs duties in a safe, ethical and honest manner. | DO/CF | 3.0 | Lisa Maria practices safely and ensures that her patients are not harmed while they are in the ED. She acts as an advocate for them and shares information with them pertinent to their diagnosis |
| 4. TEAMWORK – The ability to work unselfishly with others toward a common goal or vision. (#27) Takes ownership of any problem that customers bring to my attention by handling those things that I can, takes responsibility for contacting the appropriate person for things that I cannot solve and follow up with the customer to ensure that the issue was resolved. | DO/CF | 3.0 | Lisa Maria is experienced and shares that with others, she is not afraid to teach or assist in problem solving. |
| 5. RESPECT – Treats everyone with patience, consideration and dignity. (#44) Respects all individuals' beliefs, ideas and contributions in a courteous supportive manner. | DO/CF | 3.0 | Not judgmental-treats patients with kindness, compassion and dignity. |
| 6. INITIATIVE – Anticipates the needs of others and proactively responds. (#58) Takes the first step in providing service without being asked by anticipating, identifying and resolving concerns/challenges in day-to-day activities. | DO/CF | 3.0 | Takes the initiative to help and assist other nurses when the help is needed to keep the ED running smoothly. |
| 7. SERVICE – Exceeds performance standards and expectations while enhancing the quality of care to our customers and the quality of the work environment. (#65) Listens carefully to the needs of others, be patient and tolerant in responding to those needs and demonstrates a willingness to go the extra mile when providing service. | DO/CF | 3.0 | Lisa Maria offers consistent customer service by attending to her patients and family member concerns in a timely fashion. |

Appr[illegible] Period:

# Mills-Peninsula Health Services Performance Recognition – Part C, Key Generic Standards

Validation Codes: Record Audit (RA); Direct Observation (DO); Patient/Survey/Feedback (PS/FF); Co-Worker Feedback (CF).

Performance Rating Key: 1=Resists behavior; 2=Behavior inconsistent; 3=Meets behavior expectations; 4=Facilitates behavior/role mode for colleagues.

| | | | |
|---|---|---|---|
| 8. COMMUNICATION – Efficiently and compassionately communicates with patients, visitors, customers and fellow employees.<br>(#87) Makes eye contact and smile at customers.<br>(#47) Treats others with courtesy and respect, avoiding rudeness and sarcasm. Accepts constructive feedback.<br>(#98) Consistently resolves concerns and follows up as needed. | DO/CF | 3.0 | Lisa Maria continues to work at coming in with a positive attitude and associated behaviors. She can be kind to her peers when she is focused on her positive attitude. |
| **Overall Appraisal:** [ ] 1 [ ] 2 [X] 3.0 [ ] 4 | | | |

# Exhibit B



YOU DESERVE ROSE

REWARD OUTSTANDING SERVICE EXCELLENCE

I RECOGNIZING: Lisa Maria Boccignone (I think)

T FIRST/LAST NAME

Emergency

RTMENT

MILLS HEALTH CENTER? ☒ PENINSULA MEDICAL CENTER

OTHER FACILITY

M: [redacted]

A PATIENT/GUEST ☐ AN EMPLOYEE

A VOLUNTEER ☐ A MEMBER OF THE PROFESSIONAL STAFF

COGNITION FOR:

for her outstanding work. She is so wonderful patient and caring. She knows how to make her patients relax when they need it. Thank you Lisa for making me feel so comfortable. I know I was in great hands under your care.

THANK YOU FOR TAKING THE TIME TO LET US KNOW ABOUT A JOB WELL DONE.

respect initiative communication teamwork service

YOU DESERVE A ROSE

REWARD OUTSTANDING SERVICE EXCELLENCE

I AM RECOGNIZING: Lisa Maria Boccignone

PRINT FIRST/LAST NAME

ER

DEPARTMENT

☐ MILLS HEALTH CENTER ☑ PENINSULA MEDICAL CENTER

☐ OTHER FACILITY

FROM: Claude

☐ A PATIENT/GUEST ☑ AN EMPLOYEE

☐ A VOLUNTEER ☐ A MEMBER OF THE PROFESSIONAL STAFF

RECOGNITION FOR:

Lisa Maria has been a young R.N. in E.R. who has been demonstrating excellent sense of communications with her co-workers and patients. Lisa Maria is advocating her patients by reading their physiological and emotional needs. Thanks!

Claude

THANK YOU FOR TAKING THE TIME TO LET US KNOW ABOUT A JOB WELL DONE.

excellence honesty accountability integrity

respect initiative communication teamwork service

YOU DESERVE A

# ROSE

REWARD OUTSTANDING SERVICE EXCELLENCE

FEB 01 2008

I AM RECOGNIZING:

Lisa Marie

PRINT FIRST/LAST NAME

Emergency Room

DEPARTMENT

MILLS HEALTH CENTER ☐ PENINSULA MEDICAL CENTER

OTHER FACILITY

FROM: [redacted]

A PATIENT/GUEST ☐ AN EMPLOYEE

A VOLUNTEER ☐ A MEMBER OF THE PROFESSIONAL STAFF

RECOGNITION FOR:

She was very skilled at her job and had a wonderful bedside manner. She made our experience here much more pleasant.

THANK YOU FOR TAKING THE TIME TO LET US KNOW ABOUT A JOB WELL DONE.

respect initiative communication teamwork service

---

YOU DESERVE A

# ROSE

REWARD OUTSTANDING SERVICE EXCELLENCE

A good nurse can make a hospital stay much less difficult

I AM RECOGNIZING:

Lisa Marie Boccignone

PRINT FIRST/LAST NAME

Emergency

DEPARTMENT

☐ MILLS HEALTH CENTER ☐ PENINSULA MEDICAL CENTER ✓

☐ OTHER FACILITY

FROM:

☒ A PATIENT/GUEST ☐ AN EMPLOYEE

☐ A VOLUNTEER ☐ A MEMBER OF THE PROFESSIONAL STAFF

RECOGNITION FOR:

She has been a speedy and very efficient care giver. She has also been very friendly and seems genuinely focused on making me feel less anxious and more comfortable!

THANK YOU FOR TAKING THE TIME TO LET US KNOW ABOUT A JOB WELL DONE.

From [redacted]

excellence honesty accountability integrity respect initiative communication teamwork service



YOU DESERVE A
ROSE
REWARD OUTSTANDING SERVICE EXCELLENCE

...I RECOGNIZING: Apr 1 2 2006

...isa Maria (BOCCIGNONE)

...T FIRST/LAST NAME

Em. RM.

...RTMENT

...MILLS HEALTH CENTER ☐ PENINSULA MEDICAL CENTER

...OTHER FACILITY

...M: [redacted]

A PATIENT/GUEST ☐ AN EMPLOYEE

A VOLUNTEER ☐ A MEMBER OF THE PROFESSIONAL STAFF

...COGNITION FOR:

...fficient, friendly manner ...d sense of humor. ...n excellent person ...o have on EM staff.

respect initiative communication team

YOU DESERVE A
ROSE
REWARD OUTSTANDING SERVICE EXCELLENCE

I AM RECOGNIZING: JUL 2 6 2006

Lisa Maria Boccignone

PRINT FIRST/LAST NAME

ER

DEPARTMENT

☐ MILLS HEALTH CENTER ☒ PENINSULA MEDICAL CENTER

☐ OTHER FACILITY

FROM: [redacted]

☒ A PATIENT/GUEST ☐ AN EMPLOYEE

☐ A VOLUNTEER ☐ A MEMBER OF THE PROFESSIONAL STAFF

RECOGNITION FOR:

Outstanding Compassionate Humane Care!

excellence honesty accountability respect initiative communication team

YOU DESERVE A
ROSE
REWARD OUTSTANDING SERVICE EXCELLENCE

I AM RECOGNIZING: APR 1 2 2006

LISA MARIA

PRINT FIRST/LAST NAME

Emergency Room.

DEPARTMENT

☐ MILLS HEALTH CENTER ☒ PENINSULA MEDICAL CENTER

☐ OTHER FACILITY

FROM: Dennis Sisk - Security

☐ A PATIENT/GUEST ☒ AN EMPLOYEE

☐ A VOLUNTEER ☐ A MEMBER OF THE PROFESSIONAL STAFF

RECOGNITION FOR:

CARING NATURE - ON MARCH 26 We HAD A PATIENT PASS AWAY; I OBSERVED LISA MARIA AS SHE TALKED TO THE FAMILY MEMBERS - SHE WAS SO COMPASSIONATE AND CARING, IT MADE ME PROUD TO WORK HERE.

THANK YOU FOR TAKING THE TIME TO LET US KNOW

integrity accountability honesty excellence respect initiative communication teamwork service

# Exhibit C

CALIFORNIA NURSES ASSOCIATION

## ASSIGNMENT DESPITE OBJECTION / INPATIENT

You must first **verbally** protest your assignment to your supervisor at the time you believe it is suboptimal or unsafe. This is usually at the beginning of the shift, but may occur at any time. If your supervisor does not make a satisfactory adjustment to the assignment, complete this form to the best of your knowledge and distribute the ADO copies according to the instructions on the reverse side.

**SECTION I**

I/We Lisa Maria Boccignone RN

Registered Nurse(s) employed at Mills - Peninsula (Facility) - ER (Unit/Dept) 1900-0730 (Shift)

hereby protest my/our assignment as: ☐ primary nurse ☐ charge nurse ☒ relief charge ☐ team leader ☐ team member

given to me/us by Default Penny & Katerine (Name / Title) on July 8, 2005 noor (Date / Time)

As a patient advocate, in accordance with the **California Nursing Practice Act**, this is to confirm that I notified you that, in my professional judgment, today's assignment is unsafe and places my patients at risk. As a result, the facility is responsible for any adverse effects on patient care. I will, under protest, attempt to carry out the assignment to the best of my ability.

**SECTION IIa.** See Title 22 Revisions on reverse side. Date of charge 07/08/05

I am objecting to the aforementioned assignment on the grounds that: (check all that apply)

☒ I was given an assignment where I did not receive
- ☐ orientation to the unit.
- ☒ training to competently perform my assigned duties and responsibilities.

☒ I was given an assignment which posed a potential threat to the health and safety of my patients (explain in Section V).

☐ Staffing/Skill mix is/was insufficient to
- ☐ meet the individual patient care needs/requirements of my patients.
- ☒ perform effective assessments of patients assigned to me.
- ☐ meet the teaching/discharge needs identified by my patient's condition.
- ☒ provide breaks to prevent fatigue, accidents, and/or errors.

☒ The unit is/was staffed with
- ☒ unqualified licensed/unlicensed/certified staff.
- ☐ excessive registry personnel whose competency was not communicated to me.

☐ Direct patient care duties did not allow time for charge nurse duties (clinical supervision/coordination of care).

☐ ICU/CCU patient(s) requiring ☐ 1:1 or ☐ 1:2 nurse staffing ratio are/were not staffed at this level.

☐ New patients were transferred or admitted to unit without adequate staff.

☐ Patient(s) placed inappropriately on the unit required a higher level of care than could be provided.

☐ I was forced to work beyond my scheduled hours (mandatory overtime).

☒ Other (explain in Section V)

**SECTION IIb.** Working Conditions: (circle) Meal period missed? (YES)/NO Break missed? (YES)/NO Overtime worked? (YES)/NO

**SECTION III** Type of unit:

___ Med/Surg ___ L&D ___ SNF ___ ICU/CCU ___ NICU ___ Telemetry ___ Stepdown/TCU ___ OR X ER ___ Nursery ___ Peds ___ Post-partum ___ PACU ___ Psych ___ Other

Patient Classification System Name: ___ Unit capacity ___ Trauma L&D no tech, no ECS

Census ___ Acuity: high X average ___ low ___

Staffing system variance (difference between acuity hours and staffed hours) ___

Clerk? ☐ Yes ☒ No after 12 00.00

**SECTION IV** Patient care staffing count:

| | Regular | Float/Casual | Registry | | Regular | Float/Casual | Registry |
|---|---|---|---|---|---|---|---|
| RN | [illegible] | [illegible] | [illegible] | | 0 | 0 | 0 |
| LVN | 0 | 0 | 0 | OTHER | | | |

**SECTION V** Brief Problem Statement: [illegible] to do ... Brian & I are POC ... facility & proper training - & no both new to this facility

(If more space is needed, attach additional information and make 4 copies to distribute)

**SECTION VI** Complete this section as appropriate. Nursing care not done/not done effectively Patient care affected. (This may need to be filled out at the end of your shift, if appropriate.) (i.e. assessment, evaluation, personal care, treatments, teaching, charge duties, transfers/admissions delayed, etc.)

(Potential)/actual hazard that resulted from this situation: unprepared for all charge duties as I was only briefly oriented to them by Cynthia RN prior to my shift friday!

07/08/2005 (Date / Time)

**SECTION VII - Action:**

Notified Supervisor: Penny Hutchings (Name / Title)

Supervisory response: & MD Adams 07/08/2005 (Date/Time)

Other persons notified: MD Torrebene (Name/Title)

Other persons' response: ___

# Exhibit D

CALIFORNIA NURSES ASSOCIATION

# ASSIGNMENT DESPITE OBJECTION / INPATIENT

You must first verbally protest your assignment to your supervisor at the time you believe it is suboptimal or unsafe. This is usually at the beginning of the shift, but may occur at any time. If your supervisor does not make a satisfactory adjustment to the assignment, complete this form to the best of your knowledge and distribute the ADO copies according to the instructions on the reverse side.

**SECTION I**

I/We Lisa Maria Boccignone RN

Registered Nurse(s) employed at Mills-Peninsula (Facility) ER (Unit/Dept) 1900-0730 (Shift)

hereby protest my/our assignment as: ☐ primary nurse ☒ charge nurse ☒ relief charge ☐ team leader ☐ team member

given to me/us by Dalgvil Penny / Katerina (Name / Title) on July 8, 2005 noon (Date / Time)

As a patient advocate, in accordance with the **California Nursing Practice Act**, this is to confirm that I notified you that, in my professional judgment, today's assignment is unsafe and places my patients at risk. As a result, the facility is responsible for any adverse effects on patient care. I will, under protest, attempt to carry out the assignment to the best of my ability.

**SECTION IIa.** See Title 22 Revisions on reverse side.

Date of charge 07/10/

I am objecting to the aforementioned assignment on the grounds that: (check all that apply)

☒ I was given an assignment where I did not receive
- ☒ orientation to the unit.
- ☒ training to competently perform my assigned duties and responsibilities.

☒ I was given an assignment which posed a potential threat to the health and safety of my patients (explain in Section V).

☐ Staffing/Skill mix is/was insufficient to
- ☐ meet the individual patient care needs/requirements of my patients.
- ☒ perform effective assessments of patients assigned to me.
- ☐ meet the teaching/discharge needs identified by my patient's condition.
- ☐ provide breaks to prevent fatigue, accidents, and/or errors.

☒ The unit is/was staffed with
- ☒ unqualified licensed/unlicensed/certified staff whose competency was not communicated to me.
- ☐ excessive registry personnel whose competency was not communicated to me (clinical supervision/coordination of care).

☐ Direct patient care duties did not allow time for charge nurse duties (clinical supervision/coordination of care).

☐ ICU/CCU patient(s) requiring ☐ 1:1 or ☐ 1:2 nurse staffing ratio are/were not staffed at this level.

☒ New patients were transferred or admitted to unit without adequate staff.

☐ Patient(s) placed inappropriately on the unit required a higher level of care than could be provided.

☐ I was forced to work beyond my scheduled hours (mandatory overtime).

☒ Other (explain in Section V)

**SECTION IIb.** Working Conditions: (circle)

Meal period missed? YES/(NO) Break missed? (YES)/NO Overtime worked? (YES)/NO

**SECTION III** Type of unit:

| | | | | |
|---|---|---|---|---|
| ___Med/Surg | ___ICU/CCU | ___Stepdown/TCU | ___Nursery | ___PACU |
| ___L&D | ___NICU | ___OR | ___Peds | ___Psych |
| ___SNF | ___Telemetry | X ER | ___Post-partum | ___Other |

Patient Classification System Name: ________

Census ___ Acuity high ___ average X low ___ Unit capacity 2 RNs, 1 MD, 0 tech or secial

Staffing system variance (difference between acuity hours and staffed hours) ________

**SECTION IV** Patient care staffing count: Clerk? ☐ Yes ☒ No after

| | Regular | (Float/Casual) | Registry | | Regular | Float/Casual | Registry |
|---|---|---|---|---|---|---|---|
| RN | 2 RNs | 0 | | AIDE | 0 | 0 | 0 |
| LVN | 0 | [illegible] | | OTHER | [illegible] | [illegible] | 1 vol. |

**SECTION V** Brief Problem Statement: Not trained to perform all the tasks as charge (COVA, etc. - & other duties) [illegible] Charge nurse called in sick

(If more space is needed, attach additional information and make 4 copies to distribute)

**SECTION VI** Complete this section as appropriate.

Patient care affected (This may need to be filled out at the end of your shift, if appropriate.) Nursing care not done/not done effectively (i.e. assessment, evaluation, personal care, treatments, teaching, charge duties, transfers/admissions delayed, etc.)

________

(Potential)/actual hazard that resulted from this situation: unprepared for all charge duties; patient care was potentially compromised by being understaff & unoriented to duties

**SECTION VII - Action:**

Notified Supervisor: Penny Hutchings Manager ED (Name / Title) 07/11/05 [illegible] (Date / Time)

Supervisory response: ________ 07/10/05 22:( 

Other persons notified: MD Molander (Name/Title) (Date/Time)

Other persons' response: ________

# Exhibit E



Mills-Peninsula
Health Services
A Sutter Health Affiliate

1783 El Camino Real
Burlingame, CA 94010
650.696.5400

January 1, 2006

Lisa Maria Boccignone
853 Commodore Drive #274
San Bruno, CA 94066

Dear Lisa Maria:

It gives me a great pleasure to be able to congratulate you on your **1st** anniversary with Mills-Peninsula Health Services, and to present your award pin.

You are a vital part of our team, and I sincerely appreciate your hard work and dedication.

Again, my warmest congratulations and sincere thanks.

Sincerely,

Robert W. Merwin
Chief Executive Officer
Mills-Peninsula Health Services

Enclosure

# Exhibit F



Mills-Peninsula
Health Services
A Sutter Health Affiliate

Just state facts
∅ personal feelings

1783 El Camino Real
Burlingame, CA 94010
650.696.5400

January 4, 2006

Lisa Boccignone
853 Commodore Drive #274
San Bruno, CA 94066

Dear Lisa,

After reviewing your application for the Loan Forgiveness Program, we find that you do not meet the eligibility requirements for an award at this time. Written disciplinary actions within the last year of employment are cause for disqualification. Please refer to the guidelines enclosed.

If you have any further questions or concerns please contact Cynthia Cherin in Employee Services at (650) 696-5467 or email cherinc@sutterhealth.org .

Sincerely,

MPHS Loan Forgiveness Program Committee



Mills-Peninsula
Health Services

A Sutter Health Affiliate

1783 El Camino Real
Burlingame, CA 94010
650.696.5400

May 12, 2006

Lisa Boccignone
853 Commodore Drive #274
San Bruno, CA 94066

Dear Lisa,

After reviewing your application for the Loan Forgiveness Program, we find that you do not meet the eligibility requirements for an award at this time. Written disciplinary action within the last year of employment is cause for disqualification. Please refer to the guidelines enclosed.

If you have any further questions or concerns please contact Cynthia Cherin in Human Resources at (650) 696-5467 or email cherinc@sutterhealth.org .

Sincerely,

MPHS Loan Forgiveness Program Committee

email to Shawn
persons name
R/T HR student loans
Rentention bonus

APR 0 6 2006

**MILLS-PENINSULA HEALTH SERVICES**

**RN Loan Forgiveness Program/Educational Grant Application**

**Applicant Information**

Name: LISA MARIA BOCCIGNONE Employee Number: 36013681

Department: Emergency Room Manager: Penny Hutchings/Bobbi Foso

Hire Date: 01/2005 Scheduled Hours: 19 - 0730 RN license number: 652432

Home Address: 853 Commodore Dr # 274
San Bruno, CA 94066

Home Phone: 650 872-0639 Work Phone: 650 - 696 - 5446

**School Information**

School name and Address:
Golden West College
17842 Golden West St
Huntington Beach CA 92647

Graduation Date: Dec 20, 2004 Degree: AA, ADN

**Loan Information (one lender only please)**

Lender's Name: ACS
Lender's Address: PO Box 7051
Utica, New York 13504-7051
Lender's Phone #: 1-800-835-4611

***Attach copy of most recent loan statement(s). Copies of web page loan transactions/summaries acceptable only if lender contact information is complete above and on attached documents.***

Employee Signature: [signature] Date: 04/06/06

Department Manager: ____________________ Date: __________

*Important Note:*
*Although Mills Peninsula intends to continue to offer this program, it reserves the right to change, amend, and/or discontinue this program at any time. Discontinuation of this program will not affect any disbursements and agreements incurred while the program was in force.*

# Mills-Peninsula Health Services (MPHS)
# Loan Forgiveness Program
# For Registered Nurses

**Purpose**

This program is intended to assist registered nurses in reducing debt from loans incurred to pay for their nursing degree.

**Eligibility**

Eligibility Requirements:

- Must be a MPHS employee at the time of application and grant disbursement(s)
- Must possess a valid California RN license
- Must have at least six months of experience as a permanently licensed Registered Nurse at MPHS
- Must have an outstanding loan balance which was applied to an accredited RN program
- Must maintain a satisfactory performance with annual evaluations that meet MPHS standards with no written disciplinary actions
- Must maintain benefited status during participation in the loan forgiveness program
- Must be willing to abide by the **Loan Forgiveness Program Agreement**

**Application procedure and deadlines**

Applications must be approved by the employee's Department Manager and are to be submitted to **Employee Services** no later than **April 15th** and/or **November 15th**.

**Funding**

Funding for the program is limited and not all applicants may be funded. The size of the grant awarded is based on the following: (1) the hours worked at Mills-Peninsula Health Services (MPHS) during the six-month period prior to the employee's application for a loan forgiveness grant, (2) the amount of the balance of the employee's educational loan(s) and (3) the number of applicants to the program and MPHS' ability to fund the program. Reimbursements are paid semi-annually with an ***annual*** limit of *$5,000.00 per applicant*. The amount disbursed to a registered nurse for the purpose of the loan forgiveness is based on the hours paid during the previous six-month period. Reimbursements are reviewed annually.

**Awardees will be notified in writing of their application status.**

# Exhibit G

Mills-Peninsula Health Services

A Sutter Health Affiliate

P

00631720
ROBBINS, HARVARD 723 23MAR69 F 36
E ERS
*46435442* 6AUG05

# LITY ASSURANCE OCCURRENCE REPORT

COMPLETING THIS FORM ROUTE TO: 1 DEPARTMENT MANAGER 2 RISK MANAGEMENT 3 OUTCOMES MANAGEMENT

36039

Privileged and Confidential: For the exclusive use of the Quality Assurance / Risk Management Program (Evidence Code 1157)

## CURRENCE INFORMATION

DO NOT MAKE COPIES
DO NOT FILE IN PATIENT RECORD

F OCCURRENCE: 8/06/05 | TIME: | LOCATION OF OCCURRENCE ▶ DEPT. NO. ER | UNIT DEPT. ER | ROOM NO. 11 | OTHER

MEDICAL RECORD NO. [redacted] | AGE 36 | SEX ☐ M ☑ F

INVOLVED: ATIENT ☐ VISITOR ☐ STUDENT TPATIENT ☑ MED STAFF ☐ OTHER

NAME OF PERSON INVOLVED (if no addressograph): MD Brody

ESS (if not a pt.) | CITY | STATE | ZIP CODE | PHONE NUMBER

## CURRENCE CATEGORY

's Property
edication
Infusion / ansfusion
all

☐ Tx / Procedure
☑ Physician Related
☑ Communication
☐ Complaint
☐ Skin Breakdown

☐ Complication / Unexpected Event
☐ Diet Related
☐ Against Medical Advice
☐ Pt. Placement

☐ Consent Related
☐ Code Blue
☐ Equipment / Medical Device
☐ Violent Gesture

☐ Inappropriate Behavior
☐ Perinatal Problem
☐ Return to OR
☐ Security Related

☐ Safety Related
☐ Adverse Reaction
☑ Other Verbal orders / Lack of communication / understaff

## RIEF OBJECTIVE STATEMENT OF FACTS

on 08/06 – Was taking care of Pt: [redacted] – 7/2005. She is a non-comunicative person with severe cerebral palsy, who came in with her family c̄ C.C. ABD pain. Because her history c̄ this facility MD Brody gave orders to medicate her for pain q 30minutes c̄ 1mg dilaudid. He gave me verbal orders for Versed when she was to go to CT in the attempts to obtain a clear images. I was also told that the PO contrast was necessary and if she could not drink it, put it in by NG tube. [redacted] was able to drink almost all of the contrast – but soon after experienced projectile vomiting (USE OTHER SIDE IF NECESSARY)

WITNESS NAME: Chris DeGuzman | EMPLOYEE ☑ YES ☐ NO | PHONE/EXT 5446 | ADDRESS / DEPT. ED | DATE 08/07/05 | TIME 0600

SUPERVISOR NOTIFIED ☑ YES ☐ NO | NAME OF SUPERVISOR Bobbi Foster

## PATIENT FALLS

(narcotics, sedatives, psychotropics, diuretics)

BED POSITION ☐ HIGH ☐ LOW | BEDRAILS IN USE ☐ R. UPPER ☐ L. UPPER ☐ R. LOWER ☐ L. LOWER | ACTIVITY ☐ BR ONLY ☐ UP W / ASSIST ☐ BRP ☐ UP AD LIB | PT'S MENTAL STATUS ☐ ALERT ☐ CONFUSED ☐ UNCONSCIOUS | RESTRAINTS ☐ ON ☐ OFF ☐ NOT ORDERED | CALL LIGHT WITHIN REACH ☐ YES ☐ NO ☐ N/A | MEDS WITHIN LAST 3 HOURS ▶ MED TIME / MED TIME

## PHYSICIAN NOTIFICATION

PHYSICIAN NOTIFIED ☑ YES ☐ NO | DATE 08/06/05 | TIME 01:10 | NAME OF EXAMINING PHYSICIAN (IF DIFFERENT)

DR. Brody

EXAM TREATMENT TS ☐ YES ☐ NO | IF YES, NATURE OF TESTS / TREATMENT

## PREPARED / REVIEWED

PREPARED BY: Lisa Maria [signature] | POSITION RN | DATE 08/10/05 | TIME 2200

REVIEWED BY | POSITION | DATE | TIME

127779 (1/03)

QUALITY ASSURANCE OCCURRENCE REPORT
TO BE COMPLETED BY DEPARTMENT MANAGER / DESIGNEE

Privileged and Confidential: For the exclusive use of the Quality Assurance / Risk Management Program (Evidence Code 1157)

DO NOT MAKE COPIES

**OCCURRENCE SEVERITY**

☐ Error, potential only ☐ Error, no harm ☐ Increased monitoring, no harm ☐ Change in condition, no harm ☐ Intervention/Increased LOS ☐ Permanent harm ☐ Death

**CORRECTIVE ACTIONS**

| POLICIES AND PROCEDURES | DATE | EQUIPMENT / SUPPLIES / CONDITION | DATE | OTHER |
|---|---|---|---|---|
| Evaluated | | ☐ Evaluated | | ☐ No action at this time |
| Recommended change | | ☐ Recommend change | | ☐ Other |
| Changed | | ☐ Changed | | |
| Developed | | ☐ Make additional / new purchase | | |
| Enforced | | ☐ Removed / Repaired / Corrected | | |

| MENTOR / INSTRUCTION / COUNSELING | DATE | | DATE | | |
|---|---|---|---|---|---|
| Discuss at staff meeting | | ☐ Inservice education | | ☐ Recommend return demonstration | |
| Individual counseling # ____ | | ☐ Recommend QA/QI monitor | | ☐ Temporary restriction of duties/privileges | |

**ADDITIONAL FOLLOW-UP AND COMMUNICATION**

... was an extremly stressful & busy night c̄ only 3RNS, 1MD ... More than 15patients. I had recieved so many verbal orders ... from MD Brody that, I thought giving her zofran 4mg would be ... since he Wanted her CT c̄ PO & IV contrast. I informed ... D Brody that I gave her the zofran and he said, I should have ... checked c̄ him first. Do to the amount of narcotics in this womans ... dy, MD Brody wanted to be informed if any thing went wrong inc... as a pre caution I put her on a portable cardiac monitor. MD ... Brody said the portable monitor was not necessary - but for her safty I felt it was. The CT went well, the Pt was safe & returned to the ED. She continued to have projectile Vomiting & MD Brody asked me if I gave her Phenergan 12.5mg IV? I told him "No" since he did not order it. at 0300 (08/07/05) I gave her the phenergan and the episodes of Vomiting stopped. I continued to monitor & reassess her until she was D/C'd @ 0520 c̄ a folow up in place to be removed @ her PMD's in 2 DAYS. I spoke to Chris De Guzman, Brian Johnson, & MD Brody & Bobbi Foster about this event - and @ the time I did not write an incident report as I believed it to be handled at the nursing level. I learnd 3 lessons ① never assume anything even if I think it is in the best interests of the patient ② always ask first before anything and ③ always put the patient first

DEPARTMENT MANAGER SIGNATURE ____________________

DOES RISK MANAGEMENT NEED TO BE NOTIFIED IMMEDIATELY? ☐ YES ☐ NO

DATE ____________ TIME ____________

# Exhibit H



California Office of Administrative Law

Home Most Recent Updates Search Help ©

# Welcome to the online source for California Code of Regulations

22 CA ADC § 70217

Term

22 CCR s 70217

Cal. Admin. Code tit. 22, s 70217

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
TITLE 22. SOCIAL SECURITY
DIVISION 5. LICENSING AND CERTIFICATION OF HEALTH FACILITIES, HOME HEALTH AGENCIES, CLINICS, AND REFERRAL AGENCIES
CHAPTER 1. GENERAL ACUTE CARE HOSPITALS
ARTICLE 3. BASIC SERVICES
This database is current through 7/13/07, Register 2007, No. 28

## s 70217. Nursing Service Staff.

(a) Hospitals shall provide staffing by licensed nurses, within the scope of their licensure in accordance with the following nurse-to-patient ratios. Licensed nurse means a registered nurse, licensed vocational nurse and, in psychiatric units only, a licensed psychiatric technician. Staffing for care not requiring a licensed nurse is not included within these ratios and shall be determined pursuant to the patient classification system.

No hospital shall assign a licensed nurse to a nursing unit or clinical area unless that hospital determines that the licensed nurse has demonstrated current competence in providing care in that area, and has also received orientation to that hospital's clinical area sufficient to provide competent care to patients in that area. The policies and procedures of the hospital shall contain the hospital's criteria for making this determination.

Licensed nurse-to-patient ratios represent the maximum number of patients that shall be assigned to one licensed nurse at any one time. "Assigned" means the licensed nurse has responsibility for the provision of care to a particular patient within his/her scope of practice. There shall be no averaging of the number of patients and the total number of licensed nurses on the unit during any one shift nor over any period of time. Only licensed nurses providing direct patient care shall be included in the ratios.

Nurse Administrators, Nurse Supervisors, Nurse Managers, and Charge Nurses, and other licensed nurses shall be included in the calculation of the licensed nurse-to-patient ratio only when those licensed nurses are engaged in providing direct patient care. When a Nurse Administrator, Nurse Supervisor, Nurse Manager, Charge Nurse or other licensed nurse is engaged in activities other than direct patient care, that nurse shall not be included in the ratio. Nurse Administrators, Nurse Supervisors, Nurse Managers, and Charge Nurses who have demonstrated current competence to the hospital in providing care on a particular unit may relieve licensed nurses during breaks, meals, and other routine, expected absences from the unit.

Licensed vocational nurses may constitute up to 50 percent of the licensed nurses assigned to patient care on any unit, except where registered nurses are required pursuant to the patient classification system or this section. Only registered nurses shall be assigned to Intensive Care Newborn Nursery Service Units, which specifically require one registered nurse to two or fewer infants. In the Emergency Department, only registered nurses shall be assigned to triage patients and only registered nurses shall be assigned to critical trauma patients.

Nothing in this section shall prohibit a licensed nurse from assisting with specific tasks within the scope of his or her practice for a patient assigned to another nurse. "Assist" means that licensed nurses may provide patient

care beyond their patient assignments if the tasks performed are specific and time-limited.

(1) The licensed nurse-to-patient ratio in a critical care unit shall be 1:2 or fewer at all times. "Critical care unit" means a nursing unit of a general acute care hospital which provides one of the following services: an intensive care service, a burn center, a coronary care service, an acute respiratory service, or an intensive care newborn nursery service. In the intensive care newborn nursery service, the ratio shall be 1 registered nurse: 2 or fewer patients at all times.

(2) The surgical service operating room shall have at least one registered nurse assigned to the duties of the circulating nurse and a minimum of one additional person serving as scrub assistant for each patient-occupied operating room. The scrub assistant may be a licensed nurse, an operating room technician, or other person who has demonstrated current competence to the hospital as a scrub assistant, but shall not be a physician or other licensed health professional who is assisting in the performance of surgery.

(3) The licensed nurse-to-patient ratio in a labor and delivery suite of the perinatal service shall be 1:2 or fewer active labor patients at all times. When a licensed nurse is caring for antepartum patients who are not in active labor, the licensed nurse-to-patient ratio shall be 1:4 or fewer at all times.

(4) The licensed nurse-to-patient ratio in a postpartum area of the perinatal service shall be 1:4 mother-baby couplets or fewer at all times. In the event of multiple births, the total number of mothers plus infants assigned to a single licensed nurse shall never exceed eight. For postpartum areas in which the licensed nurse's assignment consists of mothers only, the licensed nurse-to-patient ratio shall be 1:6 or fewer at all times.

(5) The licensed nurse-to-patient ratio in a combined Labor/Delivery/Postpartum area of the perinatal service shall be 1:3 or fewer at all times the licensed nurse is caring for a patient combination of one woman in active labor and a postpartum mother and infant The licensed nurse-to-patient ratio for nurses caring for women in active labor only, antepartum patients who are not in active labor only, postpartum women only, or mother-baby couplets only, shall be the same ratios as stated in subsections (3) and (4) above for those categories of patients.

(6) The licensed nurse-to-patient ratio in a pediatric service unit shall be 1:4 or fewer at all times.

(7) The licensed nurse-to-patient ratio in a postanesthesia recovery unit of the anesthesia service shall be 1:2 or fewer at all times, regardless of the type of anesthesia the patient received.

(8) In a hospital providing basic emergency medical services or comprehensive emergency medical services, the licensed nurse-to-patient ratio in an emergency department shall be 1:4 or fewer at all times that patients are receiving treatment. There shall be no fewer than two licensed nurses physically present in the emergency department when a patient is present.

At least one of the licensed nurses shall be a registered nurse assigned to triage patients. The registered nurse assigned to triage patients shall be immediately available at all times to triage patients when they arrive in the emergency department. When there are no patients needing triage, the registered nurse may assist by performing other nursing tasks. The registered nurse assigned to triage patients shall not be counted in the licensed nurse-to-patient ratio.

Hospitals designated by the Local Emergency Medical Services (LEMS) Agency as a "base hospital", as defined in section 1797.58 of the Health and Safety Code, shall have either a licensed physician or

a registered nurse on duty to respond to the base radio 24 hours each day. When the duty of base radio responder is assigned to a registered nurse, that registered nurse may assist by performing other nursing tasks when not responding to radio calls, but shall be immediately available to respond to requests for medical direction on the base radio. The registered nurse assigned as base radio responder shall not be counted in the licensed nurse-to-patient ratios.

When licensed nursing staff are attending critical care patients in the emergency department, the licensed nurse-to-patient ratio shall be 1:2 or fewer critical care patients at all times. A patient in the emergency department shall be considered a critical care patient when the patient meets the criteria for admission to a critical care service area within the hospital.

Only registered nurses shall be assigned to critical trauma patients in the emergency department, and a minimum registered nurse-to-critical trauma patient ratio of 1:1 shall be maintained at all times. A critical trauma patient is a patient who has injuries to an anatomic area that : (1) require life saving interventions, or (2) in conjunction with unstable vital signs, pose an immediate threat to life or limb.

(9) The licensed nurse-to-patient ratio in a step-down unit shall be 1:4 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a step-down unit shall be 1:3 or fewer at all times. A "step down unit" is defined as a unit which is organized, operated, and maintained to provide for the monitoring and care of patients with moderate or potentially severe physiologic instability requiring technical support but not necessarily artificial life support. Step-down patients are those patients who require less care than intensive care, but more than that which is available from medical/surgical care. "Artificial life support" is defined as a system that uses medical technology to aid, support, or replace a vital function of the body that has been seriously damaged. "Technical support" is defined as specialized equipment and/or personnel providing for invasive monitoring, telemetry, or mechanical ventilation, for the immediate amelioration or remediation of severe pathology.

(10) The licensed nurse-to-patient ratio in a telemetry unit shall be 1:5 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a telemetry unit shall be 1:4 or fewer at all times. "Telemetry unit" is defined as a unit organized, operated, and maintained to provide care for and continuous cardiac monitoring of patients in a stable condition, having or suspected of having a cardiac condition or a disease requiring the electronic monitoring, recording, retrieval, and display of cardiac electrical signals. "Telemetry unit" as defined in these regulations does not include fetal monitoring nor fetal surveillance.

(11) The licensed nurse-to-patient ratio in medical/surgical care units shall be 1:6 or fewer at all times. Commencing January 1, 2005, the licensed nurse-to-patient ratio in medical/surgical care units shall be 1:5 or fewer at all times. A medical/surgical unit is a unit with beds classified as medical/surgical in which patients, who require less care than that which is available in intensive care units, step-down units, or specialty care units receive 24 hour inpatient general medical services, post-surgical services, or both general medical and post-surgical services. These units may include mixed patient populations of diverse diagnoses and diverse age groups who require care appropriate to a medical/surgical unit.

(12) The licensed nurse-to-patient ratio in a specialty care unit shall be 1:5 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a specialty care unit shall be 1:4 or fewer at all times. A specialty care unit is defined as a unit which is organized, operated, and maintained to provide care for a specific medical condition or a specific patient population. Services provided in these units are more specialized to meet the needs of patients with the specific condition or disease process than that which is required on medical/surgical units, and is not otherwise covered by subdivision (a).

(13) The licensed nurse-to-patient ratio in a psychiatric unit shall be 1:6 or fewer at all times. For purposes of psychiatric units only, "licensed nurses" also includes licensed psychiatric technicians in addition to licensed vocational nurses and registered nurses. Licensed vocational nurses, licensed psychiatric technicians, or a combination of both, shall not exceed 50 percent of the licensed nurses on the unit.

(14) Identifying a unit by a name or term other than those used in this subsection does not affect the requirement to staff at the ratios identified for the level or type of care described in this subsection.

(b) In addition to the requirements of subsection (a), the hospital shall implement a patient classification system as defined in Section 70053.2 above for determining nursing care needs of individual patients that reflects the assessment, made by a registered nurse as specified at subsection 70215(a)(1), of patient requirements and provides for shift-by-shift staffing based on those requirements. The ratios specified in subsection (a) shall constitute the minimum number of registered nurses, licensed vocational nurses, and in the case of psychiatric units, licensed psychiatric technicians, who shall be assigned to direct patient care. Additional staff in excess of these prescribed ratios, including non-licensed staff, shall be assigned in accordance with the hospital's documented patient classification system for determining nursing care requirements, considering factors that include the severity of the illness, the need for specialized equipment and technology, the complexity of clinical judgment needed to design, implement, and evaluate the patient care plan, the ability for self-care, and the licensure of the personnel required for care. The system developed by the hospital shall include, but not be limited to, the following elements:

(1) Individual patient care requirements.

(2) The patient care delivery system.

(3) Generally accepted standards of nursing practice, as well as elements reflective of the unique nature of the hospital's patient population.

(c) A written staffing plan shall be developed by the administrator of nursing service or a designee, based on patient care needs determined by the patient classification system. The staffing plan shall be developed and implemented for each patient care unit and shall specify patient care requirements and the staffing levels for registered nurses and other licensed and unlicensed personnel. In no case shall the staffing level for licensed nurses fall below the requirements of subsection (a). The plan shall include the following:

(1) Staffing requirements as determined by the patient classification system for each unit, documented on a day-to-day, shift-by-shift basis.

(2) The actual staff and staff mix provided, documented on a day-to-day, shift-by-shift basis.

(3) The variance between required and actual staffing patterns, documented on a day-to-day, shift-by-shift basis.

(d) In addition to the documentation required in subsections (c)(1) through (3) above, the hospital shall keep a record of the actual registered nurse, licensed vocational nurse and licensed psychiatric technician assignments to individual patients by licensure category, documented on a day-to-day, shift-by-shift basis. The hospital shall retain:

(1) The staffing plan required in subsections (c)(1) through (3) for the time period between licensing surveys, which includes the Consolidated Accreditation and Licensing Survey process, and

(2) The record of the actual registered nurse, licensed vocational nurse and licensed psychiatric technician assignments by licensure category for a minimum of one year.

(e) The reliability of the patient classification system for validating staffing requirements shall be reviewed at least annually by a committee appointed by the nursing administrator to determine whether or not the system accurately measures patient care needs.

(f) At least half of the members of the review committee shall be registered nurses who provide direct patient care.

(g) If the review reveals that adjustments are necessary in the patient classification system in order to assure accuracy in measuring patient care needs, such adjustments must be implemented within thirty (30) days of that determination.

(h) Hospitals shall develop and document a process by which all interested staff may provide input about the patient classification system, the system's required revisions, and the overall staffing plan.

(i) The administrator of nursing services shall not be designated to serve as a charge nurse or to have direct patient care responsibility, except as described in subsection (a) above.

(j) Registered nursing personnel shall:

(1) Assist the administrator of nursing service so that supervision of nursing care occurs on a 24-hour basis.

(2) Provide direct patient care.

(3) Provide clinical supervision and coordination of the care given by licensed vocational nurses and unlicensed nursing personnel.

(k) Each patient care unit shall have a registered nurse assigned, present and responsible for the patient care in the unit on each shift.

(l) A rural General Acute Care Hospital as defined in Health and Safety Code Section 1250(a), may apply for and be granted program flexibility for the requirements of subsection 70217(l) and for the personnel requirements of subsection (j)(1) above.

(m) Unlicensed personnel may be utilized as needed to assist with simple nursing procedures, subject to the requirements of competency validation. Hospital policies and procedures shall describe the responsibility of unlicensed personnel and limit their duties to tasks that do not require licensure as a registered or vocational nurse.

(n) Nursing personnel from temporary nursing agencies shall not be responsible for a patient care unit without having demonstrated clinical and supervisory competence as defined by the hospital's standards of staff performance pursuant to the requirements of subsection 70213(c) above.

(o) Hospitals which utilize temporary nursing agencies shall have and adhere to a written procedure to orient and evaluate personnel from these sources. Such procedures shall require that personnel from temporary nursing agencies be evaluated as often, or more often, than staff employed directly by the hospital.

(p) All registered and licensed vocational nurses utilized in the hospital shall have current licenses. A method to document current licensure shall be established.

(q) The hospital shall plan for routine fluctuations in patient census. If a healthcare emergency causes a change in the number of patients on a unit, the hospital must demonstrate that prompt efforts were made to maintain required staffing levels. A healthcare emergency is defined for this purpose as an unpredictable or unavoidable occurrence at unscheduled or unpredictable intervals relating to healthcare delivery requiring immediate

medical interventions and care.

<General Materials (GM) - References, Annotations, or Tables>

Note: Authority cited: Sections 1275, 1276.4 and 100275(a), Health and Safety Code. Reference: Sections 1250(a), 1276, 1276.4, 1797.58 and 1790.160, Health and Safety Code.

HISTORY

1. Restoration of text as it existed prior to 11-12-2004 and addition of explanatoryNote (Register 2005, No. 33).

2. Editorial correction implementing restoration of text as it existed prior to 11-12-2004 (Register 2005, No. 36).

22 CCR s 70217, **22 CA ADC s 70217**
1CAC

**22 CA ADC s 70217**

END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Term

Doc 2 of 2

Cite List Docs In Sequence Table of Contents

This site is provided by West.
© 2007 West | Privacy | Accessibility

# Exhibit I

**Employee Name:** Lisa Maria Boccignone RN
**Department Name:** Emergency Department
**Manager name:** Foster/Hutchings

Rebuttal Letter to Performance Correction Notice Dated August 24, 2005

In response to my; Investigatory Leave, Final Written Warning, Policy Violation, Performance Transgression, & Behavior/ Conduct Infraction, I feel the need to express my concerns & Performance Improvement Plan.

In the Incident Description area of the form, the dates are all wrong. Items #1-4 Occurred on or about August 6th to the early morning hours of August 7th. I informed Bobbi Foster of these events as soon as she came into work on Monday August 8th. A few days later I was told to file a Incident report for her & Penny, which I did. And we (Bobbi, Penny, & I) had a personal meeting and review of these incidents (Zoll, Pt transfer without IV, Medication without order, and PES patient On or about august 9th or 10th ).

I was under the impression that since we had all ready discussed and dismissed these incidents as learning events, that it was over, and for me to absorb, ask more questions, and go to my peers & charge nurses for direction and guidance. Which is what I did when incident #5 occurred.

I was surprised to see these 4 incidents on my Performance Correction Notice as I was told by both Bobbi Foster & Penny Hutchings that "our discussions are for learning purposes only and are not punitive". If these "discussions" are not punitive, then why am I being written up for them, when 2 weeks prior I was told that I wasn't going to be written up? That seems punitive to me. And to go from "learning purposes" to final written warning, without having a first written warning seems pretty harsh and punitive.

#5: Occurred on or about the morning of August 17th. I know I am a brand new nurse, and I do have lots of questions and insecurities and not to mention a whole lot of learning & experiences yet to be had & knowledge to be gained. So when I asked MD. Tornebene and Brian Johnson RN if that would be ok to insert the 14G IV as MD Tornebene was explaining to me the "worst case scenario" for this patient, and I being a novice nurse, I listened to him, and when I discussed it with Brian Johnson RN he agreed that in worst case scenario that is the correct action according to the ENA handbook, which all of us new nurses were given to read & answer questions from.

As for intentionally harming a patient, let alone another human being that is a concept that I find horrid and plain out mean. I would never, and will never harm another being on purpose or out of malice.

The events surrounding this patient and other events of that night I discussed with fellow nurses was not meant to be done in a boasting or bragging fashion. I was asking questions

to see if they heard if he was ok? Was it as serious as MD Tornebene thought? And then I know I also mentioned this other patient that MD. Tornebene & myself could not figure out, he didn't want any pain medicine, but was screaming in pain when ever his friends came in the room, and every time any one suggested pain relief he declined it. So Doctor T said maybe some IV fluids will perk him up, since all his tests are negative. Then MD. Tornebene gave me a talk about how fluid resuscitation can make a person feel better over all and that sometimes it may be psychosomatic it does have it place in medicine.

I honestly think that it was a combination of the two patient situations I was discussing that MD. White over heard, and that since he was not involved in the conversation directly (he was making blow darts with uterine swabs, 18G IV needles and chest tubes) that maybe he misinterpreted the conversation. I am not saying he is lying, or that what he heard is false. I am saying that he might not have gotten all the facts regarding the 2 separate cases.

And in order from incidents 1-5 are my explanations again:

#1& 3: Removing Zoll from Patient without consent of patients nurse. This occurred on the early am hours of August 7th when I was told by MD Brody, that under all circumstances that the oral contrast must remain and be in the patient as he needs good films of her abdomen, and he also stated that he didn't care how I got it in, "PO, NG-Tube, Gastric Levague or however" but it must stay in her. I being concerned for her health and well being was uncomfortable giving her Dilaudid 1mg every 30 minutes because she was around 70lbs and has sever cerebral palsy. She is extremely limited in her movements, except for her uncontrollable muscular spasms. It was a crazy night, and 4 incidents occurred on this night. There was only 3 nurses, more than 15 patients, and still patients in the waiting room to come back. I got worried for her safety, and I did not want her to aspirate on her secretions and emesis, so I asked a senior nurse Brian Johnson if he thought it would be ok to give an ant emetic since she has no allergies, can't stop vomiting, CT tech is here, and I still had to give her Versed. Brain agreed that it was appropriate as it was patient safety related, I gave the medication with out the order, I told MD Brody ASAP, and he told me that he had wished I had asked him first but he understood how stressful everything was and that he forgave me. I then asked Brian Johnson if I could take his portable monitor, and told him that he being the senior nurse is more likely more familiar with this equipment, I also said there is another one in room 2 but I can not get it to work nor do I know how these pads connect. I was under the impression that Brain & I were having an open dialog, which turned out to be false, and I thoroughly and completely apologized to him, and he said he wouldn't even mention it, and that it was not that big of a deal. I started crying out of frustration and stress overload, and MD Brody consoled me, and asked if this was regarding the Zofran? I said no, there are just too many really sick people in here right now, and I can not get this patient to stop vomiting, I had cleaned her 9 times. I thought it was sweet of MD Brody to offer support. And he added that he knew this family and they are high maintaince & high stress.

And during these events and others we were on divert status, with 3 RN's and 1 MD. We

had all the beds full and a waiting room full of people waiting to get back to be seen. I am not using this as an excuse, yet it did add to the stress of the night and the stress amongst all collegues.

#2: I know I gave report 6 hours earlier to Marie on TCU and I told her that there was no IV access in place as none was ordered. I noticed in your Performance Improvement Plan is that "what I do for a patient must be covered by a physicians order". In this case I had no physician order for an NS Lock, IV or fluids. And I know now that "admission = NS Lock" and I do understand I must express this to the physician in charge of this patient so I can perform an invasive procedure and maintain patient safety. When Chris Deguzman RN asked me around 0500 on the 7th if I had sent a patient to TCU without an IV I stated the truth and that I told the RN receiving report that he had no IV access as all of his meds were PO, and no physician had ordered any. She told me fine & that she was too busy to pick up this patient, that he didn't belong on her unit, and that she refused to come pick him up and to have him transported by transport services. Upon hearing this Chris Deguzman RN (my charge) told me to file an Incident Report as he was familiar with this nurse and knew that one would be coming for me. I find it hard to believe that it took her over 6 hours to realize her patient did not have IV access, but that is her call & not mine.

#4: This brings us to the PES patient & Donna RN in PES. Earlier in the evening she told me that she had arranged for this patient to go to a woman's detox center, and that she had a cab voucher, all I needed to do was road test her, get her to sober up, eat, get dressed and be out of the ER by 21:30. Donna added that if this patient would not listen to me, to get her involved. I went 3 rounds with this particular patient about getting out to the shelter & getting help, and being safe. She (the patient) did not want anything to do with me. She ate some of the food I gave her & some juice. But then kept on insisting she was going to her home. I contacted Donna 3 times, and all 3 times Donna was able to get her to agree to go. On the 3rd time, Donna said to me that if she doesn't listen to me or doesn't want to go, that she (Donna) would take care of it. After the 3rd time of this patient being hostile towards me and uncooperative I walked her back to PES, since Donna said she would handle it, and before I did I asked Chris Deguzman RN (charge nurse) what should I do? He said walk her over, I need the monitored bed, and Donna said she would handle it. At no time did I ever say anything rude to the patient or did I treat her with any disrespect. I was shocked to find out that Donna Had interpreted it that way, and after having a face to face talk with her, she said she was really stressed that night too, they are understaffed, she is working doubles, and that she appreciated my apology letter, and said I didn't need to write her one as it was no big deal. We hugged, and I thought that problem was solved.

For My personal Performance Improvement Plan: I plan on gaining wisdom, experience & knowledge from fellow nurses, mainly ones with experience and a knowledge base far grander than my own.

I will continue to consult with my charge nurse before I do any procedure that I feel is

invasive or any where near out of scope of practice.

I will not give any medications with out MD orders, nor will I perform any invasive procedures (ex: IV starts, meds, foley caths) with out direct physicians orders.

I will make a conscience effort to make suggestions to any and all physicians, if there is something I need an order for, (ex: NG-Tube, IV, Meds) if these interventions are in the best interests of the patient and are for patient safety.

I would like to be able to come to Bobbi Foster or Penny Hutchings with any questions or concerns I may have regarding my nursing practice and performance.

I do want to be the best nurse I can be, and I do believe that with continued support, suggestions, and counseling that I can become that and more.

I also have realized through this experience that my odd sense of humor, and true honesty is a bit jarring to my fellow coworkers. I have and had no ill intentions towards them, and I do want to keep open the lines of communication, so we all can be a strong solid team that is really supportive and there for each and every member of our organization.

I do regret that these events have been so punitive as I was depending on the remainder of my retention bonus to pay off my relocation up here. And I sincerely mean it that I would like to be part of the ED team and spend the next 30 or more years with Mills-Peninsula.

And I do think it is a very positive and a valuable learning tool to meet with both of you to discus my performance, because I do have the desire to improve and want to be an asset to the organization.


Thank you again for all of the guidance & support you have given me.

Sincerely,



Lisa Maria Boccignone


CC: copies ENA guidelines

# PERFORMANCE CORRECTION NOTICE

**Employee Name:** Lisa Maria Boccignone
**Department Name:** Emergency Dept.
**Manager Name:** Foster/Hutchings

**Disciplinary Level:**
- ☐ Verbal Warning
- ☐ Written Warning
- ☒ Investigatory Leave
- x Final Written Warning

**Subject:**
- x Policy procedure violation
- x Performance transgression
- x Behavior/conduct infraction
- ☐ Workflow impact problem
- ☐ Other

**Prior Notifications:**

| Type | Date | Subject |
|---|---|---|
| ☐ Verbal | | |
| ☐ Written | | |
| ☐ Final Written | | |

## Incident Description:

*Be sure to include time, place, date of occurrence, person present as well as organization impact*

8/05 - Removing pacemaker (Zoll) from a critical patient without consent of patient's nurse
8/05 -Transferring a patient to TCU without IV access
8/05 - Administering a drug without a physician order.
8/05 – Inappropriate behavior around a PES patient
8/05 - Use of a 14 gauge IV in a 16 year old patient.
All the incidences listed above occurred in the ED at Peninsula and involved patients in the ED at the time.

## Performance Improvement Plan:

1. Measurable/Tangible improvement goals. (i.e. I expect you to....)
We expect that you will practice within your scope, ensure that physician orders are a part of the process and that what you do for your patient is covered by a physician order.
We expect that you will handle PES patients in a manner appropriate to their diagnosis and respect their dignity at all times.
We expect that you will work with your peers to ensure that ED policy and procedures are followed with all patients.
We expect that in the future if you are unsure of common procedures for the care of an ED patient that you consult with your peers or other resources before moving forward with care.

2. Training or special direction to be provided:
We expect that you will use the written resources that have been provided to you for review.
We expect you to come to one of us (Manager/Director), or to the Charge Nurse if you have questions or do not understand a response to your questions.
We expect that you will use your peers as a resource when deciding what action to take with an ED patient.

3. Interim performance evaluation necessary?
We anticipate meeting with you every 2 weeks, time to be determined based on scheduling.

4. Our Employee Assistance Program (EAP) Provider, The Assist U, can be confidentially reached to assist you at 800-750-5595. This is strictly voluntary. A booklet regarding the Assist U is provided for you.

5. In addition, I recognize that you may have certain ideas to improve your performance. Therefore, I encourage you to provide your own Personal Implement Plan. Input and Suggestions.
(Attach additional sheets or Employee Original if needed)

**Outcomes and Consequences:**

**Positive:** If you meet your performance goals and demonstrate your critical thinking skills, no further disciplinary action will be taken regarding this issue. In addition, you will no longer need to meet with Director/Manager on an every 2-week basis.

*2Original – Employee Services* *Copy – Manager* *Copy – Employee* *Copy – Personnel File*

**Negative:** If at any time patient care [illegible] are brought to our attention, investig[illegible]d, and we find similar patient care issues; it will lead to immediate termination of employment.

**Scheduled review Date:** 9/9/05

**Employee Comments and/or Rebuttal:**
[Fill In Employee Comments/Rebuttal Here]
(Attach additional sheets or Employee Original If needed)

Lisa Maria Baccigalupo 8/24/05 — Employee Signature, Date

Bobbi Foster, ED Dir. — Manager Signature — Date 8/24/05

Linda Campagna RN 8/24/05
CNA Nurse Rep

rebuttail letter to be attached.

# Exhibit J

# PERFORMANCE CORRECTION NOTICE

**Employee Name:** Lisa Maria Boccignone
**Department Name:** ED
**Manager Name:** Foster/Hutchings

**Disciplinary Level:**
- ☐ Verbal Warning
- ☐ Written Warning
- ☐ Investigatory Leave
- x Final Written Warning

**Subject:**
- ☐ Policy procedure violation
- ☐ Performance transgression
- ☐ Behavior/conduct infraction
- ☐ Workflow impact problem
- ☐ Other

**Prior Notifications:**

| Type | Date | Subject |
|---|---|---|
| ☐ Verbal | | [Fill In Subject Here] |
| ☐ Written | | [Fill In Subject Here] |
| X Final Written | 8/30/05 | Patient Care |

**Incident Description:**
Over a 4-week period in February Lisa Maria was observed using a cell phone to text message during work hours. She was repeatedly reminded to stop and to take care of patients.
2/15/06 - while caring for a demented patient Lisa Maria was heard threatening the patient by saying "I can hit you too."
2/15/06 - Lisa Maria went to the lounge and slept while she was on duty even though she is aware that sleeping while on duty is not allowed.
During this same time period Lisa Maria was observed taking long breaks for lunch and had to be reminded that her meal break is 30 min long.
When changing an elderly patient Lisa Maria was observed using excess force to remove the diaper rather than turning the patient to remove it in a more gentle manner.

**Performance Improvement Plan:**

1. Measurable/Tangible improvement goals.
I expect that phone messaging during work will cease.
I expect that your breaks will be taken according to policy.
I expect that you will not sleep at any time while you are on duty.
I expect that your work with fellow employees and patients will be in compliance with all of the Standards of Conduct and Customer Service.

2. Training or special direction to be provided:
I recommend that you continue to use Assist U
I will provide you with another copy of the Standards of Conduct and Customer Service.

3. Interim performance evaluation necessary?
Your performance will be formally re-evaluated in 30 days and ~~on an ongoing basis after that.~~

4. Our Employee Assistance Program (EAP) Provider, The Assist U, can be confidentially reached to assist you at 800-750-5595. This is strictly voluntary. A booklet regarding the Assist U is provided for you.

5. In addition, I recognize that you may have certain ideas to improve your performance. Therefore, I encourage you to provide your own Personal Implement Plan Input and Suggestions.

**Outcomes and Consequences:**

**Positive:**
If you meet your performance goals and work to the established professional standards no further disciplinary action will be taken regarding this issue.

**Negative:**
This is your second final written warning. If at any time you fail to meet your performance goals by not working in accordance with established professional standards it will result in termination of your employment with MPHS.

**Scheduled review Date:**

**Employee Comments and/or Rebuttal:**
(Attach additional sheets or Employee Original if needed)

Rebuttal to follow 03/16/2006

[signature] RN 03/16/2006 — Bobbi Foster, RN, ED Director — 3/16/06

Employee Signature — Date — Manager Signature — Date

[signature]

1 *Original – Employee Services* *Copy – Manager* *Copy – Employee* *Copy – Personnel File*

# Exhibit K

 COPY

Lots of slightly inaudible noise & talking. Sounds like they were introducing Mills witnesses.

Judge: Hearing is now convenienced. Today is Thurs, 3/1/07, we're in session at San Francisco, California, presiding is administrative law judge DJ Sorvino, hearing is being recorded. Present is the claimant, Lisa Maria, am I pronouncing your last name correctly?

LMB: Boccignone

Judge: Boccignone, ok. Representing her today, your name sir?

RHG: Robert Gold, from Gold & Associates.

Judge: Ok, and with you today?

RHG: my legal assistant, Elizabeth Winchell.

Judge: W-I-N-C-H-E-L-L?

EW: correct.

Judge: Representing the employer, Mills Peninsula Health services, is, your name sir?

OC: George McKennan (???)

Judge: and with you today is, your name please?

BF: Barbara Foster

Judge: and we have an observer…

CC: Claudia Christianson

Judge: ok, and you'll be observing?

CC: yes

Judge: ok and in this matter, Ms. Boccignone has appealed from a department determination dated October 10, 2006 which found Ms. Boccignone in case #1996856 not qualified for benefits based on a finding she was discharged for misconduct connected with work. Misconduct is defined as a substantial breach of an important duty owed by the employee to the employer, which shows a willful or wanton disregard to that duty and intends to injure the employer. The employers account is reimbursable. There is an additional issue of whether the claimant had good cause for failure to appear at a previously scheduled hearing. Good cause includes things like mistakes, inadvertence, surprise and excusable neglect. It does not include negligence, carelessness or procrastination.
The order of testimony will begin with the employer who has the burden of proof, then Ms. Boccignone will present her evidence in testimony. I'll be asking questions. After you have heard and understood the

BF: she was a 12 hour person she had a schedule set up where she worked so many in one then she'd be off for a period of time

RHG: oh no, I'm sorry we're not on the same page I'm not saying she's off schedule because she was not scheduled to be there, she was placed on suspension

BF: oh, at the end of the month of February, not prior

RHG: so there was four days of that she was placed on suspension correct

BF: right, after it was the end of the month that she was put on suspension

RHG: that would cut down on the four weeks

BF: No, this was four weeks prior

RHG: well it says over a four week period of February and February has 28 days so I'm just trying to be specific <??>

BF: alright, I understand, but over a period of time over a period of four weeks it came to light in the month of February

RHG: ok

BF: cause her peers were finally had reached a point where they were complaining bitterly

RHG: ok, we'll talk about her peers in one second, uh are you aware of the fact that Lisa uh had a miscarriage on February 2, 2006

BF: yes I was

RHG: ok so there was a line here that Lisa Maria went to the lounge and slept while on duty even though she's aware that sleeping on duty's not allowed isn't fatigue a normal symptom of women who have a miscarriage after the first couple of weeks <01:00:19>

BF: uh

RHG: again, that's a yes or no question, you're a nurse

BF: No, I wouldn't answer that with a yes

RHG: you don't think when women have miscarriages and they have the blood and the fetus come out they have fatigue and emotional depression for the first couple of weeks after they have miscarried

BF: yes, I would agree with that

RHG:  you would agree or would not

BF:  I would agree, but if Lisa had was still having that then she should not have returned to work to her night shift and her regular duty

RHG:  well obviously you knew about it correct

BF:  I knew that she had had a miscarriage

RHG:  right, and you're the supervisor you're the charge nurse, correct

BF:  no, I'm the director

RHG:  you're the director, you're the top lady

BF:  um huh

RHG:  so you're the one who would make the decision overall if someone's capable of being at the hospital or not wouldn't you

BF:  no her doctor made that decision in returning her to work

RHG:  but you're her supervisor

BF:  right

RHG and if you feel the person who's working because of a physical ailment even though their trying to be a good trooper is working shouldn't' be there it's your job to send them home isn't it

OC:  objection she's answered that question he's repeating his question

Judge:  it's been asked and answered

RHG:  ok, let me go over this for one second please so she's she's being criticized for text messaging cell phone use is not allowed in the hospital, is that correct

BF:  it, it's allowed

RHG:  uh, so why is she being criticized

BF:  because she was spending the better part of her shift according to her peers text messaging to where they had to remind her to get up and take care of her patients

RHG:  ok <can't understand>, who is this

BF:  that's my assistant

# Exhibit L



Mills-Peninsula
Health Services

A Sutter Health Affiliate

# REASONABLE ACCOMMODATION REQUEST FORM

Title I and Title V of the Americans with Disabilities Act of 1990 (ADA) and California's Fair Employment & Housing Anti Disability Discrimination Law prohibit employment discrimination against qualified individuals with disabilities. Mills Peninsula Health Services (MPHS) supports the Americans with Disabilities Act (ADA) and California's Anti Disability Discrimination Law (FEHA) and will not discriminate in any employment activity against a qualified applicant or employee with a disability. We will make reasonable accommodations to persons with qualifying disabilities unless to do so poses undue hardship. MPHS's Employee Services and Department Manager shall review this request for accommodation in confidence. An examination by a physician of MPHS's choosing may be required to arrive at a reasonable accommodation resolution. Please attach a note from your provider indicating what the reasonable accommodation is.

MPHS may require that you complete the "Authorization for Disclosure of Medical Information" form, as it may be necessary to contact your healthcare provider. This information, if obtained, would be held in confidence and only used to determine the need for reasonable accommodation and implementing accommodation solutions. If you choose not to authorize these disclosures, MPHS will evaluate your request on the basis of the best information available.

To: Bobbi Foster
(Department Head)

From: Lisa Maria Boccignone RN
(Name of person requesting accommodation)

Address: 853 Commodore Dr #274
Street Apt. #

San Bruno CA 94066
City State Zip

Telephone: Home: 650-872-0639 Alternate #: 650-515-6944

1. I am requesting accommodation because (*circle one*): A or (B) [circled]

(A) I am applying for employment. The accommodation requested would allow me to perform the essential job functions of the position I am applying for (position title):

(B) [circled] I am currently employed by MPHS and request a reasonable accommodation. My current job title is: RN

2. My specific functional limitation is pregnancy. The accommodation I am requesting is described below. (Describe the type of accommodation; if it is a purchasable item list model, number, cost, where it can be obtained, etc., suggestions for work site or examination site modifications or specific job duties which may be restructured or shared to facilitate employment, or utilize a MPHS program, activity or service.)

not lifting over 30lbs, limit exposure to infectious materials & Xrays

Over

3. What is the requested duration of your requested accommodation? (Please be specific)
August 04/2006 – Jan 1st 2007

4. Describe how this accommodation will assist you. *(Please attach additional sheets as necessary)*
Prevent infections & harm to the fetus

5. Please provide your healthcare provider's information:

Name: Neil St.-Son

Address: 1828 El Camino Real STE 805
Street

Burlingame CA 94010
City State Zip

Phone: 650-692-3818

Fax: 650-552-0386

**EMPLOYEE CERTIFICATION**

**I certify that I have a disability or medical condition that requires reasonable accommodation, which will be met by acquiring the equipment, services, or work adjustments described above.**

**Signature:** [signature] **Date:** 08/04/2006

❖ Return this completed form to your Manager. They will in turn send it to Human Resources.

**Mills-Peninsula Health Services**
**Pregnancy Information Form**

**EMPLOYEE:** Complete this section and forward to your physician to complete. Return completed form to your Manager.

| | |
|---|---|
| Name: Lisa Maria Boccignone | Site: [X] Mills both [X] Peninsula [ ] Other |
| Home Address: 853 Commodore Dr #274 | Department: Emergency |
| City: San Bruno CA Zip: 94066 | Manager/Supervisor: Bobbi Foster |
| Home Phone: 650-872-0639 | Job Title: RN Shift: 1900-073 |
| Signature: [signature] | Date: 08/04/06 |

I authorize my physician to furnish my employer any information regarding my condition that relates to my work environment.

Job Duties and Environment (To be described by Employee):
All RN Duties, including moving pts, assisting patients, triage, invasive procedures, exposures to potentially infectious materials

| | |
|---|---|
| Estimated last day of work: Jan 1, 2007 | Estimated return to work date: May 6, 200 |

**PHYSICIAN:** Complete this section and return to the employee. Thank you.

The above named person is under my care for pregnancy, and will be examined by me at regular intervals. After reviewing the above description of the patient's duties and working environment, it is my opinion that she should be able to perform her work without undue risk of injury to the health of mother, child, patients or fellow employees. I recommend that she should not work beyond the date indicated.

| | |
|---|---|
| Estimated date of Delivery: 1/30/07 | Employment should not exceed estimated date of: 36wks Jan 1, |

Recommendations or limitations: not lifting in excess of 30 lbs, limiting exposure to infectious wastes & xrays.

| | |
|---|---|
| Physician Name (type/print): PENINSULA WOMENS HEALTH A MEDICAL GROUP INC. 1828 EL CAMINO REAL STE 805 BURLINGAME, CA 94010 Neil Sha[illegible] | Address: 1828 El Camino Real Ste [illegible] |
| Signature: [signature] M.D. | City: Burlingame, CA 94010 |
| Date: 08/04/2006 | Phone: 650-692-3818 |

**DEPARTMENT MANAGER COMMENTS:** Manger forward to Employee Services, Attn: Annette J. Barraza, Benefits

| | |
|---|---|
| Signature: | Date: |

**EMPLOYEE SERVICES COMMENTS:**

| | |
|---|---|
| Signature: | Date: |

Mills-Peninsula Health Services
Employee Services
1783 El Camino Real
Burlingame, CA 94010
Phone: 650-696-5635
Fax: 650-696-5698

5



# REASONABLE ACCOMMODATION REQUEST FORM

Title I and Title V of the Americans with Disabilities Act of 1990 (ADA) and California's Fair Employment & Housing Anti-Disability Discrimination Law prohibit employment discrimination against qualified individuals with disabilities. Mills-Peninsula Health Services (MPHS) supports the Americans with Disabilities Act (ADA) and California's Anti Disability Discrimination Law (FEHA) and will not discriminate in any employment activity against a qualified applicant or employee with a disability. We will make reasonable accommodations to persons with qualifying disabilities unless to do so poses undue hardship. MPHS's Employee Services and Department Manager shall review this request for accommodation in confidence. An examination by a physician of MPHS's choosing may be required to arrive at a reasonable accommodation resolution.

MPHS may require that you complete the "Authorization for Disclosure of Medical Information" form, as it may be necessary to contact your healthcare provider. This information, if obtained, would be held in confidence and only used to determine the need for reasonable accommodation and implementing accommodation solutions. If you choose not to authorize these disclosures, MPHS will evaluate your request on the basis of the best information available.

**To:** Bobbi Foster
(Department Head)

**From:** LISA MARIA BOCCIGNONE RN
(Name of person requesting accommodation)

**Address:**
853 Commodore Dr # 274
Street Apt. #

San Bruno CA 94066
City State Zip

**Telephone:**
(Home) 650-872-0639
(Work) 650-696-5446

# REQUEST FOR REASONABLE ACCOMMODATION

1. I am requesting accommodation because (circle one): A or (B)

(A) I am applying for employment. The accommodation requested would allow me to perform the essential job functions of the position I am applying for (position title):

________________________________________

((B)) I am currently employed by MPHS and request a reasonable accommodation. My current job title is: Registered nurse

2. My specific functional limitation is Pregnancy.
The accommodation I am requesting is described below. (Describe the type of accommodation; if it is a purchasable item list model, number, cost, where it can be obtained, etc., suggestions for work site or examination site modifications or specific job duties which may be restructured or shared to facilitate employment, or utilize a MPHS program, activity or service.)

3. What is the requested duration of your requested accommodation?

4. Describe how this accommodation will assist you. **(Please attach additional sheets as necessary)**

5. Please provide your healthcare provider's information:

**Name:** Neil Stinson

**Address:** 1828 El Camino Real STE 805

Street Apt #

Burlingame CA 94010

City State Zip

**Phone:** 650-692-3818

**Fax:**

## EMPLOYEE CERTIFICATION

**I certify that I have a disability or medical condition that requires reasonable accommodation, which will be met by acquiring the equipment, services, or work adjustments described above.**

**Signature:** [signature] **Date:**

# Exhibit M



PEOPLE

# BENEFITS

Effective Jan. 1 - Dec. 31, 2007

Mills-Peninsula
Health Services
A Sutter Health Affiliate



# BENEFITS

employee benefits guide

**Effective Jan. 1 - Dec. 31, 2007**

*Medical Dental Vision Flex Spending Accounts*
*Long-Term Disability Life Insurance*

## Easy steps to staying informed

It is important to stay up to date about your benefits program to ensure you take advantage of all it has to offer. Here are four easy steps:

- Read this booklet to familiarize yourself with the Mills-Peninsula benefits program;
- Follow the steps shown in Your Enrollment Guide on page 6 to sign up for benefits;
- Carefully review each issue of the employee newsletter, Weekly Update, as well as all memos entitled "RE: Your Benefits" that are sent to your home or distributed with your paycheck;
- Call the Benefits Office with any questions as well as when a family or job status change affects your benefits.

## Important Note for RNs:

If you are a registered nurse covered by the CNA contract, your labor agreement takes precedence over the benefits described in this booklet and the procedures to be followed in connection with those benefits, to the extent they differ. If you are a per diem employee, you have the option to purchase medical insurance at Mills-Peninsula's cost. If you are a contractual per diem employee, you have the option to purchase medical and dental insurance at Mills-Peninsula's cost.

## Discrepancies between this Benefits Book and official plan documents

This Benefits Book contains brief summaries of the benefit programs Mills-Peninsula provides for eligible employees. The purpose of these summaries is to acquaint employees with the general provisions of the applicable plans. For purposes of brevity and simplicity, they do not contain full statements of each of the terms, conditions and limitations of the plans. Consequently, if there is any real or apparent conflict between this Benefits Book and the terms, conditions or limitations of the official plan documents, the provisions of the official plan documents will control. Employees are therefore encouraged to review those documents for more detailed information concerning the plans. You may request copies of those documents from the Benefits Office.

# Your Mills-Peninsula Health Services Benefits Program

**Effective Dates: 1/1/2007 - 12/31/2007**

Please note that this booklet is intended to summarize the provisions of Mills-Peninsula's benefit plans. Although e effort has been made to ensure the accuracy of this booklet, if this booklet differs from applicable plan documents, the terms and conditions of those documents will prevail. You may request copies of those documents from the Be Office.

Although Mills-Peninsula intends to continue indefinitely the plans described in this booklet, it reserves the right t change, amend, require contributions and change those contributions, and/or to terminate any plan at any time fo active, retired and/or terminated employees. Termination of a plan will not affect any claim incurred while the pla was in force.

## Resources

*Information:*

Benefits Office: Carol Cruise Ext. 5017
Carol Hing Ext. 5784

*Medical Plans:*

MPHS Point of Service Health Plan
Benefit Risk Management Services
administrator - (Group #10081) 1-800-988-8373
customersupport@brmsonline.com

US Scripts Pharmacy Information 1-800-460-8988
(Group #1560)
www.usscripts.com

Mills-Peninsula PPO
Plus and Classic Plans 1-800-988-8373
customersupport@brmsonline.com

Mills-Peninsula Medical Group
Member Services 650-240-8096

Pacificare HMO (66766) 1-800-624-8822
www.pacificare.com

CCN 1-800-988-8373

*Dental Plans:*

Delta Dental Premier Plan 1-888-335-8227
(Group #2444)
www.deltadentalca.org

*Vision Plan:*

Vision Service Plan 1-800-877-7
(Group #108419)
www.vsp.com

*Flexible Spending Accounts:*

Medical Reimbursement 1-800-988-8
Fax: 866-410-(

Dependent Care 1-800-988-8
Fax: 866-410-(

*Voluntary – Sheltered Retirement Plans – 403( Accounts:*

Lincoln Financial Services 1-800-359-8
Rod Acord (Medical Center) 925-659-(
Peter Morris (Health Center) 650-578-8

Fidelity Investments (67797)
Customer Service 1-800-343-(
R.M. Weber Insurance Services
Dan Taylor 1-800-659-3

*Employee Assistance Program:*

Assist U 1-800-750-5

*Long-Term Disability Plans:*

Hartford 1-800-289-9
UNUM 1-800-421-(
MetLife 1-800-300-4

*Sutter Health Retirement Services:*

Lisa Swift A-L 1-916-286-(
Kathy Milam M-Z 1-916-286-8
Or toll free 1-888-280-(

# Your Enrollment Guide

To help you enroll for benefits, the chart below shows your benefit options, the actions you need to take to enroll or waive your participation, and the deadlines.

You will find online benefits (vbas) Reference Guide in the envelope included with this booklet.

During the Annual Enrollment period, online instructions will be available in Human Resources or go to www.vbas.com/sutter.

| Your Benefit Options | Actions to take | Deadlines |
|---|---|---|
| *Medical Plans:* | | |
| Mills-Peninsula Point of Service | Enroll online at www.vbas.com/sutter | Enroll online no later than effective date. ı |
| Mills-Peninsula PPO | Enroll online at www.vbas.com/sutter | Enroll online no later than effective date. ı |
| Pacificare HMO | Enroll online at www.vbas.com/sutter | Enroll online no later than effective date. ı |
| Waive participation (option available online) | Enroll online at www.vbas.com/sutter | Enroll online no later than effective date. ı |
| *Dental Plan:* | | |
| Delta Dental Premier Plan | Enroll online at www.vbas.com/sutter | Enroll online no later than effective date. ı |
| Waive participation | No action required. | None. |
| *Vision Plan:* | | |
| Vision Service Plan | Enroll online at www.vbas.com/sutter | Enroll online no later than effective date. ı |
| Waive participation | No Action required. | None. |
| *Flexible Spending Accounts:* | | |
| Health Care Expense Account and/or Dependent Care Assistance Account | Enroll online at www.vbas.com/sutter | Day before effective date. ı |
| Waive participation | No action required. | None. |
| *Life Insurance Plans:* | | |
| Group Term Life/AD&D Insurance Plan | Enroll online at www.vbas.com/sutter (no option to waive). | As soon as possible and whenever beneficiary designation changes. |
| Optional Life Insurance Plan | Enroll online at www.vbas.com/sutter | Enroll online no later than effective date. ı |
| Long Term Disability Plan | No action required. | None. |
| Retirement Plan | Fill out and return election form. | Submit no later than effective date. ı |
| Voluntary 403(b) Retirement Plan | Contact a representative listed under Resources on page 4, or request carrier information from Benefits Office. | None. |

ı Your effective date is the first of the month following 60 days from your hire date or the date you become eligible for benefits. We recommend you enroll online within one week of your orientation date to ensure ample time for processing prior to your effective date.

# General Health Plan Information

**ection highlights**

he boxed section below is a brief summary of the general rules that apply to all of the medical, dental and vision plans. )etails follow.

*Eligibility**

You must be a benefit status employee and work a regular schedule of at least 40 hours in each biweekly pay period.*

*Enrollment*

Enroll online at www.vbas.com/sutter prior to your effective date. Unless you have a family or job status change or your special enrollment rights apply, you may only change your coverage at annual enrollment. **Note: you must enroll online to participate in health coverage.**

*Costs*

You and Mills-Peninsula share the cost of coverage options. You pay your share of the cost of coverage through pre-tax premiums, which saves you money in taxes.

*Coordination of benefits*

If you are covered by another group health plan in addition to Mills-Peninsula's, the plans work together to pay medical benefits based on which plan is primary and which is secondary.

*When coverage ends*

In most cases, coverage for you and your dependents ends the last day of the month in which you terminate, are no longer a benefit status employee, or request termination of your coverage at annual enrollment or due to a family or job status change.

*Coverage continuation*

If your coverage terminates, you and your dependents may be eligible for medical, dental and vision continuation coverage or may be able to convert to an individual medical plan.

## Am I eligible to participate?

You may participate in the medical, dental and vision plans if you are classified as a benefit status employee on the Mills-Peninsula payroll and work a regular schedule of at least 40 hours in each biweekly pay period.* Your participation begins on your effective date, which is the first of the month after 60 days from your hire date or, if later, your benefit status date.

Persons who, for payroll purposes, are treated as independent contractors or leased employees, even if later determined to be common law employees, are not considered eligible employees under the plan. In addition, employees who are in a job classification covered by a collective bargaining agreement are excluded from coverage under the plan unless eligibility under the plan has specifically been extended to such employees through the collective bargaining agreement.

## Are dependents eligible to participate?

Dependents who are eligible for coverage under the medical, dental and vision plans include your:

- Spouse, unless legally separated or divorced;
- Unmarried children up to age 19 who are more than 50 percent dependent on you for financial support (this includes stepchildren, legally adopted children or children placed for adoption, and children under legal guardianship);
- Unmarried children of any age who are incapable of self-sustaining employment due to a physical handicap or mental retardation before attainment of age 19 and qualify as your dependents for federal income tax purposes;
- For coverage under the Mills-Peninsula Point of Service Health Plan and Mills-Peninsula PPO Plan: unmarried children between ages 19 and 25 if they qualify as your dependents for federal income tax purposes;
- For coverage under the Pacificare, Delta Dental and Vision Service Plan: unmarried children up to 19 and to age 25 if they are full-time students at an accredited school and qualify as your dependents for federal income tax purposes as determined by the claim administrator;

* All per diem employees have the option to purchase medical coverage. Contractual per diem employees may purchase medical and dental coverage. For more information, contact the Benefits Office (see Resources on page 4).

## General Information (continued)

- If dependents are eligible for coverage with both parents, they may not carry dual coverage with MPHS. Employees with spouses or domestic partners also employed by Mills-Peninsula and eligible for benefits may be enrolled in individual plans, or may enroll in a single plan. However, their dependents may only be covered by one parent.

## Can I add new dependents to my medical coverage?

If you have dependents due to birth, adoption, placement of adoption or marriage, you must enroll them within 60 days of the event. Their coverage will be effective as indicated in the chart below right. You and your dependents may not be eligible for all of these plans. See the section on page 16 entitled Your Medical Options. See special enrollment rights on page 59.

## How do I enroll?

Go to www.vbas.com/sutter to enroll no later than your effective date as defined on page 6. If you are covered under another group health plan or an individual health insurance policy and want to waive medical coverage, you must enroll online no later than your effective date. You will be eligible for a cash out payment if you are a benefit status employee and waive benefits online and are not enrolled in your spouse's plan at MPHS. The cash out payment is paid biweekly in your paycheck.

If you do not enroll during your initial enrollment period and later wish to do so, you must wait until the annual enrollment period, unless you have a qualifying family or job status change or qualify under special enrollment rights.

### Dependent coverage effective dates

| | Birth | Adoption | Marriage* |
|---|---|---|---|
| Point of Service | Immediate | Physical custody | Immediate |
| MPHS PPO | Immediate | Physical custody | 1st of next month |
| Pacificare | Immediate | Physical custody | Immediate |
| Delta Dental | 1st of next month | 1st of next month | 1st of next month |
| Vision | 1st of next month | 1st of next month | 1st of next month |
| Flexible Spending Account | 1st of next month | 1st of next month | 1st of next month |

* Enrollment form must be submitted within 60 days of qualifying event for coverage.

## Health Plan Biweekly Contributions*

| | Mills-Peninsula Point of Service Health Plan | Mills-Peninsula PPO Plus | Mills-Peninsula PPO Classic | Pacificare HMO | Vision Service Plan | Delta Dental |
|---|---|---|---|---|---|---|
| **Noncontractuals:** | | | | | | |
| Employee Only | $5.00 | N/A | $12.00 | $12.00 | $3.00 | $3.00 |
| Employee Plus Spouse/Partner | $26.00 | N/A | $28.00 | $28.00 | $5.00 | $6.00 |
| Employee Plus Children | $24.00 | N/A | $26.00 | $26.00 | $5.00 | $6.00 |
| Employee Plus Family | $30.00 | N/A | $35.00 | $35.00 | $5.00 | $8.00 |
| **RN Contractuals:** | | | | | | |
| Employee Only | $0 | $9.23 | $0 | $6.92 | $2.31 | $0 |
| Employee Plus One Dependent | $16.15 | $25.38 | $20.77 | $20.77 | $4.62 | $6.92 |
| Employee Plus Two or More Dependents | $18.46 | $30.00 | $20.77 | $20.77 | $4.62 | $6.92 |

* For per diem, COBRA, and leave of absence rates, contact the Benefits Office.

# Chart of Administration Information for the Mills-Peninsula Benefit Plans

| | Mills-Peninsula Point of Service Health Plan | Mills-Peninsula PPO Plans | Pacificare | Delta Dental Premier Plan | Vision Plan Accounts | Flexible Spending | Life/AD&D Insurance Plan | Supplemental Life Insurance | Long-Term Disability |
|---|---|---|---|---|---|---|---|---|---|
| Plan Name<br><br>Plans | Mills-Peninsula Health Services Point of Service Health Plan | Mills-Peninsula Health Services PPO Classic and PPO Plus | Mills-Peninsula Health Services Pacificare HMO | Mills-Peninsula Health Services Dental Premier Plan | Mills-Peninsula Health Services Vision Service Planning Account | Mills-Peninsula Health Services IRC Section 125 Flexile Spending Benefits for | Group Basic Life & Accidental Death, Dismemberment and Loss of Sight Employees of Program | Group Supplement Life and Dependent Life Insurance for Health Services Employee of Mills-Peninsula | Group Long-Term Disability Plan for Employees of Mills-Peninsula<br><br>Mills-Peninsula Health Services |
| Plan Number | 506 | 506 | 506 | 506 | 506 | 508/509 | 506 | 506 | 506 |
| Type of Plan | Welfare benefit plan; Group medical benefits | Welfare benefit plan; Group medical benefits | Welfare benefit plan; Group medical benefits | Welfare benefit plan; Group medical benefits | Welfare benefit plan; Group medical benefits | IRC Section 125 flexible spending account program | Welfare benefit plan; Group basic life, AD&D, and loss of sight benefits | Welfare benefit plan; Group supplemental life and dependent life benefits | Welfare benefit plan; Group long-term disability benefits |
| Source of Plan Contributions | Mills-Peninsula Health Services and participating employees | Mills-Peninsula Health Services and participating employees | Mills-Peninsula Health Services and participating employees | Mills-Peninsula Health Services and participating employees | Mills-Peninsula Health Services and participating employees | Participating employees | Mills-Peninsula Health Services | Mills-Peninsula Health Services and participating employees | Mills-Peninsula Health Services |
| Plan Year | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 | Jan. 1 - Dec. 31 |
| Type of Administration/ Funding | Benefits are furnished under a health care plan funded by the plan sponsor Benefits are self insured | Benefits are furnished under a health care plan funded by the plan sponsor Benefits are self insured | Benefits are furnished under a health care plan funded by the plan sponsor Benefits are fully insured | Benefits are furnished under a health care plan funded by the plan sponsor Benefits are self insured | Benefits are furnished under a health care plan funded by the plan sponsor Benefits are self insured | Benefits are provided from Mills-Peninsula general assets | Benefits are provided in accordance with the provisions of the applicable group policy | Benefits are provided in accordance with the provisions of the applicable group policy | Benefits are provided in accordance with the provisions of the applicable group policy |
| Plan Administrator | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 650-696-5678 |
| Agent for Service of Legal Process | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 | Mills-Peninsula Health Services 1783 El Camino Burlingame, CA 94010 |

# Exhibit N

STATE OF CALIFORNIA - State and Consumer Services Agency ARNOLD SCHWARZENEGGER, Governor

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
1515 Clay Street, Suite 701, Oakland, CA 94612
(510) 622-2973 TTY (800) 700-2320 Fax (510) 622-2952
www.dfeh.ca.gov

September 19, 2007

Robert Harlan Gold
Attorney at Law
GOLD & ASSOCIATES
235 Montgomery Street
San Francisco, CA 94104

RE: E200708A0014-00-psc
BOCCIGNONE/MILLS-PENINSULA SUTTER HEALTH

Dear Robert Harlan Gold:

**NOTICE OF FILING OF AMENDED CLOSED DISCRIMINATION COMPLAINT**

Enclosed is a copy of your client's amended closed complaint that has been filed with the Department of Fair Employment and Housing in accordance with California Government Code sections 12960 and/or 12980. Also enclosed is a copy of your client's Notice of Case Closure, which constitutes your client's right-to-sue notice.

Please note that under Government Code section 12962, you are responsible for **service of the amended complaint** on respondent(s). You should also enclose a copy of the Notice of Case Closure along with the amended complaint. These documents must be served within **60 days** of the filing date of the amended complaint. Government Code section 12962, subdivision (b), further provides that complaints must be served either personally or by certified mail with return receipt requested.

For additional information, please read the enclosed Notice of Case Closure that explains the conditions for filing a private lawsuit in the State of California.

Sincerely,

Herbert Yarbrough
District Administrator

Telephone Number: (510) 622-2967

Enclosures

Cc: Case file

ARNOLD SCHWARZENEGGER, Governor

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
1515 Clay Street, Suite 701, Oakland, CA 94612
(510) 622-2973 TTY (800) 700-2320 Fax (510) 622-2952
www.dfeh.ca.gov

July 13, 2007

Robert Harlan Gold
Attorney At Law
Gold & Associates
235 Montgomery Street
San Francisco, CA 94104

RE: E200708A0014-00-psc
Boccignone/Mills-Peninsula Sutter Health

Dear Robert Harlan Gold:

**NOTICE OF CASE CLOSURE**

This letter informs that the above-referenced complaint that was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective July 13, 2007 because an immediate right-to-sue notice was requested. DFEH will take no further action on the complaint.

This letter is also the Right-To-Sue Notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

If a federal notice of Right-To-Sue is wanted, the U.S. Equal Employment Opportunity Commission (EEOC) must be visited to file a complaint within 30 days of receipt of this DFEH *Notice of Case Closure* or within 300 days of the alleged discriminatory act, whichever is earlier.

Notice of Case Closure
Page Two

DFEH does not retain case files beyond three years after a complaint is filed, unless the case is still open at the end of the three-year period.

Sincerely,

Herbert Yarbrough
District Administrator

cc:    Case File

Bibbi  Foster
Director of Emergency Department
Mills-Peninsula Sutter Health
1725 El Camino Real
Burlingame, CA  94010

DFEH-200-43 (06/06)

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY                           ARNOLD SCHWARZENEGGER, Governor

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
1515 Clay Street, Suite 701, Oakland, CA 94612
(510) 622-2973 TTY (800) 700-2320 Fax (510) 622-2952
www.dfeh.ca.gov

July 13, 2007

Robert Harlan Gold
Attorney At Law
Gold & Associates
235 Montgomery Street
San Francisco, CA 94104

RE:  E200708A0014-00-psc
     Boccignone/Mills-Peninsula Sutter Health

Dear Robert Harlan Gold:

# NOTICE TO COMPLAINANT'S ATTORNEY

Enclosed is a copy of your client's complaint of discrimination filed with the
Department of Fair Employment and Housing on 7/13/2007 pursuant to the
California Fair Employment and Housing Act, Government Code section 12900 et
seq.  Also enclosed is a copy of your client's Notice of Case Closure, which
constitutes your client's right-to-sue notice.

Please note that under Government Code section 12962, you are responsible for
**service of the complaint** on respondent(s). You should also enclose a copy of the
Notice of Case Closure along with the complaint.  These documents must be
served within **60 days** of the filing date of the complaint.  Government Code
section 12962(b) further provides that complaints must be served either personally
or by certified mail with return receipt requested.

For additional information, please read the enclosed Notice of Case Closure that
explains the conditions for filing a private lawsuit in the State of California.

Sincerely,

Herbert Yarbrough
District Administrator

Enclosure:  Complaint of Discrimination
            Notice of Case Closure
DFEH-200-06 (01/05)

ARNOLD SCHWARZENEGGER, Governor

TATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**

515 Clay Street, Suite 701, Oakland, CA 94612
510) 622-2973 TTY (800) 700-2320 Fax (510) 622-2952
www.dfeh.ca.gov

July 13, 2007

Robert Harlan Gold
Attorney At Law
Gold & Associates
235 Montgomery Street
San Francisco, CA 94104

RE: E200708A0014-00-psc
Boccignone/Mills-Peninsula Sutter Health

Dear Robert Harlan Gold:

**NOTICE OF CASE CLOSURE**

This letter informs that the above-referenced complaint that was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective July 13, 2007 because an immediate right-to-sue notice was requested. DFEH will take no further action on the complaint.

This letter is also the Right-To-Sue Notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

If a federal notice of Right-To-Sue is wanted, the U.S. Equal Employment Opportunity Commission (EEOC) must be visited to file a complaint within 30 days of receipt of this DFEH *Notice of Case Closure* or within 300 days of the alleged discriminatory act, whichever is earlier.

Notice of Case Closure
Page Two

DFEH does not retain case files beyond three years after a complaint is filed, unless
the case is still open at the end of the three-year period.

Sincerely,

Herbert Yarbrough
District Administrator

cc:    Case File

Bibbi  Foster
Director of Emergency Department
Mills-Peninsula Sutter Health
1725 El Camino Real
Burlingame, CA  94010

DFEH-200-43 (06/06)

# Exhibit O

The BRMS Advantage

▸ TRUSTED AND VALUED RELATIONSHIPS

▸ BENEFIT ADMINISTRATION WITH VBAS®

▸ CASE STUDIES AND TESTIMONIALS

Vbas®

## The BRMS Advantage

*BRMS focuses on building quality relationships*

**Personal Service and Genuine Care**

We work directly with each customer - on a personal level - to ensure we align with your corporate goals, improve your employee benefit efficiency and effectiveness, and reduce your healthcare costs.

With a senior member of our executive team overlooking all accounts, and an Account Management Team (consisting of a seasoned Account Executive who is supported by Account Representatives and a toll free Customer Support Call Center), each client receives personal care and direct access to the answers they need.

**Your Account Management Team**

- Senior BRMS Executive
  - Account Executive
    - Account Representative
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep
    - Account Representative
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep
    - Account Representative
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep
    - Account Representative
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep
      - Customer Support Rep

**Building Trusted & Valued Relationships to Reduce Healthcare Costs**

BRMS focuses on building quality relationships — both internally and externally — to ensure we align with your corporate healthcare goals, and reduce your costs, so you can focus on building relationships with your employees.

home | © 2006 brms | California web design by gravitate design studio
the brms advantage | about us | services | contact us | site map | privacy policy

Learn More

**Exclusive Employee Benefit Administration Technology**
Our Virtual Benefits Administration System (Vbas®) is BRMS' exclusive, proprietary technology solution that manages your member's benefit data, eligibility, enrollment, reporting and consolidated billing online.

Vbas® empowers employers and employees to manage the entire benefit process via the Internet, eliminating timely processes, paperwork and errors.

**Employer Advantage**

- One secure database houses all employee data
- Online communication reduces paperwork
- Automated systems enforce plan eligibility
- Billing reconciliation reduces errors
- Consolidated billing provides one invoice
- HR and Payroll data exchange saves time and ensures data integrity
- Pre-scheduled custom reports are ready when you need them

**Employee Advantage**

- Empowerment to manage their own benefits
- 24-7 online access anytime, anywhere
- Toll-free customer support to answer benefit questions

Learn More

**Experience & Knowledge**
BRMS' experienced senior management team has been working in the employee benefit industry since the mid-1970's and is comprised of inventive seasoned professionals, continuously developing creative solutions that contain healthcare costs.

*As a result [of using Vbas ®], we were able to make better benefit decisions and cut our administration costs in half.*

Managing over $600 million in employee benefit premiums annually, our executives are known for providing valuable insight to HR professionals and health insurance committees on a multiplicity of employee benefit management topics, including:

nefit and Risk Management Services – employee benefit administration solutions

Employee benefit risk assessments and plan management

*Stockton School District*

Creative funding options

Custom, hands-on consultation

Advanced web-based administration solutions

Ongoing education on new regulations, compliance issues and industry standards

Learn More

brms™
Benefit & Risk Management Services

HOME
PROVIDER DIRECTORY
VBAS® MEMBER ACCESS
BROKER SITE

The BRMS Advantage | About Us | Services | Contact Us | Broker Site




▸ WHITE PAPERS
▸ PRESS RELEASES
▸ EXECUTIVE TEAM
▸ EDI CARRIERS
▸ JOB OPPORTUNITIES
▸ BROKER SITE

**Mission:**
To exceed our customer's expectations by improving healthcare information access and management, simplifying the benefit administration process, and reducing healthcare costs with best-in-class technology and well-trained staff.

## Benefit Administration & Healthcare Risk Management Specialists

Established in 1994, Benefit & Risk Management Services, Inc. (BRMS) is a leading benefit administrator and healthcare risk manager that delivers innovative technology and administration solutions that control rising healthcare costs.

*Leading benefit administrator and healthcare risk manager*

One of the first to introduce employee benefit administration technology solutions, our services are powered by our exclusive Virtual Benefits Administration System (Vbas®) — a proprietary database and administration system that allows employers to save time and money by automating management of the benefit supply chain and empowering employees to self-service their benefits.

Our clientele includes both public and private sector organizations, including industry leading IT companies, vineyards, hospitals, credit unions, homebuilders, school districts, unions and more.



**Education Division**
*Custom Solutions for the Special Challenges Schools Face*
As employee benefit and healthcare managers, we have led the education industry in creative membership and eligibility administration solutions. One of our first clients was a California Unified School District. Ten years later, we are still containing costs for that same client along with over 50 other School Districts throughout the state. In addition, BRMS is helping school districts throughout the country – from New York to California, and Florida to Idaho — to contain their benefit costs with our innovative administration and technology solutions.



Vbas®

home | the brms advantage | about us | services | contact us | site map | privacy policy

© 2006 brms | California web design by gravitate design studio

With a special Education Division, staffed by a team of industry veterans with dedicated experience in the Education market, we help School Districts throughout the nation to streamline and reduce employee benefit expenses. Contact us for more information.

View our Education Market Case Studies

**Healthcare Division**

*Specializing in Healthcare Service*

*Provider Employee Benefits*

BRMS has extensive experience in working with healthcare service providers, from large hospitals to mental health, counseling, and care program providers, to name a few. Presently, BRMS manages the consolidated billing and eligibility, as well as the COBRA, FSA, HIPAA and retiree healthcare accounts for over 40 Healthcare facilities representing more than 35,000 employees. In addition, we offer various levels of TPA services designed especially for hospitals and other healthcare service providers who have self-insured their Medical, Dental and Visions programs. These lives all have multi-level network benefits in which BRMS has purchased or contracted (on their behalf) one or more of the network tiers.

Given our extensive expertise in managing the unique challenges that healthcare organizations face when considering self-funding, many providers turn to BRMS to reduce their risk and increase their administration efficiencies. Contact us for more information.

**BRMS Services:**

Vbas® Online Benefit Administration & Enrollment

- Employee Communication
- Online Enrollment
- Data Management
- EDI Transfers

- Automated Reports
- Benefit Statements
- Consolidated Billing

Third Party Administration Services

- Claims Administration
- FSA/HSA/HRA Administration
- COBRA Administration
- Customer Support Call Center
- Auditing

Risk Management

- Risk Assessment and Insurance Underwriting
  - Self-Insured Coverage
  - Fully-Insured Coverage
  - Re-Insurance Underwriting and Placement
- Medical Management
- Utilization Review
- Data Warehousing & Reporting
- PPO Network Management

**Benefit & Risk Management Services, Inc.**
10860 Gold Center Drive, Suite 300
Rancho Cordova , CA 95670
Toll Free: 800.959.4767
Phone: 916.858.2950
Fax: 916.858.2970
Email: info@brmsonline.com